State of WISCONSIN, Plaintiff,

v.

THE STOCKBRIDGE–MUNSEE COMMUNITY and Robert Chicks, Defendants.

No. 98–C–0871.

United States District Court, E.D. Wisconsin.

Sept. 30, 2004.

John S Greene, Assistant Attorney General, Wisconsin Department of Justice, Madison, WI, for Plaintiff.

Brian L Pierson, Paul W Stenzel, von Briesen & Roper, Milwaukee, WI, John W Hein, von Briesen & Roper, Milwaukee, WI, Sharon Greene–Gretzinger, Stockbridge–Munsee Community, Bowler, WI, for Defendant.

## DECISION AND ORDER

GORENCE, United States Magistrate Judge.

### *NATURE OF CASE*

The plaintiff, State of Wisconsin, filed this action on September 3, 1998, against the defendants, alleging that defendant Stockbridge–Munsee Community Band of Mohican Indians (Tribe) was operating Class III electronic games of chance at the Pine Hills Golf and Supper Club (Pine Hills) which are specifically prohibited by the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.* The complaint also alleges that the State of Wisconsin and the Tribe entered into the Stockbridge–Munsee Community and State of Wisconsin Gaming Compact of 1992 (compact) for the conduct of Class III gaming as required by 25 U.S.C. § 2710(d)(1)(C). The complaint states that, by its terms, the compact limits the operation of such games of chance to locations "on tribally owned land or land held in trust by the United States on behalf of the tribe, *but only on such lands within the exterior boundaries of the tribal reservation.*" (Complaint ¶ 13 [quoting Compact, Section XV, Part H (emphasis added)]).

The plaintiff asserts in the complaint that the Tribe obtained the Pine Hills property and in December 1995, conveyed it to the United States of America to be held in trust for the benefit of the Tribe pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 465. *Id.* ¶¶ 16–17. The plaintiff maintains that operation of Class III electronic games of chance at the Pine Hills location is not permitted by the express terms of the compact because the land is located outside the boundaries of the Tribe's reservation and because Pine Hills does not meet the requirements of 25 U.S.C. § 2719(b)(1)(A). *Id.* ¶¶ 19, 20–21. In addition to injunctive relief, the complaint sought a declaration of the current boundaries of the reservation.

The State of Wisconsin moved for a preliminary injunction requiring the cessation of Class III gaming activities at Pine Hills. Following a hearing and full briefing on the motion, the court determined that the 1871 Act had diminished the reservation, leaving only the 18 sections reserved from sale as the Tribe's new reservation. *Wisconsin v. Stockbridge–Munsee Community*, 67 F.Supp.2d 990 (E.D.Wis.1999). Because the gaming activity at issue was not located on the 18 sections comprising the reservation, the court granted the preliminary injunction by order dated October 4, 1999.

Apart from the Tribe's ability to operate gaming at Pine Hills, there is another dispute between the State and the Tribe related to the boundary question. A number of tribal members living in the area in dispute, that is, within the original two-township reservation but outside the territory the State contends comprises the current reservation, are exempt from state income taxation only if they both reside and work on the reservation. The Tribe brought a counterclaim seeking a declaratory judgment that the 1856 boundaries of the reservation remain intact and an injunction barring the State from imposing income tax on tribal members residing within those borders with respect to income earned on the reservation. *See* Defendant's Counterclaim filed on April 28, 2000.

To address this matter, the parties agreed that pending final resolution of the boundary issue, the Tribe will withhold from the wages of affected tribal members—and hold in escrow—an amount equal to state income tax withholding. The parties further agreed that upon final judicial resolution of the reservation boundaries, the escrowed funds will be released either back to the tribal members, if they are found to reside within the reservation, or will be paid to the State, if the tribal members are found to reside outside the reservation. The court accepted the parties' stipulation by order dated April 12, 2000.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. § 636(b)(1)(B) and General Local Rule 72.1 (E.D.Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73.1 (E.D. Wis.).

Defendants Stockbridge–Munsee Community and Robert Chicks filed a motion for summary judgment on March 1, 2002. (Docket # 100). The motion was almost fully briefed when the death of the plaintiff's expert witness necessitated new briefing. Thereafter, supplemental expert witnesses were named and a revised briefing schedule was set. The United States then moved to filed a brief as *amicus curiae* in support of the defendants' assertion that the boundaries of the two-township reservation remained intact following the implementation of the Act of February 6, 1871, and the Act of June 21, 1906. The court granted the United States' motion. The defendants' motion for summary judg-ment is now ready for resolution and will be addressed herein.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *McNeal v. Macht*, 763 F.Supp. 1458, 1460–1461 (E.D.Wis.1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial—(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law—is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267, 106 S.Ct. 2505; *see also, Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548 ("proper" summary judgment motion may

be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ...."); Fed. R.Civ.P. 56(e). "Rule 56(c) *mandates* the entry of summary judgment, ... upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548 (emphasis added). In granting summary judgment, a " 'court may consider any material that would be admissible at trial,' including properly authenticated and admissible documents or exhibits." *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir.2001) (quoting *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir.2000) (additional citations omitted)).

Civil Local Rule 56.2 (E.D.Wis.) sets forth additional requirements for motions for summary judgment. The court of appeals for this circuit "repeatedly upheld the strict enforcement of the requirements of district court local rules." *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir.1994).

Specifically, Civil L.R. 56.2(b)(1) provides that any response to a motion for summary judgment "must include:"

> A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists.

Likewise, Civil L.R. 56.2(b)(2) further provides that the movant responding to the opposing party's findings of fact must do so "in accordance with the provisions of subparagraph (b)(1) of this rule." To the extent a party has not provided evidentiary support for its proposed findings of fact or in opposition to a particular proposed finding of fact, such party has not raised an arguable factual dispute. *See* Civil L.R. 56.2. Moreover, Civil L.R. 56.2(e) provides that the court *must* conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out.

### *Relevant Undisputed Facts* [1]

#### *The Parties*

Plaintiff State of Wisconsin (State) is a sovereign state of the United States. Defendant Stockbridge–Munsee Community (Tribe) is a sovereign federally-recognized Indian tribe (62 Fed.Reg. 55,273 [1997] ) with a reservation located in Shawano County, Wisconsin, within the Eastern District of Wisconsin. Defendant Robert Chicks is President of the Stockbridge–Munsee Mohican Community. His duties include presiding over the affairs of the Tribe. The events giving rise to the claim asserted in this action have occurred, and continue to occur, in this judicial district.

#### *Pine Hills*

Pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701 *et seq.,* the State of Wisconsin and the Stockbridge–Munsee Community entered into a tribal-state compact authorizing the Tribe to conduct Class III gaming, as required by 25 U.S.C. § 2710(d)(1)(C). Class III

---

1. As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed and the court's findings of fact in its Memorandum and Order granting the plaintiff's Motion for Preliminary Injunction filed October 4, 1999. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

gaming is defined by the Indian Gaming Regulatory Act, 25 U.S.C. § 2703(8) to include electronic games of chance such as slot machines. The state and the Tribe renewed and amended the compact in 1998, but the provisions of relevance to this case were unchanged.

The compact's terms limit the operation of electronic games of chance to locations "on tribally-owned land or land held in trust by the United States on behalf of the Tribe, but only on such lands within the exterior boundaries of the tribal reservation." (Compact, Section XV, Part H). Pursuant to the compact, since 1992, the Tribe has operated Class III electronic games of chance at North Star Casino and Bingo (North Star) located within the exterior boundaries of the Tribe's reservation, at W12180A County Road A, Bowler, Wisconsin.

In 1993, the Tribe purchased property known as the Pine Hills Golf and Supper Club (Pine Hills), located at N9498 Big Lake Road, in the Town of Red Springs, Shawano County, Wisconsin. In December 1995, the Tribe conveyed the property to the United States of America to be held in trust for the benefit of the Tribe pursuant to the Indian Reorganization Act of 1934 (25 U.S.C. § 465). This property lies within Section 2 of the Township of Red Springs.

Pine Hills lies within the boundaries of the two-township reservation set apart for the Tribe by virtue of the Treaty between the Menominee Tribe and the United States (Treaty with the Menominee, February 11, 1856, 11 Stat. 679 [MD 45])[2], in fulfillment of the obligation to do so contained in the Treaty between the Tribe and the United States in 1856. (Treaty with the Stockbridges and Munsees, Feb-

ruary 5, 1856, 11 Stat. 663 [MD 25–41]). Pine Hills does not lie within the 18 sections reserved from sale pursuant to the Act of 1871; nor does it lie within the lands administratively proclaimed to be part of the reservation in 1937 and 1948, or by Congress in the 1972 Act. On August 28, 1998, the Tribe began operating Class III electronic games of chance, namely slot machines, at Pine Hills.

### Background History of the Tribe

The Tribe is comprised in large part of descendants of the Mohican Tribe that inhabited a large territory in the Hudson River Valley in the early 17th century. They encountered Henry Hudson on his exploratory voyage of 1610. The Mohican Tribe competed with tribes belonging to the Iroquois Federation for control of the Dutch fur trade. *See* Brasser, T.J. "Mahican," *Handbook of North American Indians*, vol. 15, pp. 198–212 (1978); Dunn, Shirley, *Mohicans and Their Land 1609–1730*; Frazier, Patrick, *The Mohicans of Stockbridge* (1992). In about 1735, a large portion of the Tribe agreed to accept a Christian mission and settled in the village of Stockbridge, Massachusetts on the Housatonic River.

During the Revolutionary War, the Tribe fought on the side of the United States. After the Revolutionary War, the Tribe, having lost most of its lands at Stockbridge to white settlers, resettled in the Hudson River Valley at the invitation of the Oneida Tribe. The Tribe traveled to its new home in New York under a safe conduct document issued by General George Washington.

Under pressure from white settlers, the Oneidas and Stockbridges agreed to relo-

---

**2.** MD refers to Master Documents submitted by the parties in support of their summary judgment motions.

cate to Wisconsin. The Stockbridge–Munsee Indians emigrated from New York to Wisconsin beginning around 1821. During the removal era (the Removal Act was passed in 1830), the objective of the federal government was to remove Indian tribes to lands in the West beyond the boundaries of white settlements in exchange for their territory in the eastern United States. *See* Felix S. Cohen, *Handbook of Federal Indian Law* at 28, 78 (1982 ed.).

Through a series of treaties made with the Menominee Tribe and the United States, the Stockbridge–Munsee Tribe was provided with a two-township reservation on the eastern shore of Lake Winnebago where the Tribe established the town of Stockbridge. (Treaty with the Menominee, February 8, 1831, 7 Stat. 342; Treaty with the Menominee, February 17, 1831, 7 Stat. 346; Treaty with the Menominee Nation, October 27, 1832, 7 Stat. 405 [MD 1–5] ). In an 1839 treaty with the United States, the Tribe ceded those lands in exchange for money to explore another location in the West and other benefits. (Treaty with the Stockbridge and Munsee, September 3, 1839, 7 Stat. 580 [MD 6–7] ). After white citizens pressured the government to open the Calumet County farmlands for settlement, the government proposed that the Tribe be relocated west of the Mississippi River. Various statutes and treaties were negotiated and enacted to achieve that result but were never implemented.

An Act of Congress in 1843 disestablished the Tribe and its reservation, leaving the Tribe with no reservation rights. (Act for the relief of the Stockbridge tribe of Indians in the Territory of Wiskonsan. March 3, 1843 [MD 9–11] ). Patents in fee simple were to issue to the tribal members who thereafter would become "citizens of the United States." *Id.* Sec. 7 (MD 11).

The Act also provided that members of the Tribe would receive fee simple patents for their lands at the Lake Winnebago reservation and that, following the filing of the Secretary's report, every tribal member would become a citizen of the United States and of the Wisconsin Territory and be subject to the laws of the territory. The Act further provided that the "jurisdiction of the United States and of said Territory shall be extended over the said township or reservation now held by them, in the same manner as over other parts of said Territory; and their rights as a tribe or nation, and their power of making or executing their own laws, usages or customs as such tribe, shall cease." *Id.* Sec. 7 (MD 11).

The Tribe at this time basically was divided into two opposing camps: the Citizen party and the Indian party. The Citizen party favored relinquishing tribal status in return for United States citizenship and receipt of individual parcels of tribal land in fee simple. The Indian party wanted to preserve the tribal status and culture. This factional conflict impacted on the Tribe's dealings with the United States.

The Act of 1843 was repealed in 1846. (Act of August 6, 1846, Ch. 85, 9 Stat. 55 [MD 12–13] ). The Act of 1846 re-established the Tribe to all of its rights and privileges as though the Act of 1843 had not been passed. The Act provided for the enrollment of Stockbridge–Munsee tribal members who desired citizenship and further provided that the tribal land be divided into two districts, the Indian District and the Citizen District based on the numbers in these respective parties. *Id.* Sec. 2, (MD 12–13). The lands in the Indian District were to be held in common, while those in the Citizen District were to be divided and allotted to each Indian who became a citizen. *Id.* Sec. 3, (MD 13).

Upon completion of the division and allotment,[3] patents would be issued and a title in fee simple to the lot of land would vest in the patentee. *Id.* The Act further provided that Indians who became citizens would forfeit all rights to receive any portion of the annuity which may at the time or in the future be due the Tribe. *Id.* Sec. 2 (MD 13).

In 1848, the Tribe entered into a treaty with the United States. (Treaty with the Stockbridge Tribe of Indians, November 24, 1848, 9 Stat. 955 [MD 15–24] ). The treaty stated in relevant part:

> The said Stockbridge tribe of Indians renounce all participation in any of the benefits or privileges granted or conferred by the act of Congress entitled "An Act for the relief of the Stockbridge tribe of Indians, in the Territory of Wisconsin," approved March 3, 1843, and relinquish all rights secured by said act; and they do hereby acknowledge and declare themselves to be under the protection and guardianship of the United States, as other Indian tribes.

*Id.* Art. I (MD 15–16). The Tribe again agreed to "sell and relinquish" its lands on the east side of Lake Winnebago. *Id.* Art. III (MD 16). In consideration for this "cession and relinquishment," the government agreed to make certain monetary payments. *Id.* Art. V (MD 16). The Tribe was permitted to remain upon the lands for one year after the ratification of the agreement and agreed to "remove to the country set apart for them, or such other west of the Mississippi River as they may be able to secure." *Id.* Art. VII (MD 17).

A majority of the Tribe, however, did not want to relocate but preferred a new location in Wisconsin. Other tribal members desired to sever their tribal relations and to receive patents for the lots of land which they occupied. The intra-tribal conflict between the Citizen party and the Indian party continued.

### The Treaty of 1856

In the early 1850s, a new Indian policy emerged which was based on the idea that Indians could be taught the skills of civilization on reservations within their home territory. George Manypenny, Commissioner of Indian Affairs from 1853 to 1857, along with Charles Mix, Chief Clerk of the Indian Office, were the chief architects of the reservation policy.

The main objectives of the new policy were to concentrate Indians by reducing their land bases through land cessions which would encourage agriculture and discourage native subsistence practices and to settle Indians on reservations as a means to both protect them through the use of strong external boundaries and to more efficiently provide services at the same time. In addition, the Indians would learn the benefit of private property and labor by allotting land to each family in severalty. After a period of time, this land would be patented to the family in fee simple. In a letter to Francis Huebschmann, the Superintendent of the Northern Superintendency, Commissioner Ma-

---

3. Allotment is a term of art in Indian law which refers to the distribution to individual Indians of property rights to specific parcels of reservation. *Yankton Sioux Tribe v. Gaffey,* 188 F.3d 1010, 1015–1016 (8th Cir.1999) (citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 142, 92 S.Ct. 1456, 31 L.Ed.2d 741 [1972] ). "Indian allotment" refers to land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation. *See* Cohen, *Handbook of Federal Indian Law,* at 40. Allotment describes either a parcel of land owned by the United States in trust for an Indian ("trust" allotment) or owned by an Indian subject to a restriction on alienation in favor of the United States. ("restricted fee" allotment). *Id.* at 615–616.

nypenny instructed the superintendent to negotiate a treaty with the Stockbridge–Munsee with the goal, if possible, to unite and settle those Indians together.

In 1852, Commissioner Manypenny wrote a letter to John Quinney and Ziba Peter, members of the Stockbridge–Munsee Tribe, stating that the only reason he would recommend the negotiation of a new treaty to begin with would be "to bring together and unite in harmony as one people, at some suitable location, all members of the Stockbridge and Munsee tribes, wherever situated." (Report of Charles E. Cleland, "The History of the Stockbridge and Munsee Reservation in the Context of Federal Indian Policy," June 1, 2001 [Cleland Report] at 35 [quoting April 28, 1852, letter of Commissioner Manypenny to John Quinney and Ziba Peter]).

Two treaties established the Tribe's 1856 reservation. On February 5, 1856, the Tribe and the United States entered into a treaty which provided that a tract of land of not more than two townships be set aside for the Tribe near the southern boundary of the Menominee Reservation. (Treaty with the Stockbridge and Munsee, February 5, 1856, 11 Stat. 663 [MD 25–41]).

In order to fulfill the promise of the first treaty, on February 11, 1856, the Menominee Indian Tribe and the United States entered into a treaty. In that treaty, the Menominee Tribe ceded and relinquished to the United States a tract of land, "not to exceed two townships in extent . . . for the purpose of locating thereon the Stockbridge and Munsee Indians, and such others of the New York Indians as the United States may desire to remove to the said location within two years after the ratification hereof." (Treaty With the Menominee, February 11, 1856, 11 Stat. 679, Art. 1 [MD 45–46]).

Under the treaty with the Stockbridge–Munsee Tribe, the United States agreed to give the Tribe "a tract of land . . . near the southern boundary of the Menominee reservation." (Treaty with the Stockbridge and Munsee, February 5, 1856, Art. II [MD 27]). The tract was to be sufficient "to provide for each head of a family and others lots of land of eighty and forty acres." *Id.* The treaty included that "every such lot . . . contain at least one half of arable land." *Id.* It also required that "sufficient land shall be reserved for the rising generation." *Id.* Art. III (MD 28). In return, the Tribe agreed to "cede and relinquish to the United States" all their remaining right and title to lands in the town of Stockbridge, Wisconsin and lands in Minnesota set aside for them by the amendment to the 1848 treaty. *Id.* Art. I (MD 27).

The preamble of the treaty recounted the lengthy history of dealings between the Tribe and the United States and the internal problems and conflicts within the Tribe. *Id.* Preamble, ¶¶ 1–7 (MD 26). The treaty acknowledged that a majority of the Stockbridge and Munsee Tribe were adverse to removing to Minnesota and preferred a new location in Wisconsin "to resume agricultural pursuits, and gradually to prepare for citizenship." *Id.* ¶ 8 (MD 26). It was also recognized, however, that a number of other tribal members desired to sever their tribal relations and to receive patents for the lots of land which they occupied at the time. *Id.* The final paragraph stated:

> Whereas the United States are willing to exercise the same liberal policy as heretofore, and for the purpose of relieving these Indians from the complicated difficulties, by which they are surrounded, and to establish comfortably together all such Stockbridges and Munsee—wherever they may be now located, in Wisconsin, in the State of New York, or

west of the Mississippi—as were included in the treaty of September third, one thousand eight hundred and thirty nine, and desire to remain for the present under the paternal care of the United States government; and for the purpose of enabling such individuals of said tribes as are now qualified and desirous to manage their own affairs, to exercise the rights and to perform the duties of the citizen, these articles of agreement have been entered into.

*Id.* ¶ 9 (MD 27).

The 1856 treaty provided that, after the lands set aside for the Tribe were selected, the United States would have the lands surveyed and allotted "among the individuals and families of their tribes." *Id.* Art. 3 (MD 27). The treaty further provided that each head of a family was entitled to eighty acres of land and if the family consisted of more than four members and if thought expedient by the council of the Stockbridge and Munsee, an additional eighty acres could be allotted to him or her. *Id.* Art. 3 (MD 28). Each single male person above eighteen years of age was entitled to eighty acres and each female person above age eighteen "not belonging to any family," and any orphan child was entitled to forty acres and "sufficient land shall be reserved for the rising generation." *Id.*

The treaty further provided that after the allotments were made, the persons entitled to the land could take immediate possession and certificates would be issued guaranteeing and securing their possession and an ultimate title to the land. *Id.* The treaty stated that such certificates would not be assignable and would contain a clause expressly prohibiting the sale or transfer of the land by the holder. *Id.* Under the treaty, the United States would hold the land in trust for ten years for the holders of the land. *Id.* After ten years,

with the consent of the Stockbridge and Munsee council, patents for the land would be issued. *Id.* The purpose of the treaty was to "advance the welfare and improvement" of the Indians and to that end, the treaty provided that the President of the United States, with the advice and consent of the Senate, may "adopt such policy in the management of their affairs," as in his judgment may be most beneficial to the Stockbridge–Munsee Indians, "or Congress may, hereafter, make such provision by law, as experience shall prove to be necessary." *Id.* Art. X (MD 29).

There is no surplus-land provision in the Stockbridge–Munsee Treaty of 1856. Such a provision was used in some other treaties in the Manypenny era when the United States wanted to set up a temporary reservation for a tribe believed to be on the verge of protecting its own interests. In the case of such a reservation, after the tribe had selected allotments, the remaining land was returned to the government land office for public sale. (Cleland Report at 37–38; James W. Oberly, "The Stockbridge–Munsee Reservation, 1856–2001," May 2001 [Oberly Report] at 16).

Two townships which were formerly part of the Menominee Reservation comprised the 1856 Stockbridge–Munsee Reservation. A township contains 36 sections each of which is one mile square. Thus, the 1856 reservation contained a total of 72 sections. The two townships, now known as the towns of Bartelme and Red Springs, are located on Ranges 13 and 14 East, Township 28 North, Shawano County, Wisconsin, the 4th Prime Meridian. Although the February 5, 1856, treaty with the Stockbridge and Munsee Tribe guaranteed the Tribe a new reservation, it was also intended to further the goal of gradually making the tribal members independent of government control and protection.

After the Tribe relocated to its new reservation, tribal members selected 80– and 40–acre allotments pursuant to the 1856 Treaty. The land within the townships was unfit for farming as it contained poor, sandy soil and a very short growing season. The land was also densely forested with pine and hardwoods. In the years immediately following 1856, Stockbridge–Munsee tribal members struggled to survive as crops failed due to cold weather or insects. By 1860, many tribal members were starving.

In 1865, United States government officials took the view that the land granted to the Tribe was not subject to the usual grant of the sixteenth section of each township made by the United States to a new state entering the Union. Normally, on the date of admission to the Union, the United States granted the sixteenth section from the public domain lands to each State for the support of public education.

The allotments and patenting were eventually carried out. However, it was not until 1910 and three congressional enactments later—in 1871, 1893, and 1906—that all lots on the reservation were patented in fee simple and in severalty to individuals.

### The 1871 Act

During the 1860s, there was widespread dissatisfaction with the quality of the soil on the reservation. The new reservation with its "cold and barren sand hills" proved unfit for agriculture. (Annual Report of United States Indian Agency, Green Bay, Wisconsin dated September 23, 1966 [MD 54]). In this report, the agency stated that approximately 152 tribal members currently resided on the reservation and that because of the "forbidding character of their country," they could not realize a meager subsistence without occasional supplies from the government. *Id.* The report noted that these circumstances

"bred discontent" among tribal members who desired "a remodeling of their treaty stipulations, believing that any change must be an improvement upon their present condition." *Id.*

In a letter to Congress signed by John Hendricks, sachem, and eighty-three others dated January 6, 1863, members of the Tribe expressed their dissatisfaction with the poor quality of the land and their belief that the land provided for them as a result of the 1856 treaty was not the one promised, "nor the one for which the treaty was signed." (Appendix to Defendants' Brief in Opposition to Motion for Preliminary Injunction at 229). The tribal members stated that the soil was sand and the location too far north to allow adequate time for crops to mature. They noted that the presence and type of timber on the land "would do for a lumbering community but not for us, who are just emerging from the Indian state, to become an agricultural people." *Id.* It was widely believed by the Indians and government officials alike that the Stockbridge reservation was "totally worthless-except for its pine timber." (Cleland Report at 57).

The Office of Indian Affairs (OIA), precursor of the modem Bureau of Indian Affairs (BIA), refused to allow individual tribal members to log their selections because the selections were not legally confirmed as allotments. The OIA also opposed logging on the ground that it had a demoralizing effect on Indians. Unable to log, tribal members had no viable means of earning a living and became impoverished. The OIA also opposed simply selling the timber without the land due to the prior abuses of lumber contractors who had cleared more area than their contracts had allowed.

Because the land on the 1856 reservation had never been formally allotted to individual tribal members as called for un-

der the Treaty, the OIA viewed the timber as held in common by the Tribe. Ownership in common prevented individuals from even clearing timber for a homestead, much less lumbering for cash. With no means of income and stagnancy in clearing land for homesteads, tribal members suffered poverty, hunger, misery and despair through the 1860s.

The internal dissension within the Tribe also continued. Jeremiah Slingerland and Darius Charles, Stockbridge–Munsee tribal members, emerged as the leaders of the Tribe. They maintained a veil of legitimacy through fraudulent elections and represented themselves to the outside world as tribal delegates.

During the 1850s and 1860s, the Wisconsin market for merchantable lumber remained strong and Wisconsin's lumber companies sought new sources of timber from the Stockbridge–Munsee and Menominee Reservations. Congressman Philetus Sawyer represented the district where the Stockbridge–Munsee Reservation was located.[4] Congressman Sawyer was also president of the First National Bank of Oshkosh and proprietor of P. Sawyer and Sons Lumber Mills.

By the late 1860s, the forests of Shawano County had been logged up to the lands of the Stockbridge–Munsee and Menominee Indians. Stockbridge–Munsee tribal members estimated in 1870 that the reservation held 150 million board feet of pine timber. Congressman Sawyer did not support selling the rights to stumpage only because such a plan would lead to abuse. Loggers would cut more that they would be entitled to unless the land was subdivided, appraised and sold to individual buyers who presumably would more jealously protect their land.

In the late 1860s, Congressman Sawyer began his effort to gain access to the timber on the Stockbridge–Munsee Reservation otherwise forbidden due to its federally-protected status as land held for the benefit of the Indians. Various ideas arose, including selling the timber at auction with a minimum price per thousand board feet or selling it at a minimum cost per acre. However, certain areas within the reservation contained no pine and therefore would not sell. A checkerboard effect would defeat the idea of selling the entire reserve so that a new home could be found for the Tribe in a place with better agricultural land. Congressman Sawyer worked together with Mr. Slingerland and Mr. Charles to meet their objectives of disenfranchising their political enemies, the Citizen party, while at the same time moving the Tribe to better agricultural land.

By the late 1860s, the Indian and Citizen factions each put forth their own solution to the problems on the reservation. The Indian party plan favored relocating where better land was available in Kansas, North Dakota or among the Oneida in Green Bay. The Citizen party favored a plan to generate income by cutting and marketing the pine timber that flourished on the reservation. Both options had major obstacles. There was little other land available since the Oneida refused to give up any of their land. Cutting timber for cash was against long-standing policy of the OIA.

The Tribe continued to make repeated complaints to Congress about the conditions on the reservation, including a petition submitted in November 1866 to the Commissioner of Indian Affairs signed by members of both tribal factions. The petition recounted that the Tribe had "continued from year to year, to set forth their

4.  Philetus Sawyer, a Republican, served in the United States House of Representatives from 1865 to 1875. He served in the United States Senate from 1881 to 1893.

grievances and complaints, praying their Great Father for relief, and a new country furnished in some more hospitable climate." (Petition of November 19, 1866, at 1 [MD 56]). Having failed in their earlier efforts, the tribal members "repeat the urgency of their matters, by respectfully praying you our Great Father to grants us a new Treaty, whereby we can be delivered from our present troubles" and "be brought into a more congenial country." *Id.*

The Commissioner obliged the Tribe's request for a new treaty and a draft treaty was negotiated and signed by tribal representatives and federal officials in February 1867. (Draft Treaty with the Stockbridges and Munsees in Wisconsin, February 15, 1867 [MD 70–76]). By its express language, the Tribe was to "cede and relinquish to the United States" all the rights, title and interest held by the Tribe, individually or collectively, in the two townships. *Id.* Art. I (MD 71). The treaty also called for a new reservation for those who aligned themselves with the Indian party. *Id.* Art. IV (MD 72). Those who did not so align themselves would receive a cash payment and become citizens of the United States. *Id.* Art. III (MD 71–72). This treaty was contingent upon acquiring land for a new reservation from the Oneida Indians.

The draft 1867 treaty recognized that the Tribe had a total of 392 members, 244 of whom (57%) were Citizens, and 168 of whom were Indians (43%). It provided for allotments of "at least 80 acres" of land for each male, and "at least 40 acres" for each female. *Id.* Art. IV (MD 72). The treaty would have accomplished two principal aims: 1) it would have facilitated the breakup of the Tribe, allowing the Citizens to "cash out" their interest in the tribal estate and attain citizenship, thereby terminating their status as ward Indians; and

2) it would have established the remaining Indian party members on a new reservation to be purchased, it was hoped, from the Oneidas. Had the draft treaty been ratified it would have ended the reservation. The reservation would have been sold. The Senate did not ratify the treaty.

Efforts to secure a new treaty continued, and some time during the first three months of 1868, Indian party leaders and their lobbyist, Morgan Martin, had the idea of ceding one and one-half townships and retaining the south half of Red Springs for the Indian party. A draft treaty that same year included these precise terms. The treaty, however, was never submitted to either the Tribe or the Senate for approval.

In the two years between the draft treaty of 1868 and the introduction in March 1870 of the bill that would become the Act of 1871, the Indian party leaders—Mr. Charles and Mr. Slingerland—visited Washington to advance the goal of selling the reservation and disenfranchising the "Old Citizens." At this time, there were essentially three convergent forces: 1) the Indian party, 2) the Citizen party and 3) the lumber interests.

In a letter addressed to the House and the Senate dated February 1, 1870, approximately 20 individuals, representing themselves as "parties to the treaty of 1856," urged Congress to approve the 1867 treaty, with an amendment allowing the Citizens to opt for land "in lieu of money." (Letter of February 1, 1870, at 3 [MD 108]). Six weeks later, in a letter to the Chairman of the Senate Committee on Indian Affairs, the Indian party leaders— Mr. Charles and Mr. Slingerland—urged passage of Senate Bill 610 which was to become the Act of 1871. After recounting the failed effort to ratify the 1867 treaty, the March 1870 letter continued:

The Tribe however, being, still anxious to accomplish the desired change have appointed the undersigned Delegates to represent their wishes, and to devise a plan by which they may realize the value of their timbered lands, and at some future day obtain a more favorable location. Some members of the Tribe are also desirous of severing themselves from the Tribe and withdraw their share of the common property. Under these circumstances, your Memorialists have prepared with care the Bill presented to the Senate, and now under consideration, S. 610. Its provisions if, carried into effect will, we think, bring about all that the treaty of 1867 was designed to accomplish, viz, the final settlement of our affairs, and that too without any charge to the government.

(Letter of March 16, 1870, at 2 [MD 118–119]).

On March 2, 1870, Senator Timothy Howe of Wisconsin introduced S.610 concerning the Stockbridge–Munsee Indians. The bill passed the Senate but died in the House of Representatives. Senator Howe reintroduced S.610 on December 13, 1870. The bill passed the Senate and came to the House on January 13, 1871.

Senate Bill 610 appears to have been the product of negotiations between Representative Sawyer and the Stockbridge–Munsee tribal delegates, Mr. Charles and Mr. Slingerland. The bill contained provisions for public access to the vast timber holdings, as well as the Indian party's political agenda of expelling its Citizen party enemies from the Tribe. Mr. Charles and Mr. Slingerland worked with Morgan Martin, a lobbyist and lawyer, to secure the passage of a bill that would disenfranchise the Citizen party. In early 1871, when rumors of the law circulated on the reservation, the Indian agent assigned to the reservation, Agent W.T. Richardson, wrote to his superiors in Washington, D.C., for a copy of the bill. Agent Richardson appears to have been ignorant of the pending legislation or the passage of the bill.

Senate Bill 610 was referred to the Committee on Indian Affairs which approved it and returned it to the full House. The bill came up for a final reading in the House on January 18, 1871. The full House floor debate on S.610 showed interest in three particular areas: 1) the consent of the Stockbridge–Munsee Tribe; 2) the role of Congress in selling land outside the public domain; and 3) the manner in which the land was to be sold.

There was no discussion in the House debate showing that members of the House intended to diminish the size of the Stockbridge–Munsee Reservation. In the House floor debate, members of Congress stated that the Stockbridge–Munsee Tribe had consented to the sale of their lands under the 1871 Act and that Congress had not independently assumed authority to sell the lands:

Mr. Lawrence: Can the Government by treaty vest the title to the public lands in Indians?

Mr. Armstrong: I have no doubt of it.

Mr. Lawrence: Can the Senate, then, vest the title of all the public lands of the United States?

Mr. Armstrong: So long as the Government of the United States in its political capacity recognizes the Indian tribes and treats with them as independent Powers, so long are we bound by our contracts with them and we cannot repudiate them.

Mr. Hawley: If these are not public lands, by what authority does Congress assume to dispose of them?

Mr. Armstrong: Congress does not assume authority to sell these lands except by consent of the Indians. They ask

that these lands may be sold. The bill provides that the lands shall not be sold for less than their appraised value. If open to settlement, men would come as preemptors and take up the lands at $1.25 per acre. They are worth more, and ought to realize to these Indians their full value.

(Congressional Globe, 41st Congress, 3rd Session, January 18, 1871, at 588 [MD 130]).

Senate Bill 610 passed the House on January 18, 1871, and passed the Senate the next day. After Congress approved the bill, it was sent on to the President who asked the Secretary of Interior for his views on the bill. Secretary Columbus Delano answered that, while he could not recommend withholding approval, some of the bill's provisions were not in full accord with the views of the Department of Interior. President Grant did not sign the bill and it became law by operation of law on February 6, 1871. (An Act for the Relief of the Stockbridge and Munsee Tribe of Indians, in the State of Wisconsin, February 6, 1871, 16 Stat. 404 [MD 131–134]). The legislative history surrounding passage of the Act is limited.

The 1871 Act provided for the appraisal and sale at auction, in 80–acre lots, of 54 out of the 72 sections comprising the reservation. The Act stated that "the two townships of land, situated in the county of Shawana, and State of Wisconsin, set apart for the use of the Stockbridge and Munsee tribe of Indians shall be advertised for sale ... and shall be offered at public auction ... to the highest bidder in lots not exceeding eighty acres each, but shall not be sold for less than the appraised value thereof," except for eighteen contiguous sections of land.[5] *Id.* Secs. 1–2 (MD 131–132). The Act authorized the Secretary of

the Interior to reserve from sale lands "not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved, and are best adapted to agricultural purposes, subject to allotment to members of the Indian party of said tribe." *Id.* Sec. 2 (MD 132).

The Act further provided that all of the lands remaining unsold after one year were to be again advertised and offered at public auction "at not less then the minimum of one dollar and twenty-five cents per acre" and "thereafter shall be subject to private entry at the later price." *Id.* In all cases, the land was to be sold "for cash only." *Id.* If the lands continued to remain unsold, the government was to credit the Tribe at "sixty cents per acre." *Id.* Sec. 4 (MD 132).

The proceeds from the sale were to be divided between the Citizen and Indian parties. Proceeds belonging to the Citizen party were to be divided equally among them per capita and paid out to the heads of families and adult members. The sum belonging to the Indian party was to be credited to it "on the books of the treasurer of the United States," and the interest applied to the support of schools, the purchase of agricultural implements or paid in such other manner as the President may direct. *Id.* Sec. 5 (MD 133). However, part of the proceeds due the Indian party, "on request of the sachem and councillors" of the Tribe, could be used for "securing a new location for said tribe," and in aiding them to establish themselves in their new home. *Id.*

The Act provided for the preparation of two rolls, one to be denominated the Indian roll and the other to be denominated the Citizen roll, for the "purpose of determining the persons who are members of

---

5. In 1871, Congress ended treaty making with Indian tribes. *See* Cohen at 643 (citing Appropriations Act of March 3, 1871, ch. 120, 16 Stat. 544, 566 [codified at 25 U.S.C. § 71]).

said tribes and the future relation of each to the government of the United States." *Id.* Sec. 6 (MD 133). The Citizen roll would be composed of those "persons of full age, and their families, as signify their desire to separate their relations with said tribe, and to become citizens of the United States." *Id.* After the payment of proceeds to members of the Citizen party, there was to be "a full surrender and relinquishment" of all their claims as members of the Tribe and they and their descendants would be admitted to "all the rights and privileges of citizens of the United States." *Id.*

The Indian roll would contain the names of all persons of full age and their families as desire "to retain their tribal character and continue under the care and guardianship of the United States." *Id.* After the rolls had been made and returned, the Indian party would be known as the "Stockbridges tribe of Indians" and "may be located upon lands reserved" from sale or "such other reservation as may be procured for them, with the assent of the council of said tribe." *Id.* Sec. 7 (MD 133).

The Act further provided that "after a suitable and permanent reservation shall be obtained and accepted by the tribe either at their present home or elsewhere," it was to be surveyed and subdivided under the direction of the Secretary of the Interior, and a "just and fair allotment" made by the council of the Tribe "among the individuals and families composing said tribe." *Id.* Sec. 8 (MD 133–134). The Act specified the amount of land to be provided to adult tribal members and further provided that if a member of the Tribe died without heirs capable of inheriting, "the land shall revert to and become the common property of said tribe." *Id.* Sec. 8 (MD 134). A certified copy of the allotments made was to be returned to the Commissioner of Indian Affairs within one year after the reservation was made and accepted by the Tribe. Thereafter, the title of the lands "shall be held by the United States in trust for individuals and their heirs to whom the same were allotted." *Id.* Sec. 9 (MD 134).

The 1871 Act made no mention of the Tribe "ceding or relinquishing its reservation" or otherwise making a present and complete surrender of all of its interest in the lands to be sold. The Act did not restore the Tribe's land to the public domain. The 1871 Act resulted in the sale of land as well as timber.

After the bill became law, Congressman Sawyer sent the bill to Jeremiah Slingerland along with a letter requesting that Mr. Slingerland obtain the sanction of the Tribe. As far as it is known, no general council was ever held to obtain the Tribe's concurrence to the Act of 1871.

A large portion of the Stockbridge–Munsee Tribe signed a petition objecting to the 1871 Act. The petition to President Ulysses S. Grant stated that the law was the work of one faction of the Tribe and was not agreed by many others since it violated the terms of the 1856 Treaty. The sachem and councilors of the Citizen party wrote to President Grant, reminding him that the 1856 Treaty guaranteed land to the Tribe. They also objected to the Act of 1871 and requested the President's help in avoiding the bill's consequences.

The petition of the Indian party sanctioning the Act contained 60 names; the petition of the Citizen party contained 54 names. Some names appeared on both. The Citizen party claimed that the Indian party had fraudulently entered Citizen party names on the Indian party petition.

On January 8, 1872, an auction was held at the Menasha Land Office as called for under the Act. Various tracts of land in the 54 sections were sold, though much of the

land remained unsold. One year later, the land was open for cash entry at $1.25 per acre. In 1874, per section 4 of the Act, Congress appropriated $7,081.80 for the remaining 11,803 acres that remained unsold after the auction and cash entry. (MD 177). On May 4, 1871, the newspaper, *Oshkosh Northwestern*, wrote that the Act of 1871 was a law that enabled the Tribe to sell their timber.

There is no executive order declaring a diminishment of the Stockbridge–Munsee Indian Reservation. The General Land Office records of the Menasha Land Office show that the agency viewed the 54 sections as "Stockbridge–Munsee Lands" for sale until June of 1874. In follow up legislation in 1874, Congress did not address the Stockbridge–Munsee Reservation boundary.

When it passed the Act of 1871, Congress understood the problems of poverty, disease and unrest on the reservation. The legislation was a good-faith effort by Congress to alleviate the poverty among the tribal members and Congress understood that the legislation originated within the Tribe.

In passing the Act of 1871, Congress did not expect that settlers would purchase the sold lands—either at the initial auction or after the lands had been logged. Congress was led to believe that the lands were expected to be purchased by timber interests, but Congress did not reject the possibility that the land might be purchased by homesteaders and allowed for that possibility. *See* MD 130. There is no indication in the record that Congress' purpose in selling the 54 sections was to encourage non-Indians to settle in the midst of tribal members in order to promote interaction between the races or encourage the Indians to adopt white ways. Rather, as the Tribe has asserted, Congress intended and expected that the lands

would pass into the hands of the lumber industry for logging. As Dr. Oberly stated: "The interest of Congress was not to promote the rapid settlement of farmer-homesteaders, but rather to maximize revenue to the Tribe for selling the pinelands." (Oberly Report at 31).

The Tribe received substantially more for its lands through the 1871 Act—$169,000—than it would have received under the 1867 draft treaty. The 1867 draft treaty would have yielded only $43,175 (34,540 acres, the equivalent of 54 sections, at the rate of $1.25 per acre).

Not all recognized land cessions have used the word "cede" or a form thereof, for example, "cession." A number of treaties conveying lands did not use such language. A congressional report of 1952 treated the Act of 1871 as a cession by the tribe of 54 sections of an original area of two townships, or 72 sections. The 1871 Act "provided for cession of the two townships . . . except eighteen sections. The ceded lands were to be sold." (Report with Respect to the House Resolution Authorizing the Committee on Interior and Insular Affairs to Conduct an Investigation of the Bureau of Indian Affairs dated December 15, 1953, at 990 [MD 810]).

Between 1869 and 1877, President Ulysses S. Grant and his Commissioner of Indian Affairs, Eli Parker, developed a policy toward Indians that continued to the turn of the twentieth century and beyond. Dubbed the Peace Policy, President Grant and Commissioner Parker hoped to place Indians on reservations where they could be taught the methods of modern agriculture and be economically independent.

*Implementation of the 1871 Act*

After passage of the Act, the Tribe informed the Secretary of the Interior that it had chosen to remain in Wisconsin and

that it had selected as its "permanent home" the 18 contiguous sections in the southeastern portion of the two townships that it had previously designated as the lands to be reserved from the sale of its reservation—specifically, the south half of sections 13, 14, 15, and the east half of sections 19, 30 and 31, together with sections 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 32, 33, 34, 35, and 36. (Letter of February 21, 1872, from Darius Charles and Jeremiah Slingerland at 4 [MD 159]).[6]

On August 4, 1871, the Secretary of the Interior, acting pursuant to the Act of 1871, reserved from sale the 18 contiguous sections. (Report of the Acting Commissioner of Indian Affairs to the Green Bay agent dated September 21, 1871, [MD 153]; *see also,* Letter dated October 27, 1900, from W.A. Jones, Commissioner of Indian Affairs [MD 370]). Three-fourths of the land within the 1856 reservation was sold pursuant to the Act of 1871, with a portion of the proceeds going to members of the Citizens party who were to relinquish their tribal membership.

In 1874, pursuant to section 4 of the 1871 Act, the government appropriated $7,081.80 to the credit of the Tribe for 11,803 acres of unsold land. By this appropriation, Congress implemented the objective to complete the sale of all but the 18 contiguous sections.

### Subsequent Understanding of the 1871 Act

In his annual report to Congress on November 1, 1872, the Commissioner of Indian Affairs reported with regard to the Stockbridge and Munsee Tribe that "steps are now being taken to dispose of all of their reservation, with the exception of eighteen sections ... which are reserved

for their future use." (Report of the Commissioner of Indian Affairs, November 1, 1872, at 2 [MD 172]). The available subsequent reports from the Department of Interior to Congress up to 1910 indicated that after implementation of the 1871 Act, the reservation consisted on 18 sections. Sometimes it was expressed in terms of acreage of 11,520; sometimes the acreage was expressed as 11,803; sometimes the word "diminished" was used; and there were other equivalent phrases ("little over a half township;" "half a township"). (Commissioner of Indian Affairs Reports— Statistical Summaries 1878–1911 [MD 1053]); (Annual Department of Interior Descriptions of Size of Stockbridge–Munsee Reservation, 1871–1975 [MD 1038–1039]).

In 1892, John Adams, a Stockbridge tribal member and attorney testifying before Congress on behalf of the Citizen party, was asked how much land was in the Tribe's "present reservation." (Hearing Testimony [MD 238]). Mr. Adam responded: "They have only eighteen sections of land, the balance of their reservation having been sold under act February 6, 1871." *Id.* The following colloquy occurred:

> Senator Jones. Were they entitled at that time to seventy-two sections of land?
>
> Mr. Adams. Yes, sir; as stated in Article I, of said treaty of 1856.
>
> Senator Jones. And they gave up their township of land and their claim to the seventy-two sections for this present reservation?
>
> Mr. Adams. Yes, sir; for the present reservation, and the money stipulated in

---

6. The location of those 18 contiguous sections is depicted on Exhibits 304 [MD 1049] and 304L.

Article II of the same said treaty (Treaty of 1856).

Senator Jones. What is their present reservation?

Mr. Adams. Their present reservation contains eighteen sections, or about 11,803 acres.

*Id.* (MD 238–239).

A Shawano County Register of Deeds map created around 1880 outlined in red the 18 contiguous sections in the southeast corner of the two townships. The map contains these words: "Lands South and East of the Red lines are within the reservation and are not subject to sale." (MD 188).

On July 8, 1885, the Commissioner of Indian Affairs referred to the "Stockbridge Diminished Reserve" in a letter to the Green Bay agent. (Letter dated July 8, 1885, from Commissioner Atkins to the Green Bay Agency in Keshena, Wisconsin [MD 204]). In 1891, during the debate on what became the 1893 legislation, Congressman Perkins spoke of the 18 sections as being "a remnant of the reservation that was disposed of under the act of 1871." (MD 221).

*Events Leading up to the Act of 1893*

In the years following passage of the 1871 Act, rival petitions from members of the Indian party and the Citizen party were submitted to Congress. Between 1871 and 1893, disenfranchised Citizen party members complained to the OIA and to Congress that they had been wrongfully separated from the Tribe by the Act of 1871. Shortly after 1871, the Commissioner of Indian Affairs suspended many portions of the Act of 1871.

In 1875, former Green Bay Agent Thomas Chase wrote that the Act of 1871 was an "infamous proceeding," and attributed its passage to the desire of the Indian party

for revenge and the desire of Representative Sawyer and his friends "to have a fresh lick at Indian pine." (Cleland Report at 76 [quoting a June 18, 1875, letter from former Green Bay Agent Thomas Chase]). The "Parsons Report," which was a result of an investigation by the Department of Interior and the Office of Indian Affairs, revealed that the enrollment provisions carried out by OIA Inspector Wells were corrupt and fraudulent. (Oberly Report at 44). In 1877, Special Inspector Edward Kemble, sent by Commissioner of Indian Affairs E.H. Hayt to investigate the aftermath of the 1871 Act, reported as follows:

The law of 1871, the passage of which was procured by a fraction of the tribe, aided by interested parties, white and Indian, the proceeding had under the law and the manner in which its provisions were executed, constitute a flagrant wrong against the tribe which ought to be redressed as speedily as practicable.

(Cleland Report at 76 [quoting a report dated November 12, 1877, from Special Inspector Edward Kemble to Commissioner of Indian Affairs E.H. Hayt]).

In 1886, the Wisconsin legislature approved Memorial No. 7 to Congress regarding the 1871 Act. In the Memorial, the legislature stated that the Treaty of 1856 gave the Tribe's members "permanent homes" and that the Act of 1871 "abrogated the treaty." (Cleland Report at 78).

The conflict between the Indian and Citizen party over the 1871 Act continued in Congress. The Fiftieth, Fifty–First and Fifty–Second Congresses debated two policies: 1) to re-enfranchise the Citizen party members wrongfully expelled under the 1871 Act and grant them allotments; and/or 2) to terminate the entire Tribe and its reservation. The dispute leading up to the 1893 Act regarding which tribal mem-

bers were entitled to allotments related, in part, to the lands within the 18 sections.

During the 1880s and early 1890s, two competing legislative proposals embracing the two policy choices worked their way through Congress. Senator Sawyer, a Republican, introduced a bill, supported by the Indian party, that would settle with finality the affairs of the Tribe by selling the remaining tribal lands and terminating the Tribe (Indian Bill). The bill also included language that the Tribe would be subject to state jurisdiction. This would have maintained the exclusion of the Citizens from any share of the tribal estate.

The Citizen party wanted a share in the tribal estate and favored legislation introduced to restore the disenfranchised Citizens to the tribal roll. Senator William Vilas, a Democrat, introduced a bill, supported by the Citizen party, that left the Tribe intact and restored to membership the Citizen party members who had been wrongfully expelled under the 1871 Act (Citizen Bill).

Representative Thomas Lynch, a sponsor of the proposal backed by the Citizens, viewed his legislation as the first step in a two-step process: the first task was to re-enfranchise the wrongfully excluded tribal members; the second was " 'to introduce a bill abolishing the tribe, and conferring upon them the full rights of citizenship.' " (Report of Lawrence Kelly, "A History of the Stockbridge–Munsee Indians, 1888–1997" [Kelly Report] at 16–17). The Democrats supported the Citizens bill.

The Republicans, led by Senator Sawyer, called for an appraisal and sale of the remaining 18 sections of tribal lands and severing of federal relations with the Tribe. Senator Sawyer attempted to keep the Vilas bill from coming up for a vote in the Senate. The Senate rejected the Indian bill.

*Act of 1893*

On March 3, 1893, Congress passed "an act for the relief of the Stockbridges and Munsee tribe of Indians in the State of Wisconsin." (Act of March 3, 1893, 27 Stat. 744, [MD 276–277] ). The proposal was favored by the Citizen party. The Act addressed inequities in the application of the 1871 Act by which those who were entitled to benefits, including land allotments under the 1856 treaty, were denied them under the Act of 1871. The Act undid the questionable enrollment made under the 1871 Act (as documented by the Parsons Report) by declaring signatories of the 1856 treaty, and their descendants, to be members as long as they had not separated from the Tribe. The 1893 Act further declared that all members who were entered into possession of lands under the allotments of 1856 and had resided thereon continuously were owners of such lands in fee simple and that patents shall be issued to them. (MD 277).

The Preamble to the 1893 Act acknowledged the 1856 treaty, stating:

Whereas, a treaty was entered into on the fifth day of February, eighteen hundred and fifty-six, by and between the Government of the United States and the Stockbridges and Munsee Indians, in which the said Indians ceded certain lands to the United States, and accepted in consideration thereof certain lands as a reservation, to which said Indians removed, and upon which they have ever since resided; and

Whereas by the interpretation placed by Government officials on the act of February sixth, eighteen hundred and seventy-one, an act for the relief of said Indians, a large part of said Indians (and their descendants) who signed said treaty of eighteen hundred and fifty-six, and have continued with said tribe from

the making of said treaty to the present time, are excluded from participating in tribal funds and the right to occupy said reservation: Therefore...

(Preamble, Act of March 3, 1893 [MD 276–277]).

The Act of 1893 acknowledged that the "interpretation" the government placed on the Act of 1871 excluded from benefits those who had signed the treaty of 1856 and called for a new roll to restore those wrongfully excluded. (An act for the relief the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin, March 3, 1893, ¶ 2 [MD 276]).

The Act provided that all members of the Tribe at the time of the 1856 treaty and their descendants and all persons who became members of the Tribe under the treaty's provision and their descendants were deemed to be members of the "Stockbridges and Munsee tribe of Indians" and entitled to their pro-rata share in tribal funds and in the occupancy of the lands. *Id.* Sec. 1, (MD 277). The Act also provided that those who had entered into possession of lands under the allotments of the 1856 treaty and of the 1871 Act, and had continued to reside on them, were "declared the owners of such lands in fee simple, in severalty," and the government was to issue patents to them. *Id.*[7] The Act further provided that where the allotments of 1871 and those of 1856 were in conflict, "the latter shall prevail." *Id.* Sec. 2 (MD 277). The Act did not restore tribal lands to the public domain.

Following passage of the Act of 1893, and until the passage and implementation of the Act of 1906, the common understanding was that the Act of 1871 had reduced the reservation to 18 sections. The United States Supreme Court held in 1902 that "all Indian rights had ceased" in the 54 sections. *State of Minnesota v. Hitchcock,* 185 U.S. 373, 398, 22 S.Ct. 650, 46 L.Ed. 954 (1902). The annual reports to Congress continued to describe the reservation as 11,520 or 11,803 acres, "half a township" or 18 sections. (Annual Department of the Interior Descriptions of the Size of the Stockbridge–Munsee Reservation [MD 1038]). The available maps from the General Land Office did so as well. *See* MD 524, 498, 479, 476, 301, 280.[8]

On March 17, 1898, the Commissioner of Indian Affairs summarized to the Secretary of the Interior that, after establishment of the reservation in 1856, "its area has been changed under the provisions of the Act of [1871] which authorized the sale of one entire township and half of the other...." (Letter from W.A. Jones, Commissioner of Indian Affairs, to the Secretary of the Interior dated March 17, 1898 [MD 293]). The letter further stated: "The total area of this reservation as diminished under the Act of 1871 is 11,520 acres." *Id.* (MD 294).

In an October 9, 1897, letter to the Indian agent in Keshena, Wisconsin, the Acting Commissioner referenced the "diminished Stockbridge reservation." (Letter of October 9, 1897, to Thomas H. Savage, Esq., United States Indian Agent from the Acting Commissioner [MD 287]);

7. Apparently only 29 patents were issued under this provision of the Act. (Letter from the Acting Commissioner, Department of the Interior dated March 21, 1904, to H.K. Butterfield, United States Attorney, Milwaukee, Wisconsin). (MD 447–451).

8. Professor Lawrence Kelly, the plaintiff's expert, acknowledged the government maps which purport to characterize reservations are not always reliable. The maps do not reflect any legal analysis of the reservation boundaries by the Government Land Office. (Deposition of Lawrence Kelly [Kelly Dep.] at 172–174).

(Report to Congress from W.A. Jones, Commissioner of Indian Affairs dated January 24, 1901 [referencing the "total area of the reservation" as diminished by the Act of 1871 (11,803 acres)] [MD 367–368]). Other documents refer to the 18 contiguous sections of land set apart for the use of the Stockbridge Munsee Indians as a reservation. (Letter from the Commissioner dated October 1, 1900, to the Commissioner of the General Land Office [MD 305]); (Letter of November 15, 1890, from W.A. Jones, Commissioner of Indian Affairs [MD 313]).

On March 21, 1904, in reporting to the United States Attorney in Milwaukee on the extent of federal jurisdiction, the Commissioner stated that of the 18 contiguous sections set apart on August 4, 1871, pursuant to the Act of 1871: "These lands compose the present reservation of the tribe." (MD 448). The record contains no assertions by any person during this period that the reservation consisted of two townships.

### Act of 1906

An appropriations bill in 1895 included the following provision: "The Secretary of the Interior is hereby authorized and directed to pay to such of the Stockbridge Indians, per capita, as he shall find entitled under the Act of March third, eighteen hundred and ninety three, to be enrolled and to participate in the distribution one-half of the trust fund now to their credit in the United States Treasury, and heretofore appropriated, when the allotments to their lands shall have been completed." (Appropriations Act of March 2, 1895, 28 Stat. 876, 894).

In 1894, a new census of the Tribe showed its membership to be over 500

after implementation of the Act of 1893. The land holdings of the Tribe at that time consisted of 8,920 acres in common. Although, under the 1893 Act, all eligible tribal members were entitled to an allotment of land, there was not enough land for all tribal members to receive their proper allotment under the terms of the Treaty of 1856.

In a petition to the Secretary of the Interior from the Tribe dated November 22, 1899, the Tribe expressed its frustration at the delay in the "settlement of our affairs." The petition stated that the Tribe would accept:

> most anything that will secure us in the right in the management of our own property and to be relieved from the protection and care of the government of the United States, for we feel that we are fully competent and able to sustain ourselves in conducting our own affairs. We have been doing so for the last twenty-five years or more; therefore we ask that the balance of our land may speedily be allotted and that a special agent with such instruction be sent on to carry out the treaty of 1856 ....

(Petition[9] dated November 22, 1899, reprinted in Senate Report 173, January 7, 1904, at 15–16 [MD 372]).

In 1900, the Commissioner of Indian Affairs instructed Inspector Cyrus Beede to meet with the Tribe to solve the "big-foot, small-shoe" problem, namely, the small quantity of land owned by the Tribe and the number of Indians entitled to allotments. (James Oberly's Preliminary Report on the History of the Stockbridge Munsee Indian Reservation Boundary [Oberly 1998 Preliminary Report] App. 31 at 11). The Commissioner of Indian Affairs

9. The petition was signed by the Business Committee of the Tribe, as well as by many heads of families and bore the "endorsement of approval" of Agent D.H. George of the Green Bay Agency.

wrote to Inspector Beede giving him instructions to confer with tribal members and formulate some plan acceptable to a majority of the adult male members of the Tribe for an equitable settlement of their affairs with the government. (Letter dated October 27, 1900, from Commissioner W.A. Jones [MD 370–372]); *see also,* (Letter of December 26, 1900, from Inspector Cyrus Beede to Commissioner of Indian Affairs W.A. Jones, reprinted in Senate Report 173 accompanying S.335, January 7, 1904, at 18–19 [MD 373–374]).

According to Inspector Beede, the Commissioner charged him with conferring with the Indians "with the view of formulating a plan for the allotment of the common land of said reservation in severalty." (Letter from Cyrus Beede, United States Indian Inspector, dated December 26, 1900 [MD 373]). The letter from Commissioner Jones stated: "It is the earnest desire of the office to allot the remaining lands of the reservation." (Letter of Commissioner W.A. Jones dated October 27, 1900 [MD 371]). However, the Commissioner acknowledged that "there is insufficient land to make allotments under the treaty of 1856." *Id.*

Three factions within the Tribe each had a proposal for Inspector Beede. The Citizen party plan included an item that the tribal relationship be dissolved and citizenship be declared for the entire membership on consummation of settlement. The provision never appeared again in any subsequent drafts.

The plan submitted by Inspector Beede was approved on December 8, 1900, by a majority of the adult members of the Tribe. They accepted on behalf of themselves and the Tribe the conditions set forth in the proposed plan of settlement "as a full and complete settlement of all obligations of the Government, of whatever kind or nature, either express or implied"

upon performance by the government of the conditions set out in the plan. (Proposed Plan of Settlement with the Stockbridge–Munsee Tribe of Indians [MD 374]).

The plan provided that the government could purchase land elsewhere to make the allotments since there was insufficient land on the reservation to give each person the designated allotment. *Id.* at 375. One of the conditions was that funds to provide lands for all members of the Tribe or to pay tribal members who chose money in lieu of land would be paid by the United States rather than drawn from the Tribe's own trust funds. *Id.*

Two other principal provisions were: "[T]he land reserved to the Stockbridge and Munsee tribe of Indians by the treaty approved February 5, 1856, and which has not heretofore been sold or patented, either to the State or to individuals, shall be patented, so far as there is sufficient land for such purpose, to such Indians as were enrolled under the Act of 1893 and who have not heretofore received their patents, and to their children." *Id.* (MD 374). In addition to other provisions, the plan further provided that in cases where members of the Tribe have made selections, "it shall be obligatory upon such member or members to accept said selections." *Id.*

The proposed plan of settlement contained the following points: 1) identification of the claims being satisfied and released as those arising under the Treaty of 1856; 2) provisions relating to the Tribe's claim against the State of New York and against the United States in the Court of Claims; 3) allotment of remaining tribal lands; 4) the acquisition of additional lands as needed; 5) a no-land money provision at two dollars per acre for those members who did not receive an allotment; and 6) distribution of the tribal trust fund on a per capita basis. The proposed plan of

settlement was supplied to Congress shortly after its approval by the Tribe.

A bill incorporating the elements of the plan was introduced in 1902 (S.3620) and reintroduced as S.335 in 1903. Senate Bill 335 passed the Senate but failed to gain approval in the House.

Senate Bill 335 was drafted to implement the plan that the Tribe had approved which the Secretary transmitted to the Speaker of the House of Representatives by letter dated February 1, 1901. (Letter of February 1, 1901, transmitting to Congress the draft of "A Bill for Adjusting Matters Pertaining to the Affairs of the Stockbridge and Munsee Tribe of Indians" [MD 367]). According to the Secretary, the bill was "designed and intended to adjust and settle all matters pertaining to the affairs of the Stockbridges and Munsee tribe of Indians." *Id.* Between 1903 and 1906, the two houses of Congress argued over the source of funding for the no-land money payments.

On July 31, 1901, in its report, the Green Bay Indian Agency reported as follows: "The Department has for some time been convinced that the Stockbridge Indians ought no longer to remain wards of the Government, as they are intelligent and fully capable of caring for themselves, but owing to the various factions existing in the tribe it has, until recently, been impossible to effect a settlement of their tribal affairs." (Report of Indian Agent D.H. George of the Green Bay Agency dated July 31, 1901 [MD 325]). The report further stated that Inspector Beede secured more than a majority of the signatures of the male adult members of the Tribe to a plan of settlement which provides for an equitable division of the tribal property.

In April 1902, the Secretary of the Interior forwarded to the Chairman of the Senate Indian Affairs Committee a recent tribal petition supporting the pending bill as "a complete settlement of their tribal affairs." (Letter dated April 24, 1902, from the Secretary E.A. Hitchcock to the Chairman of the Senate Committee on Indian Affairs [MD 328]). The tribal petition stated in part:

> The office [of the Secretary] must desire to disband us as a tribe and allow us to mingle with the white people and pass out of existence as a tribe, but from the way in which our bill is left with Congress to care for itself there is little evidence of such a desire. The Stockbridge and Munsee Indians are huddled together on their reservation like cattle in a pen waiting for a settlement of their tribal affairs. The continuane [sic] of this state of affairs will not only prove dimoralizing [sic] to the tribe, but will cause the greatest suffering and poverty.

(Petition of the named duly enrolled Stockbridge Munsee Indians to the Secretary of the Interior received April 21, 1962 [MD 332]). The signers requested "immediate passage of our bill." *Id.*

In a letter of April 29, 1902, to Secretary Hitchcock, Acting Commissioner A.C. Tonner transmitted a communication and a copy of the bill from Senator Joseph V. Quarles, Chairman of the Subcommittee of the Senate Committee on Indian Affairs. Acting Commissioner Tonner stated that the bill is identical in language with a draft plan submitted to the Department of the Interior on January 24, 1901, and "which was designed and intended to adjust and settle all matters pertaining to the affairs of the Stockbridge and Munsee Tribe of Indians with the United States." (Letter from Acting Commissioner A.C. Tonner dated April 29, 1902 [MD 337]). A letter from Senator Joseph V. Quarles to Secretary Hitchcock stated that the bill will "furnish a means of adjusting satisfactorily and finally all existing differences among

the members of the tribe in question, and will also relieve the Government from future expense and care of these Indians." (Letter of March 25, 1902, to the Secretary of the Interior [MD 336–338] ).

On July 29, 1902, in its report, the Green Bay Indian Agency stated: "A bill is now before Congress which provides for a distribution of the tribal property and for a complete winding up of their tribal affairs. The plan of settlement upon which this bill is based was signed by more than a majority of the male adult members of the tribe." (Report of Indian Agent D.H. George of the Green Bay Agency dated July 29, 1902 [MD 340] ).

The agency again reported on August 17, 1903, that the Stockbridge Indians "are anxiously waiting a division of their lands and a final adjustment of their tribal affairs ...." (Report of Indian Agent Shepard Freeman of the Green Bay Agency dated August 17, 1903 [MD 352] ). The report further stated that as the Stockbridge Indians "are only nominally under the jurisdiction of this agency, an agent's influence over them is very limited." *Id.* The report continued: "They are citizens in all respects except that they hold their land in common, and have an undivided tribal fund. They exercise the right of franchise, and submit their local differences and troubles to the civil and criminal courts." *Id.*

The Department of the Interior reported to Congress that the purpose of the bill was to implement the "plan of settlement" which "had been formally agreed to by a majority of the tribe."[10] (Letter from Commissioner of Indian Affairs dated December 10, 1903 [MD 353] ); *see also,* (Letter from Secretary of the Interior dated December 16, 1903 [MD 365] ). The Department of the Interior also reported

that "a large majority of the tribe are earnestly desirous of laying aside their tribal relations and becoming United States citizens," and agreed that "[t]he members of this tribe are intelligent and industrious, well able to assume the responsibilities of citizenship and to earn a livelihood." (Senate Report No. 173, Exh. 358 at 2–3). The report to Congress on January 24, 1901 presented, among other information, Inspector Beede's conclusion that "[t]he time has fully arrived when the affairs of this unfortunate people should be settled and their relations with the Government cease." (Letter from Commissioner W.A. Jones dated January 24, 1901, included in a Report to the House of Representatives, House Document No. 405 [MD 369] ).

The House committee report on S.335 in March 1904 acknowledged the same purpose. "This is a bill intended to adjust and finally settle all of the affairs of the Stockbridge and Munsee tribe of Indians. The bill is drawn so as to carry out the plan of settlement formulated in an agreement on December 8, 1900, which was signed by more than a majority of the male adult Indians." (House Report No. 1420, Report submitted by the Committee on Indian Affairs to accompany S.335, March 7, 1904 [MD 441] ). According to the report, the bill "furnishes the best means possible for settling for all time the affairs of the tribe in question." *Id.* (MD 442).

At the turn of the century, virtually every congressman believed that reservations were a thing of the past and would soon disappear with tribal members being assimilated into non-Indian society. Indeed, the policy of assimilation—and the concomitant dissolution of tribal status— was at its zenith around the turn of the

---

**10.** The court in *United States v. Anderson,* 225 F. 825, 828–829 (E.D.Wis.1915), concluded

that the 1906 Act was in response to the petition.

century and in the years immediately thereafter. The assimilation policy was "strongest between 1890 and about 1910 or so." (Deposition of James W. Oberly, August 9, 2001 [Oberly 2001 Dep.] at 206).

Commissioner Jones, in the 1901 Annual Report of the Commissioner of Indian Affairs, declared that "it is time to make a move toward terminating the guardianship which has so long been exercised over the Indians and putting them upon equal footing with the white man so far as their relations with the Government are concerned." (Extract from the Annual Report of the Commissioner of Indian Affairs dated October 15, 1901 [MD 320]). Pursuit of this policy, according to Commissioner Jones, "will practically settle the entire Indian question within the space usually allotted to a generation." *Id.; see also,* 1901 Annual Report of the Commissioner of Indian Affairs (ARCOIA), reprinted in Francis P. Prucha S.J., *Documents of United States Indian Policy* (1990) at 201. The government's policy throughout the nineteenth century was eventually to end reservations.

An appropriations bill in 1904 authorized the Secretary of the Interior at his discretion to make per capita payments to members of twelve tribes, including the Stockbridge–Munsee:

> That the Secretary of the Interior is hereby authorized and directed under such rules and regulations as he may prescribe, to pay per capita to the following Indian tribes, all funds now to their credit in the United States Treasury or such part of such funds as he may deem necessary for their best interests, and any other funds that may hereafter be received for their credit: *Provided,* That he may retain a sufficient amount of their trust funds, which at the present rate of interest, will yield sufficient income for the support of their

schools and for pay of employees: *Provided further,* That the shares of minors shall remain in the Treasury until they become of age and the shares of incompetents also be retained in the Treasury and the interest of such shares may, in the discretion of the Secretary of the Interior, be paid to the parents or legally appointed guardians of such minors and incompetents under such regulations as he may prescribe, namely L'Anse and Vieux de Sert Chippewas, Michigan; Omahas, Nebraska; Otoe and Missouria, Oklahoma; Stockbridge and Munsee, Wisconsin; Tonkawas, Oklahoma; Umatillas, Oregon; the Iowa Indians, and the Sac and Fox Indians of Missouri, of the Pottawatomie and Great Nemaha Agency in the State of Kansas.

(Act of April 21, 1904, 33 Stat. 201 [MD 454]). Previously, in legislation enacted in 1895, Congress had authorized the distribution of half of the Tribe's trust funds.

The only dispute among tribal members over the bill centered on the validity of the enrollment under the 1893 Act. Indian party member Albert Miller sought unsuccessfully to persuade Congress to require a new roll in hopes of reducing the tribal roll prepared under the 1893 Act. The only issue was the number of persons eligible to receive tribal lands or money—and hence the size of their shares. (Hearing on February 29, 1904, before the House Committee on Indian Affairs on S.335, 58 Cong. 2 sess. at 76–77 [MD 422]). In his statement to the committee, Commissioner of Indian Affairs William Jones stated: "The only point at issue is the roll of 1893." *Id.; (see also, generally* [MD 386–402]).

The Tribe understood that the bill would result in citizenship for its members. *See, e.g.,* letter from M.J. Wallrich to the Acting Secretary of Indian Affairs dated January 27, 1906 (MD 455–456). ("There is no good reason why this tribe should long-

er be under the supervision of the government, or why any portion of them should be wards of the government.").

According to Bishop Freedman, the Indian agent assigned to the Tribe, as of 1904, "with very few exceptions the sentiment is universal for the passage of the bill, and the passage of the bill this winter. That sentiment prevails to a large extent among what is called the Miller faction, or the Old Indian party." (Hearing on February 29, 1904, before the House Committee on Indian Affairs [MD 424]). The attorney representing the Citizen party— the majority of the Tribe—strongly urged the committee to pass the bill, and in response to the Miller faction's request for a reexamination of the tribal roll asked: "How much more evidence can you expect in order to finish up this tribe?" *Id.* (MD 407).

Other than resolving the lingering dispute over enrollment, the only obstacle to passage of the bill was the source of the funds to pay those tribal members for whom no land was available for allotment and patenting. The House Speaker had refused to allow a vote on the bill because it called for an appropriation from Congress of $35,000 for the "no-land money." Ultimately Congress provided that the funds were to be paid out of the Tribe's consolidated fund held by the United States. With this change, Congress passed Senate Bill 335 which was largely based on the plan negotiated by Inspector Beede in 1900.

The bill was signed into law as part of the appropriations bill on June 21, 1906. (34 Stat. 325, 382 [MD 463–464]). The Act provided for the issuance of patents in fee simple for the Stockbridge–Munsee Indians. (34 Stat. 382 [MD 463–464]). The 1906 Act provided that the members of the Tribe who had not yet received patents for land in their own right shall "be given allotments of land and patents therefor in fee simple." *Id.* (MD 463). Those individuals who did not receive their quota of land could receive additional land from other lands or receive $2.00 per acre in lieu of receiving an allotment. *Id.* (MD at 464). The Act made no mention of the 1871 Act. It refers to the 1893 Act. *Id.* (MD 463).

The Act also provided that since there was insufficient land "within the limits of the Stockbridge and Munsee Reservation to make the allotments" in the amount specified, the Secretary of the Interior was to seek additional land and was authorized to negotiate with the Menominee Tribe for this purpose. *Id.* (MD 463–464). It was "obligatory" for allottees either "to accept such selection as an allotment," or to cash out by accepting payment for their interest. *Id.* The Act made clear that there was not sufficient reservation land to fully implement the Act's directive to give every allottee some land, and that upon allotment and patenting no trust land would remain. The 1906 Act did not restore tribal lands to the public domain.

One of the conditions set out in the plan proposed by Inspector Beede was not included in the Act. The Act provided that funds to carry out the provisions of the Act were to be paid from the Tribe's consolidated trust fund in the United States treasury, rather than paid by the United States. (MD 464).

The understanding that implementation of the Act would end federal supervision continued without interruption following its passage. In the next annual report in 1906, the Commissioner of Indian Affairs observed that with the enactment of the legislation "[i]t is hoped that the affairs of these Indians can be settled and the Government's supervision of them cease." (1906 Report of the Commissioner of Indian Affairs [MD 475]).

In November 1906, the Acting Commissioner reported to the Secretary of the Interior that the Green Bay agent met with the Stockbridge and Munsee Indians and explained the law "providing for the allotment of their reservation and the adjustment of their tribal affairs." (Letter from Acting Commissioner of Indian Affairs Larrabee to the Secretary of the Interior dated November 3, 1908 [MD 465]). The Acting Commissioner recommended that "the necessary action be taken to carry out the above provision [11] of the law in order that all the affairs of these Indians may be adjusted at the earliest practicable date." *Id.* (MD 471).

In 1908, the Secretary of the Interior was concerned that tribal members were prematurely conveying their allotments and were receiving inadequate compensation for them. He proposed a bill that would have added a restriction to the patents requiring the Commissioner to approve any conveyance of the property. (Letter from Secretary of the Interior James Rudolph Garfield to the Speaker of the House of Representatives dated January 9, 1908, House Document No. 471, 60th Cong., 1 sess. [MD 477]).

In 1909, the allotment selections for those tribal members receiving allotments in fee simple in the remaining 7,500 acres of the 18 sections were sent to the Office of Indian Affairs. In January 1910, the Secretary of the Interior approved the allotments and the patents were issued to tribal members on April 4, 1910. *See United States v. Gardner,* 189 F. 690, 693 (E.D.Wis.1911). The 400–plus tribal members who did not receive land in 1910 had to wait three more years to receive a no-land money payment at $2.00 per acre. In 1915, $32,000 from the Tribe's account was disbursed to 545 tribal members who did not receive allotments in 1910.

*Events Following the 1906 Act*

On June 9, 1910, Chief Clerk C.F. Hauke responded to a letter dated June 1, 1910, from a tribal member asking, in light of the receipt of the fee patents, whether "the Indians receiving such patents are citizens and whether the lands are taxable." (Letter from C.F. Hauke Chief Clerk of the Office of Indian Affairs to Phillip Tousey, Esq., Gresham, Wisconsin dated June 9, 1910 [MD 499]). Chief Clerk Hauke responded: "All restrictions and control of the United States having been relinquished by the issuance of patents in fee simple, the lands are taxable the same as are lands of all other residents of the State of Wisconsin. Indians receiving patents in fee simple are citizens of the State or Territory wherein they reside." *Id.*

Subsequent maps reported no Stockbridge reservation in 1913 (MD 542), 1923 (MD 616), 1933 (MD 660), and 1937 (MD 738). The maps of the General Land Office removed the Stockbridge reservation beginning in 1913.

The federal government continued to have dealings with the Stockbridge–Munsee Tribe in four limited areas: 1) resolving financial claims against tribal funds held by the United States; 2) running a government school for tribal children; 3) promoting public health among the Indians; and 4) enforcing liquor law violations involving Stockbridge Indians. (Cleland Report at 103; Deposition of Charles E. Cleland [Cleland Dep.] at 177–178); *see also,* (MD 584). During this time period, the BIA did not require the presence of a

---

**11.** The "above provision" references the provision of the Act which authorized the Secretary of the Interior to appraise and to make payments not to exceed $1,000 to those tribal members who made selections of land on tracts patented to the State of Wisconsin under the swamp-land acts and who made valuable improvements to that land. (MD 471).

reservation in order for it to assert jurisdiction over Indians and provide services to them.

During the 1920s and 1930s, the federal prohibition laws applied to all persons in all areas of the United States. In addition, federal Indian liquor laws prohibited the delivery of alcohol to ward Indians whether on or off reservations. State jurisdiction was believed not to extend onto reservations. Hence the shared understanding was that there was concurrent jurisdiction off-reservation, but exclusive federal jurisdiction within Indian reservations.

In the late 1920's, liquor problems in the town of Red Springs, specifically around Morgan Siding in the 18 sections reserved from sale after the 1871 Act, garnered a great deal of attention by law enforcement authorities. The local BIA superintendent wrote the deputy prohibition administrator in Milwaukee seeking help in this problem area that he identified as "territory adjacent to the Menominee Reservation." (Letter from W.R. Beyer, Superintendent, Keshena Indian Agency, to Deputy Prohibition Administrator William Frank Cunningham in Milwaukee, Wisconsin dated February 8, 1928 [MD 644] ). Because the jurisdiction of the federal Indian liquor agent assigned to the Menominee Reservation "is only within the limits of the reservation," assistance from the prohibition office was necessary. *Id.*

The following year, Deputy Special Officer John Winans wrote Superintendent Beyer describing Morgan Siding as "the wettest spot in Wisconsin." (Letter from Deputy Special Agent Winans to Superintendent Beyer dated May 29, 1929 [MD 648] ). He identified the area in question as the "former reservation," the "former Indian Reservation," and "this locality which formerly comrpised the Stockbridge and Munsee Indian Reservation." *Id.* (MD 647–648). In the letter, he noted the

refusal of the United States Attorney to prosecute liquor violations. Referring to a 1919 Act of Congress that defined Indian country to include all places "which have been Indian country and in which the sale of intoxicating liquor has been prohibited," Deputy Special Agent Winans asked: "Why does not this section cover this territory formerly a part of the Menominee Indian Reservation, then the Stockbridge and Munsee and later allotted to them?" *Id.* (MD 648).

Later, he stated: "I know of no act of Congress which has ever dissolved the Stockbridge and Munsee Reservation or where the authority of the federal government relative to the Indian liquor laws has been surrendered." *Id.* He asked that the Indian office seek "an opinion" as to the status of the former Stockbridge Reservation on this liquor question. *Id.*

Superintendent Beyer wrote the Commissioner of Indian Affairs about "the very bad condition of affairs in the country bordering the Reservation and known as the old Stockbridge Reservation." (Letter from Superintendent W.R. Beyer to the Commissioner of Indian Affairs dated June 12, 1929 [MD 653] ). The letter continued: This territory now comprises the township of Red Springs and the villages of Morgan Siding and Gresham. This country was opened up for settlement many years ago, and in fact can no longer be considered Indian country, as practically all the allotments have now been fee patented. *Id.* He also stated that the problems were "off of the Reservation" but that the situation was "serious" and was "undermining the health and morals of the Menominee people." *Id.* (MD 653–654). The Superintendent requested that "perhaps your Office would write the Present Governor asking his assistance in improving conditions in the territory mentioned." *Id.* (MD 653).

On August 29, 1929, the Acting Commissioner wrote to Governor Walter Kohler to request the state's help "in cleaning up the situation along the border of the reservation." (Exh. 516, Letter of Acting Commissioner to Governor Walter Kohler, August 19, 1929). The Acting Commissioner explicitly noted that the problem area "is outside of the reservation and under jurisdiction of the State." *Id.* The governor's office forwarded the inquiry to the Shawano County District Attorney who promptly responded.

The district attorney noted that "the disreputable resorts that they refer to are nothing more than a little place they call Morgan Siding in the town of Red Springs which is just south and touching the Reservation line.... The town of Red Springs formerly was the old Stockbridge Reservation and has for some number of years [been] allotted." (Letter from R.H. Fischer, District Attorney of Shawano County, to Governor Walter J. Kohler dated August 29, 1929). (MD 655). The district attorney distinguished between problems on the Indian reservation proper, and those in the area adjoining it, namely, in the Town of Red Springs.

Superintendent Beyer in Keshena reiterated the view that there was no longer a Stockbridge reservation in 1931. In a letter to the Commissioner, Superintendent Beyer noted: "There is a large amount of bootlegging being done, and a great deal of moonshine liquor is sold, especially in the Stockbridge country adjoining the Menominee Reservation. The State of Wisconsin makes no attempt to enforce the liquor laws since the passage of the Severtsen Act about two years ago." (Letter from Superintendent W.R. Beyer to the Commissioner of Indian Affairs dated March 5, 1931 [MD 659]).

In 1933, the chief special officer at the Keshena Indian Agency wrote the Commissioner of Indian Affairs. The letter stated that there was a "lack of cooperation from the county officials of Shawano County, especially in regard to the township of Red Springs which, I understand, is one of the two townships purchased from the Menominees for the Stockbridge and Brothertown tribes and now largely deeded land occupied by whites and mixed blood Stockbridges Indians." (Letter from Lewis Mueller, Chief Special Officer, Keshena Indian Agency, to the Commissioner of Indian Affairs dated October 23, 1933 [MD 666]). He further stated that the "lack of cooperation from Shawano County is due to the mooted question of jurisdiction and to economic conditions." *Id.* To address the problem of Menominee Indians purchasing liquor in Red Springs, Chief Special Officer Mueller suggested two plans, one of which was to have Congress enact a law declaring "all land in Red Springs township 'Indian country' so far as the introduction etc. of liquor is concerned" and the second of which was to provide a means to reimburse the county for the cases handled involving Indians. *Id.*

The response letter to Chief Special Officer Mueller, over the signature stamp of Assistant Commissioner John Collier, stated:

> There is no tribal unallotted land in Wisconsin belonging to this tribe. All lands allotted to them have been patented in fee, hence none of this reservation is now held in trust. These lands are not located within the exterior boundaries of any existing Indian reservation.
>
> In view of the above circumstances, this land has lost its character as "Indian country" and we would not be justified in attempting to secure legislation extending or restoring the Indian liquor laws to this territory.

(Letter from Acting Commissioner John Collier to Chief Special Officer Louis Mueller dated November 20, 1933 [MD 669] ). A memo and map dated October 30, 1933, confirmed that there was no unallotted land belonging to the Stockbridge Tribe in Wisconsin; all the land had been patented in fee and none was held in trust. (Memo dated October 30, 1933 [MD 668] ).

### Relationship with United States During the Period 1910–1934

In 1910, United States Attorney for Wisconsin E.J. Henning, who was prosecuting the United States v. Gardner case, wrote to Assistant Commissioner of Indian Affairs F.H. Abbott to ask what the limits of the Stockbridge–Munsee Reservation were. Mr. Henning stated the basis for his belief that the reservation might be disestablished and asked the OIA for guidance:

> Is the Stockbridge & Munsee Reservation, in fact, still a reservation? It is argued that under the Act of June 21, 1906 (34 Stat. L. 382), the entire reservation has been allotted, and that absolute fee titles have been given to the allottees; that by passage of the Act of June 21, 1906, the United States was divested of any title whatever in the lands; that the lands covered by the Act of June 21, 1906, were the remnants of what was left after the allotments under the Act of February 6, 1871 (16 Stat. L. 404), and the Act of March 3, 1893 (27 Stat. L. 743). That in fact the Act of June 21, 1906 is just such an act as the Supreme Court contemplated in U.S. v. Celestine, 215 U.S., (sic).

> . . . . .

> I wish you would furnish me with these facts and would also have Mr. Allen and his assistants give me the benefit of their experience and superior knowledge with reference to the question of whether or not there is still such a thing as a Stockbridge and Munsee reservation, and whether or not, if the offence was committed within a reservation, or on lands owned in fee, the offence is within the Act of 1885, denouncing crimes committed by an Indian upon another Indian in a reservation.

(Letter of January 10, 1911, from United States Attorney E.J. Henning to Assistant Commissioner of Indian Affairs Frederick N. Abbott [MD 526] ).

In his response of January 24, 1911, Assistant Commissioner Abbott analyzed the Acts of 1871, 1893 and 1906, and acknowledged the completion on April 4, 1910, of the distribution of fee patents to tribal members. Citing relevant United States Supreme Court decisions, Assistant Commissioner Abbott rejected the United States Attorney's suggestion that these circumstances effectively terminated the reservation. He stated that the Crimes Act of 1885 (23 Stat. L. 385) grants jurisdiction for the crime of rape committed " 'within the limits of any Indian reservation' under the same provision of law as if committed 'within a place within the exclusive jurisdiction of the United States:' " (Letter from Assistant Commissioner of Indian Affairs F.H. Abbott dated January 24, 1911, to United States Attorney E.J. Henning at 7–8 [MD 533–534] ).

> In this connection attention is called to the fact that the Office knows of no act of the Congress which has in any wise changed the limits of the Stockbridge and Munsee Reservation, that is to say, the two townships of land set aside for the Stockbridges and Munsee Indians. Where the limits of a reservation have been disturbed, as by opening the lands to settlement or otherwise, as has often been authorized by Congress, the limits of a reservation may be said to have been destroyed, but in the case at bar no

such fact exists. In the case of the United States v. Kiya, (126 Fed. Rep. 879), a case involving the crime of rape, it was said that:

> There is no question that the offense charged in this action was in fact committed within the limits of an Indian reservation, for the simple allotment of lands in severalty does not abrogate the reservation.

Attention is invited to the decision in the case of the *United States v. Sutton* (215 U.S. 291, 30 S.Ct. 116, 54 L.Ed. 200), which refers to and comments to a certain extent upon the decision in the case of *United States v. Celestine* (id. at 278, 30 S.Ct. 93).

From these decisions the inference is drawn that the mere fact of making allotments does not militate against the continued existence of an Indian reservation, and that an Indian reservation continues to exist after allotment, unless the reservation is duly opened by act of the Congress or an administrative act, as in the case of a reservation created by Executive Order whereon allotments have been made and the surplus lands returned to the public domain by Executive Order.

Referring specifically to the closing paragraphs of your letter, the records of the office show:

1. That the lands described in the plea of abatement have been patented in fee, that is to say, the patents therefor are dated April 4, 1910, being made under the act of 1906, supra.

2. Taking into consideration the decisions of the Supreme Court of the United States in the several cases cited, it would appear that the Stockbridge and Munsee Reservation, although allotted—except as before noted—remains intact, because (a) it has not been opened by act of Congress, and (b) the limits there-of have not been changed by administrative action.

*Id.* (MD 534–535).

Under the Swamp Land Act of 1850, states could receive patents from the United States for swamp lands. The State of Wisconsin received patents to approximately 1,000 acres within the Stockbridge–Munsee Reservation. Similar to the litigation in *Beecher v. Wetherby*, 95 U.S. 517, 5 Otto 517, 24 L.Ed. 440 (1877), the patents granted under the Swamp Land Act conflicted with the notion that the United States had vested title in these for the benefit of the Stockbridge–Munsee Tribe.

In the 1920s, the United States brought suit seeking to recover 800 acres in T28N R14E and 204 acres in T28N R13E. The United States asked for the land to be vested in the United States to be administered for the benefit of the Stockbridge and Munsee Indians. In 1925, in response to an inquiry from a tribal member asking to purchase a swamp land parcel, the OIA Chief Clerk replied that if the United States was successful in the suit, the land would be restored to its status as unallotted tribal land of the reservation.

In 1916, Congress passed legislation permitting those wrongfully excluded under the 1874 enrollment to collect back-annuity payments that they would have received between 1874 and 1894. The relevant portion of the appropriation bill, 39 Stat. 123, is at Section 25, which states in pertinent part:

> There is hereby appropriated the sum of $95,000, to be used in addition to the tribal funds of the Stockbridge and Munsee Tribes of Indians, for the payment of the members of the Stockbridge and Munsee Tribes of Indians who were enrolled under the Act of Congress of March third, eighteen hundred and ninety-three, equal amounts to the

amounts paid to the other members of said tribe prior to the enrollment under said Act, and such payments shall be made upon the certificate and order of the Commissioner of Indian Affairs upon claims being filed with him, showing to his satisfaction that such claimants, or the ancestors of such claimants, were enrolled under the Act of March third, eighteen hundred and ninety-three, entitled, "An Act for the relief of the Stockbridge and Munsee Tribes of Indians of the State of Wisconsin." (MD 584).

In 1924, Congress authorized suit in the Court of Claims against the United States by the Tribe for claims "arising under or growing out of any treaty or agreement between the United States and the Stockbridge Tribe of Indians, or arising under or growing out of any Act of Congress in relation to Indian affairs, which said Stockbridge Tribe may have against the United States, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States." (An Act Conferring Jurisdiction on the Court of Claims to Hear, Examine, Adjudicate, and Enter Judgment in Any Claims Which the Stockbridge Indians May Have Against the United States, and for Other Purposes, 43 Stat. 644, June 7, 1924). Pursuant to the 1924 authorization of suit, the Tribe proceeded on the following theory: The 1871 Act divided the proceeds from the land sale proportionally between the Citizens party and the Indian party. The large number of individuals left off either roll (and eventually re-enrolled in 1893) meant that the proportions in 1871 were much different than if the Act had been faithfully executed. The Tribe sought to recover the difference in money, plus interest, between what was actually paid and the larger proportion that would have gone to the Indian party had the

wrongfully excluded members been properly enrolled in 1871.

The Bureau of Indian Affairs ran a tribal school for the Stockbridge–Munsee children until 1915. School-age tribal members went to Tomah until 1934. According to tribal elders, after 1934, school-age tribal members went to Flandreau and Haskell Indian schools.

## Reorganization Under the Indian Reorganization Act and the Modern Era

Between 1910 and 1930, the Stockbridge–Munsee Tribe, like tribes all over the United States, was mired in poverty. During the 1930s, many individuals on allotted reservations around the state were on relief. Those Stockbridge–Munsee tribal members receiving public support were not alone.

A fundamental reform movement began under the leadership of John Collier, "a fervent admirer of Indian culture and a fierce advocate of Indian rights," who became Commissioner of Indian Affairs in 1933. (Lawrence C. Kelly, *Federal Indian Policy* [1990] at 83 [MD 984]). He is regarded as the leader of the reform movement in federal Indian policy that resulted in the passage in 1934 of the Wheeler–Howard Act, also known as the Indian Reorganization Act. Commissioner Collier was the original architect of the legislation. In correspondence dated May 3, 1933, to R.L. Robinson, Secretary of the Stockbridge and Munsee Business Committee, Commissioner Collier referred to the sold portions of tribal land as the "open part of the reservation" which, according to General Land Office records, have been patented to the state and "are no longer under federal control." (Cleland Report at 101 [quoting Letter of May 3, 1933, from Commissioner John Collier to

R.L. Robinson, Secretary of the Stockbridge and Munsee Business Committee] ).

In early February 1934, the Stockbridge–Munsee Community adopted a resolution and submitted it to Commissioner Collier requesting him to "take the steps necessary to restore to us sufficient land for the establishment of a Reservation upon which we may build homes." (A Joint and Several Resolution requesting John Collier, Commissioner of Indian Affairs, to take the necessary steps looking toward the enactment of Congressional legislation to restore to the landless Stockbridge Indians of Wisconsin certain lands in the State of Wisconsin for a Reservation [MD 677] ). The resolution also listed the land in the towns of Red Springs and Bartelme that were available for purchase.

A June 11, 1934, letter from the Superintendent of the Keshena Indian Agency to the Commissioner of Indian Affairs states: "No Indian Service Census has been maintained for these Indians for over 25 years, as they were at that time issued fee patents immediately upon allotment, and since then were no longer considered under Federal supervision." (Letter from Superintendent W.R. Beyer to the Commissioner of Indian Affairs dated June 11, 1934 [MD 679] ). A report from the Chief of the Land Division stated: "In 1909 the Stockbridge Indians were granted patents to their allotments and since that time have no longer been considered under Federal supervision." (Schedule of Information No. 1 from J.M. Stewart, Chief, Land Division [undated] [MD 701] ).

On June 18, 1934, Congress enacted the Indian Reorganization Act (IRA), 25 U.S.C. § 461 *et seq.* The Act authorized the Secretary of the Interior to expand the land bases of the Indian tribes and to proclaim new reservations. (Indian Reorganization Act of June 18, 1934 [MD 682] ).

Viewed from an historical perspective, the 1934 IRA was a change in American policy toward the Indians. While the policy in the early nineteenth century was to remove Indians west of the Mississippi and the policy from the mid-century mark to the early part of the twentieth century was to end the reservations and their dependent status by assimilating them into full American citizenship, the IRA returned to the policy of recognizing Indian distinctness and prohibiting further land alienation.

The IRA had two cornerstones: 1) to stop allotment and further loss of Indian lands, and 2) to provide tribes with a means for re-organizing their governmental and economic structures. Tribal governmental structures were established by constitutions while economic structures were established through federal corporate charters. Under the IRA, the Secretary of the Interior was authorized to "restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale, or any other form of disposal by Presidential proclamation, or by any of the public land laws of the United States." Indian Reorganization Act, Sec. 3 (MD 682); 25 U.S.C. § 463(a).

The IRA also provided that the Secretary was authorized to "acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands ... within or without existing reservations ... for the purpose of providing land for Indians." *Id.* Sec. 5 (MD 683); 25 U.S.C. § 465. Title to such lands was to be taken "in the name of the United States in trust for the Indian tribe ...." *Id.* The Secretary was authorized "to proclaim new Indian reservations on lands acquired" pursuant to the IRA. *Id.* Sec. 7 (MD 684); 25 U.S.C. § 467. John Collier expressly stated that the act "authorized the establish-

ment of new reservations for now completely landless and homeless Indians." (Excerpt from the 1934 Annual Report of the Commissioner of Indians Affairs, reprinted in Francis P. Prucha, S.J., *Documents of United States Indian Policy* at 226 [MD 671] ).

An October 3, 1934, letter from a Stockbridge–Munsee tribal leader urged federal acquisition of lands "formerly in the old Stockbridge Reservation." (Letter from Carl L. Miller to Superintendent Ralph Fredenburg, Keshena Indian Agency, dated October 3, 1934 [MD 689] ). On October 10, 1935, the Secretary of the Stockbridge Indian/Business Committee wrote to the Commissioner of Indian Affairs advising him of trespassing which was occurring on the submarginal lands "adjoining our former Stockbridges Ind. Reservation on the West." (Letter from F.L. Robinson to John Collier, Commissioner of Indian Affairs, dated October 10, 1935 [MD 706] ).

In its 1935 application to be reorganized under the IRA, the Stockbridge–Munsee Tribe submitted a draft constitution. The Tribe asserted that its territory and jurisdiction extended to the entire two-township reservation created in 1856.

A memorandum for the Assistant Commissioner of Indian Affairs dated February 1, 1936, references a review of a letter on the proposed constitution for the Stockbridge–Munsee Tribe. The memorandum states:

> The first numbered paragraph assumes that there is a reservation for these Indians. Information received from your Land Division indicates that this is not the case, that there is no tribal land or individual restricted land left of the original reservation.
>
> This paragraph should, therefore, be corrected, and further plans for organization should be correlated with some plan for acquiring land and setting up a reservation status for these Indians. It is noted that various provisions of the proposed Constitution assume the existence of a reservation.

(Memorandum of February 1, 1936, from the Board of Appeals for the Solicitor, Department of the Interior, to the Assistant Commissioner of Indian Affairs [MD 707] ).

The Tribe's application to be reorganized under the IRA was rejected because OIA officials concluded that, under the IRA, the existence of tribal land or individual-restricted land was a prerequisite to reorganization. (Letter from Assistant Commissioner William Zimmerman, Jr. dated June 9, 1936, to Carl Miller, Secretary of the Society of the Mohicans in Gresham, Wisconsin [MD 709] ). The letter was responding to a tribal member's request regarding the status of the organization of the Tribe under the IRA. Noting that objections were raised to the proposed constitution and bylaws submitted by the Tribe, the letter stated: "In view of the fact that there apparently is no tribal land or individual restricted land left of the original reservation, there is no present basis for organizing this tribe." *Id.* The letter further stated that "plans for organization should be correlated with the plan for acquiring land and setting up a reservation status for these Indians." *Id.*

In a March 15, 1937, letter to the Commissioner of Indian Affairs, the Tribe asked that a program be continued "on what is eventually to be our new reservation, now known as the 'Stockbridge Purchase' in Shawano County, Wisconsin." (Letter of March 15, 1937, from the Stockbridge Indian Tribe to John Collier, Commissioner of Indian Affairs [MD 726] ).

In the mid–1930s, government officials re-acquired lost tribal land within both townships. On March 19, 1937, the Acting

Secretary of the Interior, acting pursuant to the IRA, acquired approximately 1,049.88 acres of lands within the confines of the original reservation for the Stockbridge–Munsee. The acres were placed in trust and the Acting Secretary decreed that the lands "are hereby proclaimed to be an Indian reservation." [12] (Proclamation Setting Aside Land for Reservation for Stockbridge and Munsee Band of Mohican Indians dated March 19, 1937, [MD 731]). According to an Assistant to the Commissioner, the land purchased for the Tribe "has been proclaimed an Indian reservation by the Secretary of the Interior. This leaves the way open for completing tribal organization." (Letter dated April 28, 1937, from F.H. Daiker, Assistant to the Commissioner, to John N. Chicks, Gresham, Wisconsin [MD 733]).

In a letter dated July 1, 1937, a field agent with the Interior Department's Great Lakes Indian Agency with the approval of the Superintendent, transmitted to the Commissioner of Indian Affairs a revised constitution and by-laws prepared by the Stockbridge Business Committee. He stated: "Minor changes of language in the Constitution for clarification will not be objectionable to the Committee." (Letter of July 1, 1937, from Field Agent Peru Farver to the Commissioner of Indian Affairs [MD 734]). The territorial clause of the revised constitution stated: "The jurisdiction of the Stockbridge Munsee Community shall extend to all lands purchased, now or hereafter, by the United States for the use of members of the said Community." (Constitution and By–Laws of the Stockbridge Munsee Community received by the Office of Indian Affairs on July 8, 1937, Art. II [MD 735]).

A memorandum was sent to Kenneth Meiklejohn, Assistant Solicitor in the Interior Department, from the Director of Lands informing Mr. Meiklejohn of the reservation proclamation the Acting Secretary had made on March 19, 1937. (Memorandum of July 27, 1937, from J.W. Stewart, Director of Lands, to Assistant Solicitor Kenneth Meiklejohn, Department of the Interior [MD 741]). Mr. Meiklejohn reviewed the proposed constitution and memorialized his comments in a memorandum. The memorandum stated: "Organization of the Stockbridge and Munsee Band of Mohican Indians" "was originally held up, despite the fact that it constitutes a recognized tribe, because the Band had no reservation land." (Memorandum of Assistant Solicitor Kenneth Mieklejohn to "Indian Organization" [MD 744]). The memorandum also stated that the situation was rectified when the Acting Secretary of the Interior proclaimed as a reservation certain lands for the Band, thereby removing the "original obstacle to the Band's organization." *Id.* The memorandum bears the handwritten notation "8/7." [13] *Id.*

As of September 28, 1937, the draft constitution had been revised to the satisfaction of Interior Department staff. On that date, the Assistant to the Commissioner, F.H. Daiker, sent a letter to the Secretary asking that he sign an order calling for a special tribal election for the purpose of enabling the adult members of the Tribe to vote on the adoption of a proposed constitution. In summing up the relevant history of the Tribe and the reorganization process, Mr. Daiker stated that the calling of an election was "conditioned

---

12. The lands are depicted in pink on exhibits 306, 307 & 308 (MD 1050, 1051 & 1052).

13. Because there is a reference to the completed acquisition of land for the Tribe, which occurred in 1937, it appears that the memorandum may have been prepared on or about August 7, 1937.

upon the establishment of a reservation for these Indians." (Letter from F.H. Daiker, Assistant to the Commissioner, dated September 28, 1937, to the Secretary of the Interior [MD 747]). The letter continued: "The status of the reservation of these Indians has now been established and the constitution and by-laws resubmitted is, in my opinion, satisfactory from the viewpoint of law and policy." *Id.*

An election was held on October 30, 1937. Stockbridge–Munsee members living throughout the two townships voted on whether to reorganize under the IRA and whether to adopt the proposed constitution and federal corporate charter. The constitution was approved on a vote of 119 to 13. On November 18, 1937, the Tribe was formally reorganized under the Indian Reorganization Act when its constitution was approved by the Department of the Interior.

On April 15, 1938, by Executive Order 7868, approximately 12,085 acres of substandard land within the boundaries of the Tribe's 1856 reservation were transferred from the Secretary of Agriculture to the Secretary of the Interior for the Tribe's benefit. The land was placed under the jurisdiction of the Secretary of the Interior but was not placed in trust status. (Executive Order 7868 issued by President Franklin D. Roosevelt on April 15, 1938. [MD 760–761]); *see also,* Letter dated March 19, 1940, from Fred H. Daiker, Assistant to the Commissioner to B.J. Rusting, United States Attorney in Milwaukee, Wisconsin (MD 783).

At the time the Tribe applied for reorganization under the IRA, it is unclear how much of the land was owned by tribal members. According to one source, less than 100 acres were Indian-owned, the remainder of the Tribe having lost their lands and been reduced to "squatter" status. *See* Schedule of Information No. 1 from J.M. Stewart, Chief Land Division (MD 698–705).

In correspondence between a tribal member and the Assistant Secretary of the Interior, the parties refer to the "new land" and the "new reservation" *See* Letter from Carl Miller to Oscar Chapman, Assistant Secretary of the Interior, dated October 20, 1938 [MD 762]; Letter of November 3, 1938, from Assistant Secretary Oscar L. Chapman to Carl Miller [MD 765]. Similar expressions also are found in the following documents: MD 764, 772, 777, 779. A letter from the Assistant Secretary of the Interior to the tribal president distinguished between the "original" reservation as opposed to the "new reservation" and "recently purchased land." (Letter of January 17, 1939, from Oscar Chapman, Assistant Secretary of the Interior, to Harry Chicks, President of the Stockbridge Munsee Tribal Council [MD 777]).

In 1938, a dispute arose on the Stockbridge–Munsee Reservation over who could run for office in tribal elections. One group contended that only those members on the 1937 proclaimed lands could vote, while another group contended that any tribal member within the 1856 two-townships reservation was eligible to vote.

In October 1938, Carl Miller, a tribal member, sought to persuade the Secretary of the Interior that only tribal members living on the "new land" were eligible to hold office—not those living "within the confines of the Old Stockbridges Reservation" but not on the new proclaimed lands. (Letter from Carl Miller to Oscar Chapman, Assistant Secretary of the Interior, dated October 20, 1938 [MD 762]). In a letter dated October 27, 1938, the local superintendent at the Tomah Indian Agency informed Mr. Miller that he disagreed with his position. He stated that the Tribe's constitution "does not limit mem-

bership to actual residence on the new Reservation." (Letter from Superintendent Peru Farver to Carl Miller dated October 27, 1938 [MD 764]). Rather, as he recalled, the point was discussed at some length when the Tribe's constitution was being drafted and "it was the wish of the Committee to include those residing in the Town of Red Springs." *Id.*

In response to the October 20, 1938, inquiry from Carl Miller, the Assistant Secretary stated that any member who desired to run for election to the Tribal Council must be an actual resident of the new reservation. (Letter of November 3, 1938, from Assistant Secretary Oscar L. Chapman to Carl Miller [MD 765]).

In a November 30, 1938, letter to the Commissioner, Mr. Miller stated that he had received a ruling from the Secretary of the Interior that a tribal member must be living on the reservation proper in order to hold office. In that letter, Mr. Miller applauded the decision "that a member must be living on the Reservation proper in order to hold office therein." (Letter from Carl Miller to the Commissioner of Indian Affairs dated November 30, 1938 [MD 772]). He noted further that "[a]t present all of our council members are living off of the reservation and they do not have our interest at heart and do not function at all to the satisfaction of we who live on the new reservation." *Id.*

The Department of the interior reversed its initial decision by letter dated January 17, 1939, stating that tribal members within the two townships could run for tribal office. In that letter, Assistant Secretary Chapman informed Tribal President Harry Chicks that all members of the Tribe were eligible, namely those who have lived "within the original confines of the Stockbridge Reservation for at least one year preceding election." (Letter from Oscar Chapman, Assistant Secretary of the Interior, to Henry Chicks, President of the Stockbridge Munsee Tribal Council, dated January 17, 1939 [MD 777]). The letter stated that, in contrast, the Tribe's jurisdiction "is clearly limited to 'all lands purchased, heretofore or hereafter, by the United States for the benefit of said Community.'" *Id.* The letter explained that the term, "community," within the Stockbridge–Munsee Constitution had more than one meaning depending on its context. The letter stated that:

> [T]he constitution appears to foster two ideas in its use of the word "community." First of all, there is the actual physical area over which the organized group shall have jurisdiction, and in this case the word "community" is clearly limited to "all lands purchased, heretofore or hereafter, by the United States for the benefit of said Community." At the same time a larger meaning is intended in defining membership in the Community; in the latter case the term comprehends "all persons whose names appear on the Stockbridge Allotment Roll of 1910 and who are residing within the original confines of the Stockbridge Reservation, in Shawano County, State of Wisconsin, on the date of the adoption of this Constitution and By-laws." As I see it, the Department has no interest in either restricting or broadening the term, except as the Indians themselves may indicate their wishes in the matter.

*Id.*

Sometime prior to March 1940, the Department of the Interior, pursuant to the IRA, completed the purchase of an additional 1,200 acres of land for the use of the Stockbridges within the Town of Bartelme and, thus, inside the original two-township reservation boundaries. The letter stated that the land had "not yet been proclaimed an Indian Reservation." (Letter from Fred H. Daiker, Assistant to the Commis-

sioner, to B.J. Husting, United States Attorney in Milwaukee, Wisconsin, dated March 19, 1940 [MD 783]). The letter recounted that 1,049.88 acres were formally declared to be an Indian reservation under authority of the Act of Congress approved on June 18, 1934. The letter also stated that an additional 12,085 acres were purchased for Indian use and that jurisdiction over this land was transferred to the Department of the Interior by Executive Order 7868 dated April 15, 1938 "for the benefit of the Stockbridge Indians." *Id.*

In 1948, a second proclamation added approximately 1,200 acres to the 1937 proclamation lands. In the proclamation dated December 7, 1948, Secretary of the Interior J.A. Krug, declared that the approximately 1,200 acres [14] "are hereby added to and made a part of the existing reservation established March 19, 1937." (Proclamation of December 7, 1948 [MD 799]).

In a letter dated the same day as the proclamation, the Secretary of the Interior informed Senator Alexander Wiley of Wisconsin of that day's proclamation, noting that "there is no apparent reason why this land should not be added to and made a part of the existing reservation." (Letter from J.A. Krug, Secretary of the Interior, to Senator Alexander Wiley dated December 7, 1948 [MD 797]). The Secretary stated in the letter that, as "the situation now stands," the Stockbridges "are in the position of using land belonging to the United States and in which the Indians have no enforceable right, title, or interest." *Id.* The Secretary asked Senator Wiley to sponsor legislation the Department had drafted to declare the Farm Security Administration (FSA) lands to be held in trust for the Indians which would allow them to be added to the reservation.

Up until then, the Secretary observed that the present reservation had consisted "of 1,049.88" acres purchased under authority of the IRA in 1934 in trust for the Tribe and proclaimed a reservation in 1937. *Id.*

The State of Wisconsin has consistently exercised jurisdiction over the disputed area with the full consent of the tribe. *See, e.g.,* Report of United States Indian Agent Shepard Freeman dated August 17, 1903 (MD 352). In March 1944, the Tomah Indian Agency reported that law and order "services as are needed are provided by the county and local government The Stockbridge people sanction the enforcement of State laws and have encouraged its enforcement by local authorities." (Tomah Indian Agency Report—March 1944 [MD 790]).

In February 1940, the United States Attorney requested guidance from the Interior Department concerning the status of and jurisdiction over recently acquired land in the Township of Bartelme (within the original two-township reservation). In response, the Assistant Commissioner informed the United States Attorney that only the approximately 1,050 acres that were proclaimed an Indian reservation by the 1937 proclamation constituted reservation lands and that the remaining 1,200 acres were not. The letter further stated that the question remained unresolved as to whether federal criminal jurisdiction could extend to the 12,085 acres that had been purchased through the Farm Security Administration program. (Letter from Fred H. Daiker, Assistant to the Commissioner to United States Attorney B.J. Husting dated March 19, 1940 [MD 783]).

A similar issue arose in 1945, concerning federal jurisdiction over a crime committed on land subject to the 1937 reservation

---

14. The lands are depicted in yellow on Exhs. 307 & 308. (MD 1051 & 1052).

proclamation. Assistant Commissioner Daiker confirmed that the proclaimed lands had reservation status for purposes of federal criminal law. He further stated that the FSA lands "are in a different class. Until Congress has authorized their being proclaimed as an Indian reservation apparently the state has jurisdiction to prosecute for offenses committed thereon by Indians as well as by others." (Letter from Fred H. Daiker to Superintendent of the Tomah Indian Agency Peru Farver dated October 5, 1945 [MD 791]).

On January 5, 1946, the United States Department of Justice advised the United States Attorney in Milwaukee that the FSA lands (within the original reservation) "are not lands which are 'on and within any Indian reservation.'" (Letter from Assistant Attorney General Theron L. Caudle to United States Attorney Timothy J. Cronin dated January 5, 1946 [MD 792]).

A House report of December 15, 1952, stated: "The lands used by the Stockbridge–Munsee Indians consist of 2,250 acres held in trust by the United States as tribal lands and 13,081 acres acquired with funds made available by the Federal Emergency Relief Administration, the Resettlement Administration and the Farm Security Administration." (Report with Respect to the House Resolution Authorizing the Committee on Interior and Insular Affairs to Conduct an Investigation of the Bureau of Indian Affairs [MD 806]). The same report stated that the Stockbridge–Munsee "were no longer wards of the Government having been given their citizenship in 1909." *Id.* (MD 814).

### Addition of Farm Security Administration (FSA) Lands to the Reservation

Legislative efforts to add FSA lands to the reservation lands began as early as 1948 at the time of the second reservation proclamation. In 1950, the Tribe lobbied members of Congress to enact legislation to add the FSA lands to the reservation, and in the process made clear it shared the view that the lands currently were not part of its reservation. For example, in a March 1950 letter to Congressman Reid F. Murray, Arvid Miller, the Stockbridge Tribal President, promised to allow nonmembers to continue hunting and fishing on the FSA lands "if these lands are added to our reservation." (Letter from Arvid Miller, President of the Stockbridge Munsee Community, to Congressman Reid T. Murray dated March 15, 1950 [MD 800]). In a similar letter to Senator Joseph McCarthy of Wisconsin, he observed that the FSA lands "adjoin tribal lands." (Letter from Arvid Miller, President of the Stockbridge Munsee Community, to Senator Joseph McCarthy dated March 15, 1950 [MD 801]).

Tribal President Arvid Miller made a number of representations to Congress stating his understanding that the reservation was limited to the approximately 2,250 acres that had been proclaimed reservation lands in 1937 and 1948. On January 24, 1962, he wrote to Senator Wiley stating that although the government had purchased 13,000 acres for the Tribe, they were "never actually added to the small reservation we have of some 2200 acres of land." (Letter from Arvid E. Miller, President of the Stockbridge–Munsee Tribe, to Senator Alexander Wiley dated January 24, 1962 [MD 827]).

In another letter dated that same day to Congressman William Van Pelt, Tribal President Miller appealed for his support for legislation "to add the 13,000 acres of FSA lands to the reservation lands of the Stockbridge–Munsee Community." (Letter from Arvid E. Miller, President of the Stockbridge–Munsee Tribe, to Congress-

man William K. Van Pelt dated January 24, 1962 [MD 826]). The letter stated that if the Tribe was ever to "build an economic unit," this additional land was necessary because "our present reservation only consists of approximately 2200 acres." *Id.*

On January 28, 1962, Tribal President Miller wrote to Congressman Alvin E. O'Konski of Wisconsin, stating: "We are asking for the addition of 13,000 acres of FSA lands purchased for our use but never added to our small existing reservation of 2200 acres." (Letter from Arvid E. Miller, President of the Stockbridge–Munsee Tribe, to Congressman Alvin E. O'Konski dated January 28, 1962 [MD 820]). He also wrote to Congressman Melvin Laird of Wisconsin, stating: "Remember we only have 2250 acres of actual reservation lands and are trying to add the 13,077 acres of Farm Security Lands." (Letter from Arvid E. Miller, President of the Stockbridge–Munsee Tribe, to Congressman Melvin Laird dated January 7, 1963 [MD 821]).

The tribal council also acknowledged that the reservation was limited to the 2,250 acres proclaimed a reservation under the 1937 and 1948 proclamations. A 1963 tribal council resolution authorized President Miller to represent the Tribe in Washington, D.C. and instructed him to lobby for the pending "land bill which would add 13,077 acres of FSA land to our now inadequate 2,250 acre reservation." (Stockbridge–Munsee Tribal Council Resolution dated February 16, 1963 [MD 825]).

A 1963 Great Lakes Agency document about the history of the Stockbridge Munsee Reservation states: "Under the Indian Reorganization Act of 1934, the Government purchased 1,050 acres of land ... and on March 19, 1937, the Secretary under Proclamation established what is presently known as the Stockbridge Res-

ervation." (History of the Stockbridge–Munsee Reservation [MD 824]).

The Bureau of Indian Affairs continued to take the position that the FSA lands were not part of the existing reservation. In a letter dated April 3, 1967, the Chief of the Tribal Government Section of the Bureau of Indian Affairs stated that the 1937 proclamation·established "what is presently known as the Stockbridge Reservation." (Letter from Leslie N. Gay, Chief, Tribal Government Section, Bureau of Indian Affairs, to Guy Calkins in Shawano, Wisconsin dated April 3, 1967 [MD 831]). In response to a request about the existence of the Stockbridge–Munsee Reservation, the BIA stated that the "Stockbridge–Munsee Indians are using 15,327 acres of land, of which 2,250 acres have been declared to be a reservation. The remaining 13,077 acres constitute the so-called resettlement land owned outright by the United States and administered by the Secretary of the Interior." (Letter of June 6, 1967, from Charles B. Rovin, Acting Deputy Assistant Commissioner, to Shawano–Menominee County Court Judge Ken Trager. [MD 833–834]).

A 1970 tribal council resolution stated that the "Reservation proper of I.R.A. lands as it is referred to, is in such limited portion, consisting of 2,250 acres." (Stockbridge–Munsee Tribal Council Resolution dated January 9, 1970 [MD 835]). The resolution further stated that because the "declared reservation" is "far too small" to meet the needs of the Tribe, the council requests "that said Farm Security Land be declared and made a part of the present existing reservation." *Id.* The August 15, 1970, minutes of an Inter–Tribal Meeting state with respect to the Stockbridge–Munsee: "The tribal land base at present is 2,250 acres, exclusive of submarginal lands." (Minutes of an Inter–Tribal Meeting on Sub–Marginal Lands in Minne-

apolis, Minnesota on August 15–16, 1970 [MD 844] ).

On October 9, 1972, Congress passed legislation declaring that the approximately 13,077 acres of submarginal lands [15] purchased for the Stockbridge–Munsee Tribe in 1933 under the Farm Security Act "shall be a part of the reservation heretofore established for this community." (Act of October 9, 1972, Public Law 92–480 [MD 885] ).

In hearings leading up to enactment of that law, the following statements were made to Congress. A tribal chairman stated: "In 1937, a reservation was proclaimed and approximately 2,250 acres was placed in trust status .... An additional 13,077 acres was acquired and administrative jurisdiction transferred from the Secretary of Agriculture to the Secretary of the Interior.... Should these lands be made a part of our reservation, we will be in a good position to improve our housing." (Hearings before the Subcommittee on Indian Affairs, March 26, 1971 [MD 852] ). Mr. Davids, a tribal member, stated: The IRA land and the FSA land "is all we have, just coming up the road." *Id.* (MD 854). Mr. Harold M. Gross, an attorney, testified: "Both the submarginal acreage and the IRA acreage were entirely within the former Stockbridge Reservation, and purchased to restore those parcels to the tribe. Without these parcels, the tribe has no other land base." *Id.* (MD 859). Wisconsin Senator Gaylord Nelson in a formal statement at the congressional hearing stated: "Today, only 2,250 acres of land are part of the reservation." *Id.* (MD 851).

A letter presented to the President of the United States Senate from the Office of the Secretary of the Interior supporting the bill noted that the submarginal lands in question were located "within the former reservation." (Letter from the Office of the Secretary, Department of the Interior, to Spiro Agnew, President, United States Senate, dated March 1, 1971, and appended to Senate Report 92–822, at 5, 6 [MD 866] ).

A General Accounting Office report on the Stockbridges' lands submitted to the United States Senate in 1971 described the history of the Tribe and its reservation. The report stated: "In March 1937 the Secretary of the Interior established the new Stockbridge Reservation and the land was placed in tribal trust." (Report to Committee on Interior and Insular Affairs, United States Senate, by the Comptroller General of the United States, October 27, 1971[MD 863] ). The 1,050 acres were comprised "of former reservation lands." *Id.*

By letter dated December 19, 1973, Tribal Chairman Leonard Miller, Jr., wrote a BIA official in Washington, D. C., seeking his assistance with, among other things, "clarifying our Reservation boundaries" for purposes of posting the boundaries against trespassers. (Letter from Tribal Chairman Leonard Miller to Howard Pepinbrink, Bureau of Indian Affairs, dated December 19, 1973 [MD 886] ). The letter states: "On [sic] February 1871, an Act of Congress reduced the Township of Red Springs from two Townships to 18 sections. In 1893 to 1906, Congress patented the land at the request of the Tribe. The period of 1893 to 1906 is just a guess on my part." *Id.*

In his March 17, 1999, affidavit explaining his letter, Mr. Miller stated that he always thought of the two townships "as the reservation in a cultural, emotional and traditional sense." (Affidavit of Leonard Miller, Jr. [Miller Aff.] ¶ 4 dated March 17,

---

**15.** These lands are depicted in green on Exh. 308. (MD 1052).

1999 [MD 961]). His letter asking the BIA for assistance in clarifying the reservation boundaries "primarily attempted to address the 'reservation' in a legalistic, administrative sense in which ... the BIA understood the term." (Miller Aff. ¶ 7 [MD 962]).

The April 5, 1974, response from the Commissioner of Indian Affairs to Chairman Miller's letter marks the first time since the Abbott letter in 1911 that an employee of the Interior Department concluded that the Stockbridge–Munsee Reservation had survived the implementation of the 1906 Act. (Letter from Kenneth Payton, Commissioner of Indian Affairs dated April 5, 1974, to Mr. Miller [MD 887–893]). Mr. Payton's conclusion was also based on his "cursory review" of the record, which "reveals that the United States continued in fact to provide certain trust services for the subject tribe and did acknowledge the existence of a reservation subsequent to the 1906 Act and prior to the 1934 Indian Reorganization Act." *Id.* (MD 891).

Later that year, in about September 1974, the Tribe enacted Conservation Codes, which Mr. Miller signed on September 14, 1974. The Conservation Codes contained the following provision:

"Stockbridge–Munsee Community" shall mean all lands and waters acquired by purchase under the provisions of Section 16 of the Act of June 18, 1934 (48 Stat. 984) and proclaimed to be an Indian reservation for the use and benefit of the Stockbridge–Munsee Tribe of Indians of Wisconsin.

(1974 Conservation Codes—Stockbridge–Munsee Community, section 11.01[b] [MD 901]).

In October 1981, a Menominee tribal member executed a quit claim deed conveying to the United States, in trust for the Menominee Indian Tribe of Wisconsin, property within the township of Red Springs adjacent to the Menominee reservation.[16] (Quit Claim Deed, October 15, 1981 [MD 920]). Pursuant to the Menominee Restoration Act, 25 U.S.C. § 903d(c), upon approval, the property would be added to the Menominee reservation. On December 28, 1981, the Acting Area Director of the Bureau of Indian Affairs approved the quit claim deed. (MD 923).

Because the property was within the boundaries of the original Stockbridge–Munsee two-township reservation and because of the 1974 Payton letter opining that this land was within the present Stockbridge–Munsee Reservation, the question arose whether the conveyance could be approved. The question was addressed in the December 30, 1981, letter from the Office of the Field Solicitor of the Department of Interior to the Acting Area Director in Minneapolis, Minnesota, repudiating the Payton letter. (Letter from Mark A. Anderson for the Field Solicitor dated December 30, 1981, to Abe Zuni, Acting Area Director, Minneapolis Area Office [MD 940–941]).

The historical progression of maps depicting the area of the Stockbridge–Munsee Reservation reflect the common understanding that the implementation of the 1871 Act reduced the reservation to 18 sections and that the implementation of the 1906 Act eliminated the remaining reservation entirely. After the 1856 treaty, the Interior Department maps consistently showed a two-township reservation. Between 1878 until at least 1905, they depicted the reservation as limited to the 18 sections selected by the Tribe and withheld from sale pursuant to the 1871 Act.

16. Those lands are depicted in blue on Exh. 308. (MD 1052).

From 1912 to at least 1931, the reservation was missing from the maps.

As of 1920, whites outnumbered non-whites in the Town of Bartelme 302 to 77; in 1930 the ratio was 229 to 31. By 1940, following the movement of tribal members into the newly-proclaimed reservation and the FSA lands in the Town of Bartleme, the population had evened out with 254 whites and 256 non-whites. The proportion of the Indian population of Bartelme has steadily grown since so that as of 2000 the population consisted of 164 whites and 536 non-whites. (Oberly Report at 9–11).

### Office of Indian Affairs Cartographic and Statistical Evidence

The cartographic evidence is mixed. A summary of 22 maps prepared by Dr. Oberly, together with the maps submitted in preliminary injunction proceedings, show that, generally, maps after 1878 but before 1910, depict an eighteen section reservation and maps from the period 1910–1931 show no reservation. The chronology of the pattern of how federal maps depicted the Stockbridge–Munsee Reservation may be described as: 1) 1859 to 1878—the reservation is shown as two townships, 2) 1878 to 1905—the reservation is depicted as 18 sections in the south half of T28N R14E, reserved under the 1871 Act, 3) 1912 to 1931—the reservation is missing from Government Land Office and OIA maps.[17]

The Government Land Office did not include the Stockbridge–Munsee Reservation on its maps of the "Western United States" which it began publishing in 1913. According to Professor Kelly, neither the Government Land Office nor the OIA maps reflect any legal analysis of the reservation boundaries by either agency. Throughout the period 1870–1948, it was the OIA's practice to report as reservation acreage the lands that continued to be held in trust for an Indian Tribe. Thus, as lands were sold, the OIA automatically reduced the acreage indicated in the reports without regard to any action by Congress.

In various correspondence, OIA reports and congressional committee reports after 1872, the Stockbridge–Munsee Reservation is referred to as 18 sections or 11,520 acres or 11,803 acres. (MD 172, MD 215, MD 217, MD 219, MD 221, MD 238, MD 240–275; MD 289–295, MD 305–308; MD 313). The 11,803 figure actually represented the number of acres the government had paid the Tribe at $.60 per acre to acquire pursuant to section 4 of the 1871 Act. (MD 177). The OIA Reports of 1910, 1912, 1913 and 1915 indicating "unallotted" reservation acreage list the Stockbridge–Munsee Tribe but show no unallotted acres. The 1918 and 1919 Reports indicate, under "Area of Indian Lands," a total of 8,920 acres in the Stockbridge–Munsee Reservation. None of the reports after 1919 in the State's exhibit gives information on reservation size. (MD 541, MD 548, MD 565). The OIA Reports of 1921, 1922, 1923, 1924, 1927, 1928, 1929 (in a footnote) and 1931 (in a footnote) all include the Stockbridge–Munsee Tribe in narrative reports. (MD 604, MD 606, MD 609).

The Oneida reservation established pursuant to an 1838 treaty consists of about 65,000 acres. *See* Opinion of the Attorney General, August 21, 1981 (MD 925–939). Pursuant to the Chippewa treaty of 1854,

---

17. With respect to the time period from 1939 to the present, the defendants assert that the reservation is shown on federal maps as two full townships. (Defendants' Proposed Findings of Fact # 138[d] ). However, the plaintiff asserts that counter examples from this time period show that the post–1939 maps are at best inconsistent. (Plaintiff's Proposed Findings of Fact # 104[E] ).

the Lac du Flambeau, Lac Courte Oreilles and Red Cliff Bands received reservations of approximately 69,000, 69,000 and 7,921 acres, respectively. *See United States v. Bouchard,* 464 F.Supp. 1316 (E.D.Wis. 1978). The OIA Reports reflect a similar level of federal supervision over the Oneidas and Stockbridge–Munsee during the period 1910–1934. The Oneida and Red Cliff Indian reservations were also missing from maps between 1912 and 1931.

### Demographics of the 1856 Reservation

Between 1856 and 1910, the population of the two townships of Bartelme and Red Springs was nearly entirely Indian. Between 1910 and 2000, the population of the two townships was roughly equally divided between the Indian and non-Indian population. In 1990 and 2000, the population of the two townships was 55% and 63% Indian, respectively.

Between 1856 and 1871, the entire two townships, T28N R13E and T28N R14E, were held in trust by the United States for the benefit of the Tribe. There is no evidence that anyone but Stockbridge–Munsee Indians and their families lived within the two townships during this time.

The non-white percentage of the population within the two townships proceeded as follows: 1920, 48%; 1930, 47%; 1940, 49%; 1950, unknown; 1960, 42%; 1970, 49%; 1980, 49%; 1990, 55%; 2000, 63%. The non-white population is an accurate approximation of the Stockbridge–Munsee population because with respect to 1920, 1980 and 1990, Professor Oberly was able to verify that the non-white and Stockbridge–Munsee population numbers were nearly identical. *See* Oberly Report, Table 1, at 9–10.

The southern half of the Town of Red Springs had almost no white population as late as 1910. By 1920, "a large white settlement came into the new Town of Red Springs and continued up until 1940." (Oberly Report at 11). In the 1910s, 20s, and 30s, Stockbridge–Munsee tribal members used the land within the two townships for various activities, including hunting, gathering, swimming and fishing.

### Expert Witnesses—State of Wisconsin

#### Dr. James A. Clifton:

Dr. James A. Clifton was the Scholar-in-Residence at the Department of Anthropology at Western Michigan University, adjunct professor at the United States Marine Corp. Command and Staff College in Quantico, Virginia and associated with Home/Ethnohistory Associates in Kalamazo, Michigan. He received his Ph.D. from the University of Chicago. Dr. Clifton's expertise was in ethnohistory, an interdisciplinary field that deals with American Indians and their relationships with governments, among other things. He spent 95 percent of his professional life, spanning 41 years, beginning in 1957, writing, teaching, and extensively publishing in this field. He served on several university faculties and had received numerous professional honors.

#### Dr. Lawrence Kelly:

Dr. Lawrence Kelly is an historian retired from the faculty at North Texas State University, where he served from 1971 to 1999. He received his Ph.D. in history from the University of New Mexico in 1961. Professor Kelly's academic specialty is federal Indian policy in the twentieth century, a topic on which he has published numerous articles and books throughout his career. Professor Kelly did not research the 1871 Act that authorized the sale of 54 sections of the Stockbridge–Munsee Reservation.

#### Alan Newell:

Alan Newell is a senior associate historian at Historical Research Associates, Inc.

(HRA), a private research firm based in Missoula, Montana. HRA, which he co-founded in 1974, offers historical, anthropological and archaeological consulting services. Mr. Newell received a master's degree in history in 1979 from the University of Montana and has 27 years of experience as a project manager or principal investigator in historical consulting with HRA. He does not hold a full-time academic appointment at a college or university, but rather characterizes himself as a "public historian." (Deposition of Alan Newell [Newell Dep.] at 10). One of Mr. Newell's specialties is the history of federal Indian policy on which he has published extensively.

*Richard Zeitlin:*

Dr. Zeitlin is the Director of the Wisconsin Veterans Museum in Madison, Wisconsin, a position he has held since 1980. Dr. Zeitlin received his Ph.D. in history in 1973 from the University of Wisconsin–Madison. One of his longstanding areas of emphasis has been Wisconsin history and he has authored a number of articles on Wisconsin history and military history.

### Expert Witnesses—Stockbridge–Munsee Tribe

*Dr. Charles Cleland:*

Dr. Charles Cleland holds the rank of Distinguished Professor of Anthropology Emeritus at Michigan State University. He received his Ph.D. in anthropology from the University of Michigan. Professor Cleland has over 40 years experience working with the ethnography, prehistory, and ethno-history of Native People of the Great Lakes region including the development and effect of federal Indian policy on the native tribes of the region.

*Dr. James W. Oberly:*

Dr. James W. Oberly is the Maxwell P. Schoenfeld Professor of the Humanities, University of Wisconsin–Eau Claire. He holds a doctoral degree in history from the University of Rochester. Dr. Oberly is currently a National Endowment for the Humanities Fellow at the D'Arcy McNickle Center for American Studies, Newberry Library. His scholarly publications have focused on public lands and Wisconsin Indians.

### Positions of the Parties

The State of Wisconsin and the defendants agree that a treaty between the United States and the Stockbridge and Munsee Indians in 1856 provided the Tribe a two-township reservation in Shawano County, Wisconsin as a permanent home. The parties also are in agreement that the approximately 15,000 acres of land within the original two-township reservation was proclaimed a reservation by proclamations of the Secretary of the Interior in 1937 (1,049.88 acres), and in 1948 (approximately 1,200 acres), and by Act of Congress in 1972 (approximately 13,077 acres).

The plaintiff maintains that the reservation was diminished by the Act of 1871, whereby Congress authorized the sale of 54 sections of the reservation. The plaintiff further asserts that Congress disestablished the remaining reservation through the Act of 1906. According to the plaintiff, the historical evidence shows that all parties involved shared the understanding that the reservation was diminished by the 1871 Act and disestablished by the 1906 Act.

The defendants contend that the Supreme Court has established legal principles that control the issue of reservation diminishment in the post–1948 era and that based on these principles, "a finding of diminishment must be based on evidence that is 'explicit,' 'unequivocal,' or 'substantial and compelling.' " (Revised Defendants' Summary Judgment Brief

[Defendants' Revised Brief] at 2 [quoting *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) ] ). While acknowledging the plaintiff's documentary evidence, the defendants assert that there is an absence of the requisite evidence of specific congressional intent to diminish or disestablish the reservation.

Specifically, the defendants assert that the Act of 1871 makes no explicit reference to cessation or other language evidencing the present and total surrender of all tribal interests. Rather, the defendants maintain that the 1871 Act provided that the land was to be sold at public auction with the proceeds appropriated for the Tribe's benefit and with the United States acting as a sales agent for the Tribe. They challenge the plaintiff's contention that the 1871 Act involved a provision of payment of a "sum certain" as compensation. To the contrary, the defendants assert that the United States merely acted as a sales agent, which the court in *Solem* considered a factor against diminishment. While acknowledging that sections seven, eight and nine of the 1871 Act are confusing, the defendants state that their apparent purpose was to authorize allotments to the Indian Party whether members remained on the existing reservation or moved to a new reservation that might be created for them elsewhere. The defendants point out the lack of any statement in the Act indicating that the existing reservation was to be diminished.

The defendants argue that the draft "treaties" of 1867 and 1868 relied upon by the plaintiffs are largely irrelevant and unhelpful in ascertaining congressional intent behind the 1871 Act. The defendants maintain that because in 1871 Congress apparently did not believe it could unilaterally abrogate a treaty, the fact that the 1871 Act was not in the form of an agreement reinforces the defendants' position that Congress intended only a sale of land not a diminishment of the reservation.

The defendants also contend that the events surrounding the passage of the 1871 Act and the tenor of the legislative reports do not unequivocally reveal a widely-held understanding that the reservation would shrink as a result of the proposed legislation. The defendants assert that there were no open "negotiations" in connection with the passage of the 1871 Act. The defendants maintain that the Act was a fraudulent joint venture between timber interests and the Indian Party whose purpose was to disenfranchise the Citizen's Party. They also point out that there are no legislative reports relating to the 1871 Act which reflect an intent to diminish the reservation. Rather, the defendants assert that they reflect that Congress was selling the land on the Tribe's behalf. The defendants also state that other contemporaneous understandings assumed that the 1871 Act was limited to the purchase of timber.

The defendants further maintain that, contrary to the plaintiff's assertion, evidence of events that occurred after 1871 does not support a finding that the reservation was diminished. In particular, the defendants contend that the omission by Congress of any mention of boundaries in the Act of 1874 is significant because this would have been "the logical opportunity for Congress to diminish the reservation, had diminishment been intended in 1871." (Defendants' Revised Brief at 20).

The defendants also contend that the Act of 1893 reaffirmed the 1856 treaty and the reservation it created. They point to the preamble to the Act which they assert states explicitly that as of 1893, tribal members occupied the reservation created by the Treaty of 1856, not a new reservation created in 1871. The defendants argue that Congress' rejection in hearings in

1892 of the bill proposed by the Indian Party was significant in that section three of the bill would have expressly provided that "the jurisdiction of the said State of Wisconsin shall be extended fully over the lands allotted and patented to persons as aforesaid after said patents shall be issued, in the same manner as over other portions of said State." *Id.* at 22. The defendants argue that the absence of such a provision in the Citizen Bill, which became the 1893 Act, merits the inference that diminishment was not intended. While acknowledging that references were made to a "little" or "18–section reservation" in hearings on the Citizen and Indian bills in 1892, the defendants state that such references "reflect the common usage of 'reservation' during this era as a shorthand for land in trust." *Id.* The defendants further contend that the Acts of 1895 and 1904 do not support a finding that the reservation was diminished.

The defendants maintain that the Act of 1906 lacks the requisite clear language to show congressional intent to diminish or disestablish the reservation. They also contend that the 1906 Act, enacted 35 years after the 1871 Act, is not close enough in time to provide much insight into the intent behind the 1871 Act. They assert that "the Act bears none of the features recognized by the Supreme Court as possibly reflecting a Congressional intent to diminish." *Id.* at 23. The defendants point out that Congress refers in the fifth paragraph of the Act to the two-township "Stockbridge and Munsee Reservation" created by Treaty in 1856, not the new reservation which the plaintiff asserts was created for the Stockbridge Indians under section seven of the 1871 Act. The defendants also state that nowhere in the 1906 Act is there reference to a "diminished" reservation or a "former" reservation or any indication that the two-township

reservation established in 1856 was not intact.

The defendants further assert that events surrounding the passage of the 1906 Act do not unequivocally reveal a widely-held understanding that the reservation would diminish. The defendants maintain that the legislative history of the 1906 Act is ambiguous and that under the mandate of *Solem,* ambiguities must be resolved in the Tribe's favor. The defendants also maintain that the events subsequent to the 1906 Act, including the issuance of patents and the letter from C.F. Hauke, Chief Clerk in the Office of Indian Affairs, fail to support disestablishment of the reservation.

The defendants note that the Acts of 1916 and 1924 do not address reservation boundaries and that the Act of 1972 provides no insight into congressional intent behind the 1871 or 1906 Acts. The defendants also maintain that the language Congress used in 1972 merely carries over assumptions adopted by the Office of Indian Affairs when the Tribe was reorganized in the 1930s.

According to the defendants, subsequent treatment by the Office of Indian Affairs also does not support a finding that the reservation was diminished. The defendants point to a letter written by Assistant Commissioner of Indian Affairs Frederic H. Abbott dated January 24, 1911 (Abbott letter) in which he analyzed the Acts of 1871, 1893 and 1906 and addressed the completion on April 4, 1910, of the distribution of fee patents to tribal members. The defendants assert that Assistant Commissioner Abbott applied "legal principles essentially identical with those set forth in *Solem* " and found that "it would appear that the Stockbridge and Munsee Reservation, although allotted . . . remains intact." *Id.* at 28 (quoting Letter of January 24, 1911, from Assistant Commissioner Abbott

to United States Attorney E.J. Henning at 7–8 [MD 528–536]).

The defendants also maintain that statistical reports and maps contain inconsistent categories and are internally contradictory making them of limited use for purposes of diminishment analysis. According to the defendants, allotment era records are of little value "because they are largely based on the incorrect assumption that a tribe's reservation could not include individual fee or trust lands." *Id.* at 30. They point out that this allotment era understanding of Indian country was rendered obsolete when in 1948, Congress "rejected the linkage of Indian country with Indian title and clarified that Indian country includes all lands within an Indian reservation 'notwithstanding the issuance of any patents.'" *Id.* at 31 (quoting 18 U.S.C. § 1151[a]).

The defendants acknowledge that during the reorganization process of the 1930s, the Office of Indian Affairs determined that the 1856 reservation was no longer intact. However, the defendants assert that this fact is not entitled to significant weight under the governing four-part diminishment test since the Office of Indian Affairs' determination was not based on any known legal analysis and occurred long after the Acts of 1871 and 1906.

With respect to documents of the 1930s, the defendants state that they were generated more than 60 years after the 1871 Act and more than 25 years after the 1906 Act. They assert that the documents contain no legal analysis of the relevant congressional acts and have minimal evidentiary value in determining congressional intent.

The defendants also contend that assertion of jurisdiction over the Stockbridge Reservation by Wisconsin state courts subsequent to the 1871 and 1906 Acts has no probative value because the Wisconsin Supreme Court in 1879 took an extraordinarily aggressive position, claiming jurisdiction over all of Indian country. The defendants point out that the Wisconsin Supreme Court continued to take the position that fee lands within reservation boundaries were not Indian country, citing *State v. Johnson,* 212 Wis. 301, 249 N.W. 284 (1933).

The defendants dispute the plaintiff's contention that the demographic evidence supports diminishment of the reservation. They assert that the reservation has maintained its Indian character through the years and that the Tribe has a "continuing and significant presence within the two township reservation [which] demonstrates that a de facto diminishment has not occurred in this case." (Defendants' Revised Brief at 35–36).

In challenging the plaintiff's position, the defendants assert that the plaintiff has improperly substituted "assimilative purpose" for the "congressional intent" standard mandated by the Supreme Court. The defendants take issue with the plaintiff's use of allotment era understandings and common understandings of the time to support diminishment of the reservation. Rather, they assert that the focus must be on congressional intent as evidenced by the statutory language. The defendants also maintain that allotment era understandings were uncertain and continually changing. They assert that the relationship between land title, citizenship status and the terms, "reservation" and "Indian country" were confused during the allotment era.

The defendants further contend that, contrary to the plaintiff's position, the issuance of fee simple patents did not disestablish the reservation. The defendants state that the plaintiff relies on discarded assumptions of the allotment era and that its position that the issuance of fee simple

patents was sufficient to end the reservation, is contrary to well-developed Supreme Court diminishment jurisprudence under which congressional intent, not transfer of land title, is paramount. Moreover, they assert that the plaintiff's contention that a fully-patented reservation cannot remain a reservation "is contradicted by 18 U.S.C. § 1151," the 1948 law clarifying that "Indian country" includes all land within the boundaries of an Indian reservation. (Revised Defendants' Brief in Opposition to the Plaintiff's Motion for Summary Judgment and Reply in Support of Defendants' Motion for Summary Judgment [Defendants' Revised Brief in Opposition] at 22). The defendants state that Congress enacted § 1151 to remove the uncertainty surrounding the terms, "Indian country," reservation, citizenship, land tenure and their interrelationship.

The defendants maintain that the plaintiff's position that fee patenting of the reservation is equivalent to its disestablishment ultimately comes from an improper application of section six of the General Allotment Act, 24 Stat. 388, as amended by the Burke Act of 1906. While pointing out that the Stockbridge–Munsee Reservation was not allotted under the General Allotment Act and that the acts pursuant to which the reservation was allotted do not contain a counterpart to section six, the defendants explain that subsequent Supreme Court cases have clarified the effect of allotment on reservation status and state jurisdiction.[18] Thus, according to the defendants, "the logic that persuaded some officials in the allotment era to assume that fee patenting necessarily implied diminishment has been rendered obsolete." (Defendants' Revised Brief at 40).

The defendants assert that numerous Acts of Congress with unambiguous language relating to reservation cessations were passed throughout the period from 1865 to 1915, including enactments close in time to the Acts of 1871 and 1906. The absence of any such language in any act relating to the Tribe, the defendants argue, weighs heavily against a finding of diminishment. According to the defendants, Congress' use of unambiguous language in contemporaneous acts undermines the plaintiff's argument that the court should find a diminishment of the Stockbridge–Munsee Reservation based on inferences and secondary language.

■ The amicus brief filed by the United States supports the defendants' position. At the outset, the court notes that the defendants contend that the amicus curiae brief warrants judicial deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, the brief was filed by the United States, not an administrative agency, and it is not interpreting or constructing a statute that the United States administers. Moreover, as argued by the plaintiff, the United States participated in six of the seven diminishment cases decided by the Supreme Court. In none of the six cases did the Court suggest that the United States' view of diminishment is entitled to deference. Therefore, although the United States' amicus brief warrants consideration, it is not entitled to deference.

In its amicus brief, the United States maintains that only Congress can alter the boundaries of an Indian reservation and to do so, Congress must state its intent to diminish or disestablish in the text of the statute itself or it must be "clear and

---

**18.** The defendants cite *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) and *County of Yakima v. Yakima Nation,* 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) to support their position.

plain" based on that text when read in conjunction with the surrounding circumstances. The United States asserts that this case presents two complex issues: "1) whether the boundaries of a reservation remain intact when Congress allots the reservation in fee to individual Indians, after which the tribe continues to occupy the reservation under the supervision of the federal government; and 2) whether the reservation boundaries are altered by a statute that sells a portion of the reservation lands to non-Indians and charges the United States with serving as the sales agent for the tribe." (United States Amicus Curiae Brief [Amicus Curiae Brief] at 18).

The United States claims that since this case lacks both statutory language and clear and plain congressional intent to alter reservation boundaries, the plaintiff "seeks to shift attention away from the 'clear and plain intent of Congress' test by fashioning a novel presumption based almost solely on the historical context, equating reservation boundaries with the existence of tribal trust land." *Id.* The United States asserts that the court should reject the plaintiff's "facile" approach "which would treat all sales or allotments of tribal land as altering a reservation's boundaries and render superfluous the mechanisms crafted by the Supreme Court for uncovering congressional intent." *Id.*

While the United States acknowledges that the application of the Supreme Court's jurisprudence to Congress' treatment of the Stockbridge–Munsee Tribe is difficult, it states that the Court's adherence to the clear and plain intent of Congress is beyond question. The United States asserts that neither the language of sale in the 1871 Act nor the provisions regarding possible movement of the Tribe to another reservation constitute clear and

plain congressional intent to alter the boundaries of the reservation.

The United States posits as a plausible explanation for the 1871 Act that in the post-Civil War years when federal money for Indian tribes was not available, Congress used the sale of timber lands within the reservation to provide the Tribe with much-needed funds and economic development on the reservation, as well as to compensate the Citizen Party. The United States also contends that the circumstances surrounding passage of the Act and its legislative history support the conclusion that Congress did not intend to diminish the reservation. The United States asserts that in the Act of 1893, Congress continued to refer to the two-township reservation boundaries as they were established in the 1856 Treaty and that this subsequent treatment of the reservation evidences Congress' understanding that the 1871 Act did not diminish the reservation boundaries.

The United States asserts that the statutory language of the 1906 Act does not on its face disestablish the reservation and provides insufficient evidence of a clear and plain congressional intent to disestablish the two-township reservation. The United States further asserts that this is particularly evident from the way Congress dealt with the Stockbridge–Munsee Reservation in prior treaties and acts. The United States contends that where Congress intended to alter reservation boundaries or establish state or territorial jurisdiction, it did so expressly and with attention to details.

The United States claims that when faced with a lack of explicit statutory language in the 1906 Act, language triggering a presumption of disestablishment or clear evidence of disestablishment, the plaintiff relies on a general legislative assumption and argues that by allotting all lands in

fee to tribal members, Congress intended to dispose of all communal lands within the boundaries of the reservation. According to the United States, the plaintiff then asserts that this, in turn, would have been understood at the time as an intent to disestablish the reservation. The United States states that there are three fundamental flaws in the plaintiff's argument for disestablishment by extrapolation: 1) the plaintiff fails to provide evidence of a clear and plain congressional intent to disestablish; 2) if the plaintiff's position was correct, the shift of reservation land to allotments or fee land would diminish or disestablish a reservation by operation of law and this has been rejected by the Supreme Court; and 3) the general assumption relied upon by the plaintiff was no longer universally accepted by the late 19th and early 20th centuries and, therefore, is not indicative of congressional intent.

The United States further maintains that the legislative history and the circumstances surrounding the 1906 Act support the conclusion that Congress intended to keep the reservation boundaries intact. According to the United States, the Department of the Interior and the State's treatment of the Stockbridge–Munsee Tribe following the 1906 Act have been inconsistent and, therefore, inconclusive.

The United States further asserts that the federal and state governments' subsequent treatment of the reservation lands has been "rife with contradiction and inconsistencies," and that such inconsistencies are insufficient to support a finding of diminishment or disestablishment. *Id.* at 19. Finally, the United States asserts that the demographics of the area provide support for the continuing integrity of the reservation boundaries since the Tribe still occupies and has a strong presence in the community comprising the two townships. Although acknowledging the "complex and sometimes contradictory history of the treatment of the Tribe and the two-township reservation," the United States asserts that "the United States continues to recognize the original boundaries of the two-township [Stockbridge–Munsee] reservation." *Id.* The United States does not elaborate on this statement.

In response to the defendants' summary judgment motion and the amicus brief of the United States, and in support of its motion for summary judgment, the plaintiff asserts that "the historical record shows unmistakably that all involved—the Tribe, Congress, federal officials responsible for Indian affairs, and the local community—shared the same understanding: that the 1871 Act diminished the Stockbridge reservation and the 1906 Act disestablished it." (Revised Version of the State's Brief Opposing the Tribe's Motion for Summary Judgment, and Supporting a Grant of Summary Judgment in the State's Favor [State's Revised Brief] at 3).

The plaintiff states that the defendants and the United States continue to insist upon particular words, even though the Court does not require the use of particular words in congressional enactments to establish diminishment. The plaintiff contends that they ignore the "obvious" reason the express words of cessation or restoration to the public domain are not present in the 1871 and 1906 Acts—neither act constituted a transfer of title to the United States. Thus, the plaintiff asserts that words of cessation or restoration to the public domain were irrelevant.

The plaintiff also points out that the common understanding of the time is an important component of diminishment analysis. The plaintiff contends that the defendants and United States "denigrate" the importance of "the massive historical evidence that the nearly universal contemporaneous and subsequent understanding

was that the reservation was diminished in 1871 and disestablished in 1906." *Id.* at 9. The plaintiff insists that, contrary to the defendants' and the United States' assertions, the Court regularly has looked to common understanding to ascertain Congress' intent. The plaintiff maintains that the common understanding supports its position.

The plaintiff insists that the defendants and the United States misapply the governing test for diminishment. The plaintiff contends that the defendants' "selective reliance on language in Supreme Court decisions interpreting surplus land acts is misplaced." *Id.* at 4. The plaintiff observes that the surplus land acts were designed to open up surplus reservation land for non-Indian settlement partly to speed up the process of assimilation by bringing Indians into contact with non-Indian homesteaders. The plaintiff asserts that, unlike the acts in the cases relied on by the defendants, the 1871 and 1906 Acts at issue were not surplus land acts and did not purport to open up lands to non-Indian settlement to promote assimilation. The plaintiff maintains that the evidence is "abundant and uncontroverted" that when Congress enacted the two laws, it understood that the reservation boundaries would thereby change. (State's Revised Brief at 4). The plaintiff further states: "As the Tribe is forced to acknowledge, the notion that the reservation survived the sale of the 54 sections and then the fee patenting of the entire 18 sections remaining would have been inconceivable to Congress at that time." *Id.*

Thus, the plaintiff asserts that "to decide this case it is necessary to extrapolate from the Court's decisions involving surplus land acts, rather than apply them in rote fashion to dissimilar circumstances." (Revised Version of the State's Surreply Brief and Response to the Amicus Brief of

the United States [State's Revised Surreply Brief] at 3). The plaintiff further asserts that although the defendant Tribe "tries strenuously to avoid the so-called 'assimilative purpose' factor, the fact remains that only acts intended to promote settlement and thereby speed assimilation have been held not to diminish reservation boundaries." *Id.* at 4.

The plaintiff takes issue with the defendants' argument that Congress' definition for jurisdictional purposes of the term, "Indian country," in 1948, 18 U.S.C. § 1151, evidences Congress' intent behind the 1871 and 1906 Acts. The plaintiff asserts that the defendants' argument is flawed for two reasons: a subsequent Congress cannot alter the intent of a prior Congress and, even if it could, § 1151 did not alter the definition of "reservation," thereby somehow retroactively recreating a reservation that had disappeared long ago.

The plaintiff argues that events leading up to the Act of 1871 show a clear trend toward disestablishment of the reservation. The plaintiff contends that the language of the Act of 1871, the historical context and subsequent understanding reflect Congress' clear intention to diminish the reservation to 18 contiguous sections. The plaintiff explains that the absence of language like "cede" or "relinquish" in the 1871 Act is readily explainable because the 1871 Act was a unilateral act, not like the examples cited by the defendants which involved bilateral agreements between the tribes and the federal government. The plaintiff notes that objections to the legislation were not to the sale of the 54 sections, but to the exclusion of the Citizen Party.

The plaintiff also asserts that, contrary to the defendants' argument, the "sum certain" factor is present in the 1871 Act. The plaintiff points out that the manner of sale

called for by the Act provided for a definable sum and set a fixed minimum of "not less than the minimum of one dollar and twenty-five cents per acre." *Id.* at 27 (quoting Act of 1871, § 2). The plaintiff does not dispute the United States' contention that cashing out the Citizens Party does not necessarily imply a change in the reservation boundaries if this were the sole factor involved. However, the plaintiff asserts that the cashing out of the Citizens Party was also accompanied by the outright sale of 54 sections and a new reservation for the Indian Party. According to the plaintiff, events following the 1871 Act also show an understanding that the reservation was diminished to 18 contiguous sections.

Addressing the Act of 1906, the plaintiff contends that this Act disestablished the remainder of the Stockbridge–Munsee Reservation. The plaintiff maintains that the intent to disestablish the reservation through implementation of the 1906 Act is clear and plain and that the common understandings of the time support this conclusion. The plaintiff states that the allotment provisions of the Act clearly refer to the reservation as diminished by the 1871 Act.

The plaintiff points out that the 1906 Act called for the complete fee patenting of all land within the 18–section diminished reservation "whereupon all the tribal members would become citizens and all vestiges of reservation status would disappear." *Id.* at 30. Specifically, the plaintiff states that the failed effort to impose restrictions on the patents also strongly supports the intent to disestablish.

The plaintiff states that even the Tribe has conceded that "[u]nder the logic of the allotment era, trust status implied federal supervision. At such time as Indian land was no longer subject to federal supervision, it was assumed reservation status would end." *Id.* at 11 (quoting Defendants' Revised Brief at 38). The plaintiff also takes issue with the defendants' and the United States' position regarding the concept of a reservation without restricted land.

The plaintiff states that the defendants confuse and fail to distinguish between the terms "Indian country" and "reservation." The plaintiff contends that the Supreme Court has explicitly recognized that "Indian country" and "reservation" are distinct terms. The plaintiff explains: "Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries." (State's Revised Surreply Brief at 14 [quoting *Solem,* 465 U.S. at 468, 104 S.Ct. 1161 (emphasis omitted) ] ). The plaintiff further explains that in *United States v. John,* 437 U.S. 634, 647 n. 16, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), the Court observed that while the Major Crimes Act originally used the term "reservation" to define the geographical scope of federal jurisdiction, Congress replaced it with the broader concept of "Indian country" in 1948. The plaintiff also points out that although the Court addressed the scope of Indian country in a number of cases around the turn of the century, it did not address the definition of "reservation."

The plaintiff further contends that although the fact that the Stockbridge Indians became citizens with the implementation of the 1906 Act might not be sufficient standing alone to terminate the reservation, such fact, along with the complete fee patenting of the reservation and the circumstances surrounding the 1906 Act, is powerful evidence that the reservation was dissolved. The plaintiff claims that as of 1906, the granting of citizenship to Indians was viewed as an essential step in terminating their tribal relations.

According to the plaintiff, the treatment and events subsequent to the 1906 Act's passage confirm that the Act disestablished the remaining 18 sections of the reservation. The plaintiff cites various events occurring after 1906 to support its position, including the reorganization of the Tribe under the Indian Reorganization Act in 1934 and the proclamation of a new reservation. It also asserts that the 1910 letter from Chief Clerk C.F. Hauke to a Stockbridge tribal member attested to Indian citizenship and the absence of a reservation.

The plaintiff challenges the 1911 letter written by Assistant Commissioner of Indian Affairs Frederick Abbott, asserting that it was " 'contrary' to the nearly universal contemporaneous and subsequent understanding of the legal status of the reservation." (State's Revised Surreply Brief at 42). The plaintiff maintains that the common understanding of the effects of the 1871 and 1906 Acts continued unabated during the succeeding decades.

The plaintiff argues that Congress' addition in 1972 of approximately 13,000 acres of submarginal lands located within the two townships supports its position that the reservation was disestablished since there would be no need to add the lands to the reservation if Congress believed that the lands were already within the reservation. The plaintiff also maintains that the demographics reflect the loss of reservation status of the areas affected by the Acts of 1871 and 1906.

The plaintiff takes issue with the United States' position that since 1974, the Department of the Interior consistently has adhered to a two-township reservation. The plaintiff points out that the United States ignores a substantial amount of significant history, including the department's approval of an expansion of the Menominee Reservation onto a portion of the original two-township Stockbridge Reservation and reorganization under the Indian Reorganization Act. The plaintiff also contends that the post–1910 statistical reports do not show that the Stockbridge Reservation survived the fee patenting.

## ANALYSIS

A summary review of the changing relationship between the federal government and Indian tribes in the 19th and early 20th centuries, as relevant to this case, provides a framework for the issue before this court. By the beginning of the 19th century, unoccupied fertile land had become scarce in the eastern part of the United States and white settlers wanted the government to remove Indians from their territory. Lawrence C. Kelly, *Federal Indian Policy*, at 42 (1990 ed.). Thus, in the early 19th century, the federal government engaged in a policy of removing the Indians to lands in the West beyond the boundaries of white settlements in exchange for their territory in the eastern United States. *See* Felix S. Cohen, *Handbook of Federal Indian Law* at 28, 78 (1982 ed.).

This policy, known as the removal policy, made a vast area available for white settlement and reduced the conflict of sovereign authority caused by the presence of independent Indian governments within state boundaries. Cohen at 79. The removal policy was formally established by the Act of May 28, 1830. *Id.* at 122, n. 470 (citing 4 Stat. 411). Although President Thomas Jefferson first had proposed that eastern Indians be relocated west of the Mississippi River in the early 1800s, it was not until the presidency of Andrew Jackson in 1829 that Indian tribes were faced with forced removal. Kelly at 42. The forced removal of Indians caused them great hardship and many died during the arduous journey westward. *Id.* at 40–43.

"Removal and concentration were perceived as a method for the civilization and ultimate assimilation of the Indian into American life." Cohen at 123.

Two United States Supreme Court cases in the 1830s clarified the relationship of Indian tribes to the states. In *Cherokee Nation v. Georgia*, 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831), the court held that an Indian tribe is not a "foreign state within the meaning of the Constitution, but rather 'domestic dependent nations' subject to the ultimate authority of the federal government." Their relationship to the United States resembles that "of a ward to his guardian." *Id.* In *Worcester v. Georgia*, 31 U.S. 515, 561, 6 Pet. 515, 8 L.Ed. 483 (1832), the court acknowledged that the Cherokee Nation did not have independent foreign nation status, but it made clear that the Cherokee Nation within the State of Georgia was not within the territorial jurisdiction of the State and, therefore, not subject to Georgia laws. Rather, the Court held that as distinct political communities with territorial boundaries, the regulation of Indian nations was committed exclusively to the federal government. *Id.*

Prior to the 1850's, federal policy generally supported the rights of Indian tribes to maintain communal or tribal ownership of land and their related social and political institutions. *Cohen* at 613. Occasionally, tribal lands were allotted to individual Indians or families. *Id.*

In the mid 19th century, changing conditions on the frontier impacted the Indian tribes. The westward migration of white settlers and miners resulted in clashes between the Tribes and the settlers. Gradually, federal policy shifted from a policy of removal to fixed reservations for Indian tribes. *Id.* at 124; Kelly at 47–50.

In 1853, the federal government adopted a policy of allotment by which tribal ownership in some lands was converted into title held by individual tribal members. *Cohen* at 98. The underlying rationale for the allotment policy was the belief that the Indians should be assimilated into the "mainstream of American life." *Id.* at 128–129. During this allotment period, numerous treaties included clauses authorizing allotments. *Id.* at 130. In some cases, allottees surrendered their interests in the tribal estate and became United States citizens subject to state and federal jurisdiction. *Id.* at 130, n. 26 (citing treaties, including the November 24, 1848, Treaty with the Stockbridge Tribe of Indians).

In 1871, Congress provided for the termination of treaty-making with Indian tribes. Cohen at 127; *see* Appropriations Act of March 3, 1871; 16 Stat. 544 (codified at 25 U.S.C. § 71). However, the relationship between the federal government and the Indian tribes continued much as it had before, except that negotiations with the tribes about land cessions resulted in "agreements," rather than treaties. Cohen at 127. Following the passage of the 1871 Act, the tribes were no longer regarded as sovereign nations and the federal government began to regulate tribal affairs by statute or through contractual agreements ratified by statute. *DeCoteau v. District County Court for the Tenth Judicial District*, 420 U.S. 425, 431, 95 S.Ct. 1082, 43 L.Ed.2d 300, (1975) (citing Act of March 3, 1871, c. 120, s 1, 16 Stat. 566).

The policy of the federal government toward Indian tribes underwent further changes. In the latter half of the 19th century, the federal government set aside large sections of the western states and territories for Indian reservations. Towards the end of the 19th century, Congress increasingly held the view that Indian tribes should "abandon their nomadic

lives on the communal reservations and settle into an agrarian economy on privately-owned parcels of land." *Solem v. Bartlett*, 465 U.S. 463, 466, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). This shift in viewpoint was based in part on the belief that farming on individual plots of land would hasten the assimilation of Indians and, in part, by the continuing demands for new lands for homesteaders who were moving west. *Id.*

In 1887, the General Allotment Act, 24 Stat. 388, commonly known as the Dawes Act,[19] was enacted by Congress in an attempt to "reconcile the Government's responsibility for the Indian's welfare with the desire of non-Indians to settle upon reservation lands." *DeCoteau*, 420 U.S. at 432, 95 S.Ct. 1082 (citing Act of February 8, 1887, c. 119, 24 Stat. 388). The Dawes Act gave the President the discretion to make individual allotments of reservation lands to resident Indians and, with tribal consent, to open up unallotted surplus lands for non-Indian settlement. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 335, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998); *DeCoteau*, 420 U.S. at 432, 95 S.Ct. 1082 (citing *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 [1973] ).

The policy of the Act "was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing." *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). When all the lands had been allotted and the trust expired, the reservation could be abolished. *Id.* The purpose in making unallotted lands available to non-Indians was to promote interaction between Indians and whites and to encourage Indians to adopt white ways. *Id.* at 496, 93 S.Ct. 2245 (citing § 6 of the General Allotment Act, 24 Stat. 390). The belief was that

within a generation or two, the reservations would disappear, the tribes would dissolve and individual Indians would be absorbed into the larger community of white settlers. *Yankton Sioux Tribe*, 522 U.S. at 335, 118 S.Ct. 789 (citing Hearings on H.R. 7902 before the House Committee on Indian Affairs, 73rd Cong., 2d Sess., 428 [1934] [Statement of D.S. Otis on the history of the allotment policy] ).

As a corollary to the allotment policy, the federal government sought the cession of tribal lands which remained after each eligible Indian had received an allotment. Cohen at 613. These "surplus" lands were open to purchase for homesteading by non-Indians. *Id.* "The rationale for the policy was that most lands remaining after allotment was completed were not needed by the tribes." *Id.* at 613–614.

By the 1920's, however, the allotment policy was generally deemed to be a failure. *Id.* at 614. Rather than benefitting the Indians, the policy often had resulted in the loss of Indian lands. The sale of these surplus lands and alienation of allotments resulted in the loss of almost ninety million acres of tribal land by 1934. *Id.* at 614.

The late 1920s and early 1930s saw a marked change in the federal government's attitude regarding Indian policy and a departure from many of the assimilationist policies of the allotment era. *Id.* at 144. There was greater tolerance for many traditional aspects of Indian culture and new protections were provided for some Indian rights. *Id.* Greater respect was accorded Indian culture than was evident during the allotment era.

The 1930s marked the passage of reform legislation. In 1934, Congress passed the Indian Reorganization Act (IRA) which,

---

**19.** Senator Henry L. Dawes of Massachusetts was the sponsor of the bill.

from an historical perspective, was a change in federal government policy toward the Indians. Under the Act, which ended the federal government's allotment policy, the Secretary of the Interior was authorized to expand the land base of Indian tribes, 25 U.S.C. § 465, and to establish new reservations where none previously existed. 25 U.S.C. § 467. The IRA was designed to encourage economic development and tribal self-government and to end the alienation and further loss of tribal land needed to support tribal members. *Cohen* at 144–149. In addition, the IRA's purpose was to provide for the acquisition of additional tribal lands and generally to improve the economic situation of Indians. *Id.* Indian tribes were allowed to organize and adopt a constitution under section 16 of the IRA, which provided a congressional sanction of tribal self government. *Id.* at 149; *see also,* Indian Reorganization Act of June 18, 1934 (MD 685).

The IRA received a mixed response from Indian tribes, but a majority of tribes elected to come under the provisions of the Act. Cohen at 150. The bleak economic conditions in the 1930s and World War II had an impact on implementation of programs under the IRA.

The federal government's view of Indian lands changed over the years. At the turn of the 19th century, reservation status of Indian lands generally was considered to be coextensive with tribal ownership. *See Solem,* 465 U.S. at 468, 104 S.Ct. 1161. "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest: trust lands, individual allotments and, to a more limited degree, opened lands that had not yet been claimed by non-Indians." *Id.* (citing *Bates v. Clark,* 95 U.S. 204, 24 L.Ed. 471 (1877); *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920)). "Federal criminal jurisdiction

over Indian lands traditionally had been defined with reference to the term 'Indian country.'" Cohen at 162.

However, in 1948, Congress uncoupled reservation status from Indian ownership and statutory defined Indian country to include those lands held in fee by non-Indians within the boundaries of a reservation. *Solem,* 465 U.S. at 468, 104 S.Ct. 1161. On June 25, 1948, Congress enacted a revision to Title 18 of the United States Code containing a new statutory definition of "Indian country" in section 1151. This 1948 revision stated:

> Except as otherwise provided in Sections 1154 and 1156 of this title, the term "Indian country" as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities with the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

With this brief historical summary, the court will address the issue in this case. The issue before the court is whether the boundaries of the Stockbridge–Munsee Reservation as defined by the Treaty of 1856 remain intact. To address this question the court must determine whether the Act of 1871, "An Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin," diminished the original Stockbridge–Munsee Reservation to 18 contiguous sections. The court must also determine whether the Act of 1906

disestablished the remainder of the Stockbridge–Munsee Reservation.

To determine whether the 1856 boundaries of the Stockbridge–Munsee Reservation were diminished by the Act of 1871, and subsequently disestablished by the Act of 1906, the court is guided by well-established legal principles. In *Solem*, the Supreme Court addressed a 1908 surplus land act which authorized the Secretary of the Interior to open 1.6 million acres of the Cheyenne River Sioux Reservation to homesteaders. 465 U.S. at 464, 104 S.Ct. 1161. The Court, in concluding that the act did not diminish the reservation, discussed the historical underpinnings of the surplus land acts enacted by Congress.

The court explained that at the turn of the 19th century, Congress passed the surplus land acts "to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement." *Id.* at 467, 104 S.Ct. 1161. At that time, Congress increasingly shared the belief that Indians would be more quickly assimilated into American society if they abandoned their nomadic lives on the communal reservations and settled into an agrarian economy on parcels of land which they privately owned. *Id.* at 466, 104 S.Ct. 1161. The Court stated that it is "settled law that some surplus land acts diminished reservations ... and other surplus land acts did not" and that the effect of any given surplus land act depended upon the language of the act itself and the underlying circumstances of its passage. *Id.* at 469, 104 S.Ct. 1161 (citations omitted).

The Court recognized that the surplus land acts seldom stated whether opened lands retained reservation status. The Court explained that such distinction seemed unimportant at the time since Indian lands were judicially defined to include only those lands in which the Indians

held some property interest, such as trust lands, individual allotments, and, to a more limited extent, those opened lands that had not yet been claimed by non-Indians. *Id.* at 468, 104 S.Ct. 1161. "The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century." *Id.*

■■ The Court in *Solem* then articulated the "fairly clean analytical structure" which had been established for determining whether a surplus land act diminished a reservation or merely offered non-Indians the opportunity to purchase land within the boundaries of an established reservation. *Id.* at 470, 104 S.Ct. 1161. The first and governing principle is that "only Congress can divest a reservation of its land and diminish its boundaries." *Id.*; *see also, United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909). As the Court explained: "[o]nce a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly decides otherwise." *Solem*, 465 U.S. at 470, 104 S.Ct. 1161. Moreover, diminishment will not be lightly inferred. *Id.* Congress must clearly evince an "intent to change boundaries" before diminishment will be found. *Id.* (quoting *Rosebud v. Kneip*, 430 U.S. 584, 615, 97 S.Ct. 1361 [1977] ).

■ The most probative evidence of the intent of Congress is the statutory language used to open Indian lands. *Solem*, 465 U.S. at 470, 104 S.Ct. 1161. "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Id.* (citing *DeCoteau*, 420 U.S. at 444–445, 95 S.Ct. 1082). Language of cession coupled

with an unconditional commitment from Congress to compensate the tribe for its opened land creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Solem*, 465 U.S. at 470, 104 S.Ct. 1161.

■ The Court stated, however, that explicit language of cession and unconditional compensation are not prerequisites for a finding of diminishment. *Id.* Moreover, no particular set of words must be present for the court to find that there has been a diminishment. *Hagen v. Utah*, 510 U.S. 399, 411–412, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). In determining congressional intent, the court should examine the face of the act, the surrounding circumstances and the legislative history. *Rosebud v. Kneip*, 430 U.S. 584, 587, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (citing *Mattz v. Arnett*, 412 U.S. at 505, 93 S.Ct. 2245). The court "must give effect to Congress' intent" in passing the act at issue. *Yankton Sioux Tribe*, 522 U.S. at 357, 118 S.Ct. 789.

■ The contemporary historical context surrounding the passage of the act is also a factor to be considered. *Yankton Sioux Tribe*, 522 U.S. at 351, 118 S.Ct. 789; *Hagen*, 510 U.S. at 411, 114 S.Ct. 958; *Solem*, 465 U.S. at 471, 104 S.Ct. 1161. In *Solem*, the Court stated:

> When events surrounding the passage of a surplus land act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress—unequivocally reveal a widely-held contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise

suggest reservation boundaries remained unchanged.

*Id.* at 471, 104 S.Ct. 1161. "Even in the absence of a clear expression of congressional purpose in the text of a surplus land act, unequivocal evidence derived from the surrounding circumstances may support the conclusion that a reservation has been diminished." *Yankton Sioux Tribe*, 522 U.S. at 352, 118 S.Ct. at 802 (citing *Solem*, 465 U.S. at 471, 104 S.Ct. 1161).

To a lesser extent, to discern Congress' intentions, courts look to events that occurred after the act's passage, such as the subsequent treatment of the land in question, particularly in the years immediately following passage and the pattern of settlement on the land. *Yankton Sioux Tribe*, 522 U.S. at 344, 118 S.Ct. 789 (citing *Hagen*, 510 U.S. at 411, 114 S.Ct. 958). Thus, the court can take note of the contemporary historical context, the subsequent congressional and administrative references to the reservation and demographic trends. *Yankton Sioux Tribe*, 522 U.S. at 351, 118 S.Ct. 789. "On a more pragmatic level," the Court has "recognized that who actually moved onto opened reservation lands is also relevant to deciding whether a surplus land act diminished a reservation." *Hagen*, 510 U.S. at 411, 114 S.Ct. 958 (quoting *Solem*, 465 U.S. at 471, 104 S.Ct. 1161). Thus, the pattern of settlement is also a consideration.

■ Throughout the inquiry, any ambiguities are to be resolved in favor of the Indians. *Yankton Sioux Tribe*, 522 U.S. at 344, 118 S.Ct. 789; *Hagen*, 510 U.S. at 411, 114 S.Ct. 958; *Solem*, 465 U.S. at 470, 104 S.Ct. 1161; *see also, South Dakota v. Bourland*, 508 U.S. 679, 687, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (" 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit' ") (quoting *County*

*of Yakima v. Confederated Tribes and Bands of Yakima Nation,* 502 U.S. 251, 269, 112 S.Ct. 683, 116 L.Ed.2d 687 [1992] [internal quotation marks omitted] ).

The court will apply these principles to the facts of this case to determine whether the Act of 1871 clearly evinces congressional intent to diminish the boundaries of the Stockbridge–Munsee Reservation and whether the Act of 1906 clearly shows that Congress intended to disestablish the reservation.

The defendants and the United States assert that the Supreme Court has established clear legal principles that control the issue of reservation diminishment in the post–1948 era. They point out that the Court's diminishment cases mandate a careful, fact-specific review of the relevant factors in each case in which a diminishment is alleged, and that such a review in this case compels the conclusion that the Stockbridge–Munsee Reservation was not diminished by the Act of 1871 or disestablished by the Act of 1906. The defendants and the United States insist that the controlling legal principles do not support a finding of diminishment but rather requires a determination by the Court that the two townships set aside for the Tribe in the Treaty of 1856 still constitute the Stockbridge–Munsee Reservation. They urge the Court to utilize *Solem* as a yardstick in assessing whether the Act of 1871 altered the boundaries of the two-township reservation since the facts in *Solem* closely parallel the facts and circumstances in this case and is controlling.

The court will review the facts in *Solem* and other diminishment cases as relevant to this case. *Solem* involved a surplus land act enacted by Congress in 1908 which authorized the Secretary of the Interior "to sell and dispose of" a specified portion of the Cheyenne River Sioux Reservation for homesteading with the pro-

ceeds of the sale to be deposited in the United States Treasury to the credit of the Indians belonging to and having tribal rights on the reservation. 465 U.S. at 472–473, 104 S.Ct. 1161. The Court concluded that the operative language authorizing the Secretary of the Interior to sell and dispose of certain lands, in conjunction with the creation of Indian accounts for the proceeds, did not result in diminishment of the reservation. Rather, the Court found that these provisions suggested "that the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent." *Id.* at 473, 104 S.Ct. 1161. The Court stated that precisely the same language was addressed in *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), and that the Court concluded in *Seymour* that such provisions "did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Solem,* 465 U.S. at 473, 104 S.Ct. 1161 (citing *Seymour,* 368 U.S. at 356, 82 S.Ct. 424).

In examining the balance of the 1908 Act, the Court in *Solem* found that certain provisions strongly suggested that the unallotted opened lands would remain an integral part of the reservation for the immediate future. *Id.* at 474, 104 S.Ct. 1161. The Court noted that the Act authorized the Secretary of the Interior to set aside portions of the opened lands for agency, school and religious purposes. *Id.* The Court observed: "It is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation." *Id.*

The Court acknowledged that some language in the act indirectly supported the

view that the reservation was diminished. However, the Court noted that language in subsequent portions of the act referring to the opened areas as being in the "public domain" and unopened areas as comprising the "reservation thus diminished" were not dispositive when balanced against the stated limited goal of opening up the reservation lands for sale to non-Indians settlers. *Id.* at 475–476, 104 S.Ct. 1161. The Court concluded that it was "impossible to infer from a few isolated and ambiguous phrases" in the legislative history that Congress intended to diminish the reservation. *Id.* at 478, 104 S.Ct. 1161.

The Court then looked to the circumstances surrounding the passage of the Cheyenne River Act, noting that the Act had its origins in "a bill to authorize the sale and disposition of a portion of the surplus and unallotted lands in the Cheyenne River and Standing Rock reservations." *Id.* at 476, 104 S.Ct. 1161 (citing S. 1385, 60th Cong., 1st Sess. [1907]). The Court observed that the bill was initiated by a United States Senator and did not begin with an agreement between the United States and the tribes. Rather, after the bill was under consideration, it was brought to the tribes so that they could be consulted about the possible cession of their lands. *Id.* at 476, 104 S.Ct. 1161. However, before a decision was received from the Cheyenne River Tribe, a report was made to Congress which stated that the tribe was in favor of the relinquishment of the opened lands. *Id.* at 477, 104 S.Ct. 1161. The Court pointed out that the legislative history made no mention of the effect of the Act on the reservation's boundaries, nor was there clear evidence that the tribe had agreed to cede the open areas. *Id.*

The Court gave little weight to the subsequent treatment of the reservation by Congress, the courts and the executive branch, finding it to be too "rife with contradictions and inconsistencies" to be of much use. *Id.* Finally, the Court noted that most of the tribe obtained individual allotments on the lands opened by the Act and that two-thirds of the existing tribe now lived on the opened lands. *Id.* at 480, 104 S.Ct. 1161.

A review of other diminishment cases provides additional guidance and is helpful to the resolution of the issues before the court. In *Rosebud Sioux Tribe,* 430 U.S. at 606–607, 97 S.Ct. 1361, the Supreme Court held that the circumstances surrounding the passage of the Acts of 1904, 1907 and 1910 unequivocally demonstrated that Congress intended each act to diminish the Rosebud Reservation. In 1901, the Rosebud Sioux Tribe had voted in favor of an agreement to cede a portion of their unallotted land in exchange for payment of a sum certain by the United States. The negotiated agreement was never ratified. It was undisputed that had the 1901 agreement been ratified, it would have disestablished a portion of the Rosebud Sioux Reservation.

Three years later, Congress passed the Act of April 23, 1904, which incorporated the 1901 agreement's cession language, but replaced the sum certain payment with a provision guaranteeing the tribe payment from the sale of the opened lands. The 1904 Act provided that the tribe did "cede, surrender, grant, and convey to the United States" all their right, title, claim, and interest in the certain remaining unallotted lands. *Id.* at 597, 97 S.Ct. 1361. The Court found that nothing in the changed method of payment or the failure to obtain approval by a three-quarters vote of the Indians indicated that the clear intent of the 1901 agreement to diminish the reservation had changed between 1901 and 1904. *Id.* at 598, 97 S.Ct. 1361.

In 1907 and 1910, Congress passed two additional surplus land acts involving Rosebud Sioux Reservation land. Each of the subsequent acts authorized the sale and disposal of additional lands and provided that the tribes would receive the proceeds of the sales. Neither act contained words of cession or termination. Despite the lack of language in the acts that clearly severed the tribe from its interest in the unallotted opened lands, the Court held that the language of the three acts and the legislative history demonstrated that Congress intended to diminish the reservation boundaries.[20] *Id.* at 614–615, 97 S.Ct. 1361.

The Court also conducted a fact specific review of the statutory language and historical circumstances of a congressional act in *Yankton Sioux Tribe.* The 1894 Act at issue provided that the Yankton Sioux Tribe would "cede, sell, relinquish, and convey to the United States" all title, right and interest to the unallotted lands within the limits of the reservation in exchange for the sum of $600,000. 522 U.S. at 338, 118 S.Ct. 789. Discounting a savings clause in the Act, the Court concluded that the total surrender of tribal claims in exchange for a fixed payment bore "the hallmarks of congressional intent to diminish a reservation." *Id.* at 345, 118 S.Ct. 789. The Court stated that the manner in which the transaction was negotiated and the Presidential Proclamation opening the lands to settlement revealed a contemporaneous understanding that the act altered the boundaries of the reservation. Little weight was given to the subsequent congressional and administrative references to the land because they presented a mixed record which revealed no consistent or dominant approach to the territory at issue.

Similarly, in *Hagen,* the Court was called upon to determine whether Congress diminished the Uintah Indian Reservation by passage of the Act of 1902. The operative language provided for allocations of reservation land to Indians and further provided that "all the unallotted lands within said reservation shall be restored to the public domain." 510 U.S. at 412, 114 S.Ct. 958. The Court found that such language evidenced Congress' intent to terminate reservation status. The Court noted that statutes of the time indicated that "Congress considered Indian reservations as separate from the public domain." *Id.* at 413, 114 S.Ct. 958 (internal citations omitted). Given the statutory language, contemporary historical evidence, and the subsequent treatment of the area, the Court concluded that Congress had diminished the reservation.

In *DeCoteau,* 420 U.S. at 445, 95 S.Ct. 1082, the Court held that the Lake Traverse Indian Reservation was terminated and returned to the public domain by an act enacted in 1891. The 1891 Act had ratified an 1889 agreement between the Sisseton and Wahpeton Tribes and the United States, wherein the tribes agreed to "cede, sell, relinquish and convey to the United States" all remaining unallotted land within the reservation in exchange for a sum certain payment per acre for the lands ceded. The Court concluded that the "face of the Act," its surrounding circumstances and its legislative history pointed unmistakably to the conclusion that the 1891 Act terminated the reservation. *Id.*

In *Mattz,* the Supreme Court addressed whether Congress diminished the Klamath

---

**20.** The Court in *Solem* acknowledged that the 1907 and 1910 Acts were "strikingly similar" to the 1906 Act which the Court in *Seymour* found not to have diminished the Colville Reservation. 465 U.S. at 469 n. 10, 104 S.Ct. 1161.

River Reservation when it passed the surplus land act in 1892. The act provided that the lands would be "subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands" under certain provisions. 412 U.S. at 495, 93 S.Ct. 2245. The proceeds from the sale of the lands constituted a fund to be used under the direction of the Secretary of the Interior for the "maintenance and education of the Indians now residing on said lands and their children." *Id.* According to the Court, the allotment provisions of the 1892 Act, which were similar to those of the General Allotment Act of 1887, were "completely consistent with continued reservation status." *Id.* at 497, 93 S.Ct. 2245. The Court also observed that both Congress and the Department of Indian Affairs had repeatedly recognized the reservation status of the land after 1892. *Id.* at 505, 93 S.Ct. 2245. Based on its analysis of the relevant factors, the Court concluded that the reservation was not terminated and remained Indian country. *Id.* at 506, 93 S.Ct. 2245.

A similar conclusion was reached in *Seymour,* 368 U.S. at 354–357, 82 S.Ct. 424, based in part on the Court's observation that Congress and the Department of the Interior had explicitly recognized the continued existence of the reservation in the years following the 1906 Act at issue. In *Seymour,* the Court held that a 1906 Act providing for the sale of mineral lands and for the settlement and entry under the homestead laws of other surplus lands remaining on the Colville Indian Reservation did not diminish the reservation. *Id.* at 354–355, 82 S.Ct. 424. The Court noted that in 1892, Congress had diminished the size of the reservation in an act that "vacated and restored to the public domain" the northern half of the reservation. *Id.* at 354, 82 S.Ct. 424. "Nowhere in the 1906

Act is there to be found any language similar to that in the 1892 Act." *Id.* at 355, 82 S.Ct. 424. The Court also noted that the 1906 Act provided that the proceeds from the disposition of the lands were to be deposited in the United States Treasury to the credit of the tribe. *Id.* at 355–356, 82 S.Ct. 424.

■ In the instant case, the 1871 Act at issue does not contain explicit reference to cessation or other language evidencing the surrender of all tribal interests in the 54 sections of the Stockbridge–Munsee Reservation. While such language is most probative of the intent of Congress, it is not a prerequisite for a finding of diminishment. *See Hagen,* 510 U.S. at 411–412, 114 S.Ct. 958; *Solem,* 465 U.S. at 470, 104 S.Ct. 1161. Even in the absence of a clear expression of such congressional purpose in the text of the Act, events and circumstances surrounding the Act's passage that unequivocally show a widely-held contemporaneous understanding that the reservation would be diminished may support a finding of diminishment. *See Yankton Sioux Tribe,* 522 U.S. at 351, 118 S.Ct. 789, *Solem,* 465 U.S. at 471, 104 S.Ct. 1161. Therefore, the historical context and events leading up to the passage of the 1871 Act will be briefly examined.

Unlike many tribes, the Stockbridge–Munsee Tribe has a long history of involvement with white settlers dating back to their days in Massachusetts and the Hudson River Valley. In 1735, a large segment of the Tribe accepted a Christian mission and settled in the Village of Stockbridge, Massachusetts, from which the Tribe derived its name. In 1821, the Tribe was removed to Wisconsin. Shortly after removal, a conflict arose within the Tribe. Tribal members of what became known as the Indian party wanted to preserve their tribal status and culture. However, the

so-called Citizen party favored relinquishing tribal status in return for United States citizenship and allotment of land. At the time, and through most of the 19th century, the prevailing view was that tribal affiliation was inconsistent with the acquisition of United States citizenship.

The intra-tribal conflict between the Indian party and the Citizen party was a continuing issue for the Tribe. The Act of 1846, which repealed the 1843 Act passed by Congress, restored and re-established the Tribe's rights and privileges and also provided for the division of tribal lands into two districts: the Indian District and the Citizen District. The lands in the Indian District were to be held in common while the lands in the Citizen District were to be divided and allotted to each Indian who became a citizen. Upon completion of the division and allotment, patents in fee simple would be issued. Under the Act, Indians who became citizens would forfeit any rights to receive any portion of the annuity which the Tribe might receive in the future.

In the Treaty of 1848, the Tribe renounced all participation in the benefits or privileges granted by the 1843 Act and declared themselves to be under the "protection and guardianship of the United States, as other Indian tribes." ("Treaty with the Stockbridge Tribe, 1848," 9 Stat. 955, Art. 1 [MD 16] ). The Tribe agreed to "sell and relinquish" land to the United States in return for which the United States agreed to pay the Tribe a sum of money. *Id.* Art. III (MD 17). The Tribe also agreed to remove to other land set aside for them. The treaty provided for the allotment of lands to those tribal members who had become citizens, and also provided that patents would be issued to them.

Despite these efforts, conflicts within the Tribe continued. A majority of the Tribe did not want to relocate to other land, while other tribal members wanted to sever their relations with the Tribe and receive patents for the land which they occupied. The federal government again attempted to resolve this conflict between the Indian party and the Citizen party.

The Treaty of 1856 between the Tribe and the United States, in part, was an effort to address this on-going intra-tribal conflict. The preamble to the treaty recounted the internal strife within the Tribe and the treaty recognized the divisions within the Tribe. Some members of the Tribe were adverse to removing to Minnesota and wanted to engage in agricultural pursuits at a new location in Wisconsin. Other tribal members wanted to sever their relations with the Tribe and receive patents for the land they occupied. The Treaty of 1856 established a reservation for the Stockbridge–Munsee Tribe consisting of two townships which were formerly part of the Menominee Reservation.[21]

In the 1860's, the Tribe became increasingly dissatisfied with the quality of the soil on the reservation since it proved unfit for agriculture. By letter of January 6, 1863, to Congress, some 84 members of the Tribe expressed their dissatisfaction with the poor quality of land and their opinion that the land was not the one promised "nor the one for which the treaty was signed." (Appendix to Defendants' Brief in Opposition to Motion for Preliminary Injunction at 229). They pointed out that the timber on the land would support

---

21. In order to provide the two townships of land to the Stockbridge–Munsee Tribe, on February 11, 1856, the United States entered into a treaty with the Menominee Tribe whereby the Menominee Tribe ceded and relinquished the two townships as a location for the Stockbridge–Munsee Tribe.

timbering, but was unsuited for agriculture.

By the late 1860's, three convergent forces were at work: 1) the Indian party; 2) the Citizen party; and 3) the lumber interests. The Indian party favored relocating to better land in Kansas, North Dakota or among the Oneida Tribe in Green Bay. The Citizen party favored a plan to generate income by cutting and marketing the pine timber on the reservation. Wisconsin's lumbering interests sought new sources for timber since the market for merchantable lumber remained strong and the lumber companies had logged the forests of Shawano County up to the lands of the Stockbridge–Munsee and the Menominee Indians. However, there were major obstacles. There was little land available for relocation because the Oneida Tribe refused to part with any of their land. Moreover, because the land had never been formally allotted to individual tribal members as called for under the 1856 treaty, the Office of Indian Affairs viewed the timber as held in common and refused to allow tribal members to log the timber.[22] Common ownership prevented individual tribal members from even clearing the timber for a homestead. Thus, with no means of income, tribe members suffered poverty, hunger and despair.

The Tribe continued to complain to Congress about conditions and submitted a petition to the Commissioner of Indian Affairs in November 1866, signed by members of both tribal factions. The petition recounted that the Tribe had repeatedly set forth their grievances "praying their Great Father for relief, and a new country furnished in some more hospitable climate." (Petition of November 19, 1866, at 1 [MD 56]). The petition stressed the

urgency of the situation and requested that they be granted a new Treaty whereby they could "be delivered from [their] present troubles" and "be brought into more congenial country." *Id.*

The Commissioner obliged the Tribe's request for a new treaty which was negotiated in 1867. By its express language, the Tribe agreed to cede and relinquish to the United States all title, right and interest in the two townships. The treaty, which would have ended the reservation, was not ratified by the Senate. In a draft treaty in 1868, the Tribe agreed to cede one and a half townships while retaining the south half of Red Springs for the Indian party. The draft treaty was never submitted for approval to the Tribe or to the Senate.

Following the failed effort to ratify the 1867 treaty, some 20 individuals, representing themselves as "parties to the treaty of 1856," urged Congress to approve the 1867 treaty with an amendment allowing the Citizens to opt for land "in lieu of money." (Letter of February 1, 1870, at 3 [MD 108]. Subsequently, two Indian party leaders urged passage of Senate Bill 610 which began the Act of 1871.

The debate on the bill in the House of Representatives showed interest in three specific areas: 1) the consent of the Stockbridge–Munsee Tribe; 2) the role of Congress in selling land outside the public domain; and 3) the manner in which the land was to be sold. During the debate, House members stated that the Tribe had consented to the sale of their lands under the Act and that Congress had not independently assumed authority to sell the land. Senate Bill 620 became law on February 6, 1871.

---

**22.** The OIA also opposed logging on the ground that it had a demoralizing effect on Indians.

The 1871 Act provided that "two townships of land set apart for the use of Stockbridge–Munsee tribe of Indians shall be advertised for sale ... and shall be offered at public auction" to the highest bidder in 80 acre lots for not less than the appraised value. ("Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin," Secs. 1–2, 16 Stats. 404 [MD 131–132] ). However, the Act authorized the Secretary of the Interior to reserve from sale lands "not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved, and are best adapted to agricultural purposes, subject to allotment to members of the Indian party of said tribe." *Id.* Sec. 2 (MD 132). All lands remaining unsold after one year were to be offered at public auction "at not less than the minimum of one dollar and twenty-five cents per acre" for cash only. *Id.* If any lands remained unsold, the Act provided that the government was to credit the Tribe at "sixty cents per acre." *Id.* Sec. 4 (MD 132).

The proceeds from the sale of the land were to be divided between the Indian and Citizen parties in proportion to their numbers, although the proceeds were to be allocated differently for members of the Indian party and members of the Citizen party. Proceeds belonging to the Citizen party were to be divided among the members on a per capita basis and paid out to the heads of families and adult members of that party. The sum belonging to the Indian party was to be credited to that party "on the books of the treasurer of the United States," and the interest applied to certain areas, including the support of schools, the purchase of agricultural implements, or paid in such other manner as the President might direct. *Id.* Sec. 5 (MD 133). Part of the proceeds due the Indian party could be used "for securing a new location for said Tribe" and in helping them to establish themselves in their new home. *Id.*

Recognizing the division among tribal members, the 1871 Act created two rolls, the Indian roll and the Citizen roll, for the "purpose of determining the persons who are members of said tribes and the future relation of each to the government of the United States." *Id.* Sec. 6 (MD 133). The Citizen roll included those tribal members who expressed their desire to sever their relations with the Tribe and to become citizens of the United States. After the members of the Citizen party received their proceeds, there was to be "a full surrender and relinquishment" of all their claims as tribal members and they and their descendants would be admitted to "all the rights and privileges of citizens of the United States." *Id.*

The Indian roll was comprised of tribal members who desired to retain their tribal character and "continue under the care and guardianship of the United States." *Id.* After the rolls had been made and returned, the Indian party would be known as the "Stockbridge tribe of Indians" and "may be located upon lands reserved" from sale or "such other reservation as may be procured for them with assent of the council of said tribe." *Id.* Sec. 7 (MD 133).

The Act also provided that "after a suitable and permanent reservation had been obtained and accepted by the tribe either at their present home or elsewhere," it was to be surveyed and subdivided by the Secretary of the Interior and "a just and fair allotment" made by the council of the Tribe "among the individuals and families composing said tribe." *Id.* Sec. 8 (MD 133–134). In addition to specifying the amount of land to be provided to adult tribal members, the Act provided that if a member of the Tribe died without heirs

capable if inheriting, "the land would revert to and become the common property of said tribe." *Id.* (MD 134). After a certified copy of the allotments made was returned to the Commissioner of Indian Affairs, the title of the lands "shall be held by the United States in trust for individuals and their heirs to whom the same were allotted." *Id.* Sec. 9 (MD 134).

The Act of 1871 does not make explicit reference to cession or otherwise state that the size of the Stockbridge–Munsee Reservation was diminished. The court also acknowledges that the limited legislative history does not provide significant guidance. However, after careful review and consideration of the positions of the parties and the United States in light of the applicable law and facts and circumstances of this case, the court concludes that Congress intended to diminish the size of the Stockbridge–Munsee Reservation to 18 contiguous sections when it passed the Act of 1871. The court has not reached this conclusion lightly, but has exhaustively examined the submissions of the parties and the United States, including the voluminous historical record, detailed briefs and the reports of the expert witnesses. Although it would have been easier to conclude that the lack of specific cession language in the 1871 Act alone compels the conclusion that the reservation was not diminished, Supreme Court case law mandates a more comprehensive analysis.

Thus, despite the lack of specific cession language in the text of the Act, the court concludes that its purpose, the events and circumstances surrounding the passage of the Act, and the historical context evidences a widely-held contemporaneous understanding that the reservation was diminished. Subsequent treatment of the reservation further supports this conclusion.

Unlike the surplus land acts which were designed to open land to white settlers and to encourage the assimilation and integration of the tribes into white society, the purpose of the 1871 Act was to provide economic benefit to the Tribe and to open lands to lumbering interests for the legal harvesting of timber. There is no indication that Congress' purpose in selling the 54 sections was to encourage non-Indians to settle among members of the Tribe to promote interaction between them or to encourage the Indians to adopt white ways. At that time, the Tribe had a long history of involvement with white settlers going back to the mid–18th century.

The Act also addressed the long standing conflict between the two tribal factions, the Indian party and the Citizen party, and treated them in different ways. Citizen party members would be paid their share of the proceeds for the opened land and would become citizens of the United States. After the payment of the proceeds, there was to be a "full surrender and relinquishment" of all their claims as members of the Tribe. *Id.* Sec. 6 (MD 133).

The Indian party, which would be known as the "Stockbridge tribe of Indians," could obtain either the 18 sections reserved from sale under section two of the Act or "such other reservation as may be procured for them." *Id.* Sec. 7 (MD 133). Thus, the fact that the 1871 Act provided that Indian party members could remain on the 18 sections of "such other reservation" indicates that the 18 sections constituted the reservation. Section eight of the Act provided for the allotment of the lands to be occupied by members of the Indian party "as soon as practicable after a suitable and permanent reservation shall be obtained and accepted by said tribe, either at their present home or elsewhere," *Id.* Sec. 8 (MD 133). The allotments were to

be made within one year after the reservation was made and accepted by the Tribe.

The defendants argue that sections seven, eight and nine are "admittedly confusing" and apparently were simply authorizing allotments to the Indian party whether members remained on the existing reservation or moved to a new reservation at a new location. (Defendants' Revised Brief at 10). They correctly point out that there is no statement that the existing reservation would be disestablished. The defendants also note that section eight of the Act does not explicitly state that the land reserved for the Indian party under section two would constitute a new reservation.

The United States contends that the provisions regarding possible relocation of the Tribe to another reservation do not constitute clear congressional intent to diminish the reservation. The United States posits several allegedly plausible interpretations of these provisions and takes issue with what it states is this court's interpretation.

The provisions of the 1871 Act must be read as a whole. Section two reserved 18 contiguous sections best suited to agricultural purposes from sale. This land was reserved for members of the Indian party. The language in the Act provided options for the tribe. The Indian party could be located on the lands reserved by section two or, if they chose, upon such other reservation as may be procured for them. Sections eight and nine provide for the allotment of lands to be occupied by the Indian party after a suitable and permanent reservation had been obtained and accepted by the Tribe.

The Act contemplated but one reservation, whether it was the 18 sections or some other reservation as might be procured for the Tribe with their consent. If the Tribe decided to move to a new loca-

tion, the reservation status of the two townships would have ceased because the Act clearly contemplated the establishment of but one reservation for the Tribe.

Although the defendants and the United States maintain that the Act did not specify payment of a set amount to the Tribe as compensation, the Act provided that the land, with the exception of the 18 sections, was to be sold at public auction for not less than the appraised value in lots not exceeding 80 acres each. The unsold lands would not be retained by the Tribe. Rather, the lands which remained unsold after one year were to be offered at public auction for not less than one dollar and twenty-five cents per acre. If any lands remained unsold after the last public sale, the value of the remaining lands at sixty cents per acre was to be included in the total amount due the Tribe from the United States. Thus, the Act provided for payment of a minimum definable sum to members of the Tribe.

The 1871 Act provided a clear distinction in the manner in which the two tribal factions were to be compensated for the opened lands. The proceeds payable to the Citizen party were to be divided equally on a per capita basis among the members and paid out to the heads of families and adult members of that party. In contrast, in *Solem*, the proceeds from the sale and disposition of the lands were to "be deposited in the Treasury of the United States, to the credit of the Indians belonging and having tribal rights on the reservation." 465 U.S. at 473, 104 S.Ct. 1161.

Similarly, in *Mattz*, 412 U.S. at 495, 93 S.Ct. 2245, the act at issue provided that "the proceeds arising from the sale of said lands shall constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands

and their children." In *Seymour*, 368 U.S. at 355, 82 S.Ct. 424, the Court found that the 1906 Act at issue did not diminish the Colville Indian Reservation in part because proceeds from the disposition of the land were to be "deposited in the Treasury of the United States to the credit" of the tribes. The Court observed that the act merely opened the way for non-Indian settlers to own land on the reservation in a way which the federal government, acting as guardian and trustee of the Indians, regarded as beneficial to the development of its wards.

The amount belonging to the Indian party, on the other hand, was to be credited to it "on the books of the treasurer of the United States." (An Act for the Relief of the Stockbridge and Munsee Tribe of Indians in the State of Wisconsin, Feb. 16, 1871, 16 Stat. 404, Sect. 5[133] ). Thus, there was a clear and distinct commitment from Congress to compensate the Tribe for its opened lands. Furthermore, unlike the situation in *Solem*, the operative language, when considered with the manner of distribution of the proceeds to the Citizen party, does not compel the conclusion that the Secretary of the Interior was acting as the Tribe's "sales agent." *See Solem*, 465 U.S. at 473, 104 S.Ct. 1161.

The defendants assert that the 1871 Act was not a project of the Office of Indian Affairs as would typically have been the case at the time and that there were no negotiations with the Tribe in connection with the Act. A review of the events leading up to the passage of the Act reveals that the Tribe had made its views known to the Office of Indian Affairs and had engaged in negotiations for a new treaty in the years immediately preceding passage of the 1871 Act.

In a petition submitted in November 1866 to the Commissioner of Indian Affairs signed by members of both the Citizen and Indian parties, the Tribe complained about the dire conditions on the reservation and requested a new treaty and new land in a more hospitable climate. The Commissioner granted the request and a draft treaty was negotiated and signed by tribal representatives and federal officials in February 1867. The treaty would have facilitated the breakup of the Tribe by allowing the members of the Citizen party to "cash out" their interest in the tribal estate and become citizens while members of the Indian party would have a new reservation purchased for them. The treaty, if it had been ratified, would have disestablished the existing reservation. A draft treaty the following year which provided for the cession of three-fourths of the reservation and the retention of 18 sections for the Indian party was never submitted to Congress or the Tribe.

Tribal members continued to contact Congress to urge their cause. In a February 1, 1870, letter, approximately 20 individuals representing themselves as "parties to the treaty of 1856" urged Congress to approve the 1867 treaty with an amendment that would allow the Citizen party to obtain land in lieu of money. Indian party leaders, Mr. Charles and Mr. Slingerland, advised the Chairman of the Senate Committee on Indian Affairs that they had been appointed delegates by the Tribe to represent the Tribe's wishes. They urged passage of Senate Bill 610 which became the Act of 1871. There is no evidence that members of Congress viewed Mr. Charles and Mr. Slingerland as anything but representatives of the Tribe. Moreover, the Commissioner of Indian Affairs apparently had stated in March 1870 that the identical prior bill met with his approval. Thus, the record shows that Congress had reason to believe the Tribe was aware of, and had significant input into, the terms and passage of the 1871 Act.

The defendants assert that no one involved in the 1871 Act paid any attention to its effect on jurisdiction or reservation boundaries. However, the surplus land acts seldom detailed whether opened lands retained reservation status or were divested of all Indian interests. *See Yankton Sioux Tribe*, 522 U.S. at 336–337, 118 S.Ct. 789 (Court concluded the reservation was diminished notwithstanding the fact that, during negotiations with the tribe, the future boundaries of the reservation were not discussed.); *see also, Solem*, 465 U.S. at 468, 104 S.Ct. 1161. "When the surplus land acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century." *Solem*, 465 U.S. at 468, 104 S.Ct. 1161.

The Court in *Solem* noted that the turn-of-the-century assumption was that Indian reservations were things of the past and that within a generation at most, Indian tribes "would enter traditional American society and the reservation system would cease to exist." *Id.* The Court explained: "Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation." *Id.* Therefore, the fact that the 1871 Act did not explicitly state whether or not the opened lands retained reservation status is not determinative and merely reflects the practice of the time.

The defendants contend that the "common understandings" relied upon by the plaintiff are illusory because the relationship between land title, citizen status, "reservation" and "Indian country" was confused during the allotment era (1887–1934). Thus, the defendants contend that the "common understandings" argument as presented by the plaintiff is inadmissible.

"Indian country" was defined by the act of June 30, 1834:

"Be it enacted, that all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisiana, or the Territory of Arkansas, and also that part of the United States east of the Mississippi River, and not within any State to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed Indian country."

*Bates v. Clark*, 95 U.S. 204, 205, 5 Otto 204, 24 L.Ed. 471 (1877) (quoting 4 Stat. 729). "Indian title" referenced in the definition was the aboriginal title of "those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man." *Worcester v. Georgia*, 31 U.S. 515, 544, 6 Pet. 515, 8 L.Ed. 483 (1832). Thus, "Indian title" did not include reservations on lands to which tribes had never held title, or lands patented to individual Indians in trust or fee.

With the passage of the Major Crimes Act in 1885, "reservation", rather than "Indian country," became the prominent jurisdictional concept. Thus, the defendants assert that Congress conflated the terms "reservation" and "Indian country". The defendants assert that, because of this conflation, contrary to the plaintiff's argument, there was not a clear "common understanding" that Indian title was a prerequisite to "reservation" status. The defendants further assert that although there was a link between reservation status and Indian title during the allotment era, the link was between Indian country and Indian title. Regardless of any confusion during the allotment era, there was a "common understanding of the time" that tribal ownership was "a critical component of reservation status." *See, e.g., Yankton*, 522 U.S. at 345, 118 S.Ct. 789.

In 1948, Congress redefined "Indian country" to include fee lands within reservations:

[T]he term "Indian country" ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

The defendant apparently asserts that the 1948 enactment of the definition of "Indian country" somehow restored the original reservation boundaries. The plaintiff, citing a decision of the Commissioner of the Department of the Interior, argues that the passage of 18 U.S.C. § 1151 did not alter reservation boundaries in any way. (Exh. 398). In 1952, the Minneapolis area office asked the Commissioner to clarify the legal status, under 18 U.S.C. § 1151, of 13,887 acres of FSA lands within the "former reservation." The Commissioner concluded that while the FSA lands would "probably" be considered Indian country, it was not within the "former reservation." Thus, 18 U.S.C. § 1151 clarified the jurisdictional status of land within the boundaries of existing reservations by providing that even fee-patented lands within a reservation constitute "Indian country".

Moreover, the change in the definition of "Indian country" in 1948 did not and could not alter the "common understandings" of Congress at the time it passed the Act of 1871 and the Act of 1906. See Yankton, 522 U.S. at 345–46, 118 S.Ct. 789 (applying the common understandings "of the time"1858 to 1894). Thus, the defendants' contention regarding use of the common understandings of the time is unpersuasive. Under Supreme Court precedent, "common understandings" is a component of diminishment analysis.

Although the defendants and the United States cite Solem as a yardstick for assessing whether the 1871 Act altered the boundaries of the two-township reservation, there are several important distinctions. The 1906 surplus land act in Solem authorized the Secretary of the Interior to "sell and dispose" of a portion of the reservations with the proceeds from the sale to be deposited in the treasury of the United States to the credit of the Indians having tribal rights on the reservation. In the instant case, the proceeds from the sale of the 54 sections were to be divided between the Citizen and Indian parties with the proceeds for the Citizen party to be divided equally among them and paid out on a per capita basis. Only the sum belonging to members of the Indian party was to be credited to it on the books of the treasury of the United States.

Neither act made specific reference to the cession of Indian interests in the opened lands. However, certain provisions in the act in Solem "strongly suggest[ed] that the unallotted opened lands would for the immediate future remain a[sic] integral part of the Cheyenne River Reservation." 465 U.S. at 474, 104 S.Ct. 1161. The Court pointed out that section one of the act authorized the Secretary of the Interior to set aside parts of the opened lands for agency, school and religious purposes and to remain so reserved "as long as agency, school or religious institutions are maintained thereon for the benefit of said Indians." Id. (citing 35 Stat. 461). The Court acknowledged that

it was "difficult to imagine why Congress would have reserved such lands for such purposes if it did not anticipate that the opened area would remain part of the reservation." 465 U.S. at 474, 104 S.Ct. 1161. The Court also noted that section two of the act provided further support for its position. Similar language is not found in the 1871 Act.

Moreover, unlike the instant case, the subsequent treatment of the Cheyenne River Reservation was "so rife with contradictions and inconsistencies as to be of no help to either side." *Id.* at 478, 104 S.Ct. 1161. Two years after the passage of the act at issue in *Solem*, Congress passed legislation to sell a part of the opened lands in the area it called the "surplus and unallotted lands in the Cheyenne River Indian Reservation," thereby suggesting that the opened land was still part of the reservation. *Id.* at 479, 104 S.Ct. 1161. Yet, some 12 years later, Congress passed a law which referred to the open lands as "the former" Cheyenne River Reservation. *Id.* Based upon these and other examples, the Court was left with the "distinct impression that subsequent Congresses had no clear view" as to whether or not the opened lands were still part of the reservation. *Id.*

In this case, the subsequent treatment of the reservation by government officials and Congress immediately following the passage of the 1871 Act, as well as historical documents, support the conclusion that Congress intended to diminish the size of the reservation. The treatment of the area by Congress in the years immediately following the opening of the lands has some evidentiary value, as does the way in which the Bureau of Indian Affairs and local judicial authorities deal with the opened lands. *Solem,* 465 U.S. at 471, 104 S.Ct. 1161.

After the Tribe informed the Secretary of the Interior that it had chosen to remain in Wisconsin and had selected as its permanent home the 18 continuous sections, the Secretary reserved the 18 sections from sale on August 4, 1871. In the annual report to Congress on November 1, 1872, the Commissioner of Indian Affairs reported with regard to the Tribe that "steps are now being taken to dispose of all of their reservation with the exception of eighteen sections ... which are reserved for their future use." (Report of the Commissioner of Indian Affairs, November 1, 1872, at 2 [MD 172] ). Although there are minor inconsistencies in some contemporaneous reports, the reports considered together support the conclusion that the reservation was diminished. In 1874, the government appropriated $7,081.80 to the credit of the Tribe for the 11,803 acres of unsold land. Given the purpose of the Act, the defendants' contention that Congress' omission of any mention of the reservation boundaries in this act suggests the reservation was not diminished is unpersuasive.

The defendants and the United States contend that the 1893 Act reaffirmed the 1856 treaty and reservation, citing the preamble to the 1893 Act. The preamble references the 1856 treaty in which the Tribe ceded certain lands to the United States and obtained "certain lands as a reservation to which said Indians removed, and upon which they have ever since resided." (Preamble, Act of March 3, 1893 [MD 276] ). The language must be read in the context of the overall provisions of the Act and surrounding circumstances.

The 1893 Act was the result of the still continuing conflict between the Indian party and the Citizen party, whose members had complained to Congress that they had been wrongfully separated from the Tribe by the Act of 1871. The Act addressed

inequities in the 1871 Act and provided for a new roll to restore those previously excluded. Under the Act, all members of the Tribe at the time of the 1856 Treaty and their descendants were deemed to be members of the "Stockbridge and Munsee tribe of Indians" and entitled to their pro-rata share in tribal funds and in the occupancy of the lands. The Act further provided that those who possessed lands under the allotments of the 1856 treaty and the 1871 Act and continued to reside on the land were owners of such lands in fee simple and patents were to be issued to them.

Prior to passage of the 1893 Act, Congress was well aware that the Tribe's reservation consisted of 18 sections. In 1892, John Adams, a Stockbridge tribal member and attorney, testified before Congress on behalf of the Citizen party. When he was asked how much land was in the Tribe's "present reservation," he replied that the Tribe had only 18 sections of land, or about 11,803 acres, with the balance of the land having been sold under the 1871 Act. (Hearing Testimony [MD 238] ). In addition, during the debate on what became the 1893 Act, Congressman Perkins described the reservation as "eighteen sections" and "a remnant of the reservation that was disposed of under the Act of 1871." (Congressional Record—House of February 19, 1891 [MD 221] ). During the course of the 1892 hearings on the Citizen and Indian bills, references also were made to a "little" and "18 section" reservation. Thus, based on the events surrounding the passage of the 1871 Act, and the subsequent understandings and treatment of the reservation, the language of the preamble does not compel the conclusion that the 1856 reservation remained intact.

Other contemporaneous documents reinforce this determination and describe the reservation as consisting of 18 sections. In his annual report for the year ended September 30, 1872, United States Indian Agent William T. Richardson reported that the "reservation of this tribe now contains about 11,500 acres ... the balance of their lands having been disposed of by act of Congress February 6, 1871." (Report of William T. Richardson, Indian Agent, United States Indian Department, Green Bay, Wisconsin, dated October 18, 1872 [MD 163] ).

The 1874 Annual Report of the Commissioner of Indian Affairs states that the "Stockbridges, with remnant of the Munsees, occupy a reservation of 11,520 acres." (1874 Annual Report of the Commissioner of Indian Affairs (ARCOIA), James W. Oberly, "The Stockbridge–Munsee Indian Reservation", 1856–2001, Volume II, List of Documents, Document No. 55);[23] see also, Annual Department of the Interior Descriptions of the Size of the Stockbridge–Munsee Reservation (MD 1038). The 1877, 1878 Annual Reports of the Commissioner of Indian Affairs list a reservation of 11,520 acres. Id. The 1883, 1884 and 1885 reports list a reservation of 11,803 acres. Id.

In 1886, the Annual Report of the Commissioner of Indian Affairs to Congress, which includes the report from the Green Bay Agency in Keshena, Wisconsin, states that the "Stockbridge and Munsee Reservation contains a little over a half township of land." Id. The Commissioner of Indian Affairs reported in 1887 that the "Stockbridge and Munsee reservation consists of 18 sections of land adjoining the Menomonee Reservation on the south and west".

23. Document 55 contains the Annual Reports of the Commissioner of Indian Affairs beginning with 1856 and ending in 1932.

*Id.* The 1889 report stated: "This tribe numbers 138 and occupy [sic] a reserve of 18 sections, or 11,520 acres." *Id.* Similar descriptions of the land comprising the Stockbridge–Munsee Reservation are included in the Annual Reports of the Department of the Interior to Congress in 1900, 1901, 1902, 1904, 1905, 1906. *Id.*

In addition to the annual reports, other documents reflect the diminished size of the reservations. In 1898, the Commissioner of Indian Affairs summarized to the Secretary of the Interior that, after establishment of the reservation in 1856, its area had changed under the provisions of the 1871 Act. He stated: "The total area of this reservation as diminished under the Act of 1871 is 11,520 acres." (Letter from W.A. Jones, Commissioner of Indian Affairs, to the Secretary of the Interior dated March 17, 1898 [MD 193]). A letter to the Indian agent in Keshena, Wisconsin, from the Acting Commissioner referred to the "diminished Stockbridge reservation." (October 9, 1897, letter to United States Indian Agent Thomas H. Savage, Esq., from the Acting Commissioner [MD 287]).

Other documents refer to the 18 contiguous sections of land set apart for the use of the Stockbridge–Munsee Indians as a reservation. (Letter from the Commissioner of Indian Affairs dated October 1, 1900, to the Commissioner of the General Land Office [MD 305]); (November 15, 1890, letter from W.A. Jones, Commissioner of Indian Affairs [MD 313]); (Letter of March 21, 1904, to the United States Attorney in Milwaukee, Wisconsin from the Commissioner of Indian Affairs [MD 448]). The available maps from the General Land office also describe the reservation as 11,520 acres, 18 sections or half a township, but the maps do not reflect any legal analysis of reservation boundaries and, therefore, are of little value in the court's analysis.

Moreover, in 1904, the United States Supreme Court in *Minnesota v. Hitchcock,* 185 U.S. 373, 398, 22 S.Ct. 650, 46 L.Ed. 954 (1902), found that "all Indian rights had ceased" in the 54 sections. The Court based its conclusion on its determination that the Indians had removed from the lands and had received other lands for their location.

In sum, based on the court's analysis of the relevant factors, the court concludes that Congress intended to diminish the Stockbridge–Munsee Reservation to 18 contiguous sections when it passed the act of 1871. The widely-held contemporaneous understanding was that the reservation was diminished.

■ The issue of whether the Act of 1906 disestablished the Stockbridge–Munsee Reservation must also be addressed. The 1906 Act does not contain specific cession language or other explicit language evidencing the surrender of tribal interests in the reservation. Admittedly, such language is most probative of congressional intent. However, notwithstanding the absence of such language, other events and circumstances surrounding the passage of the Act that unequivocally show a widely-held contemporaneous understanding that the reservation would be diminished or disestablished may support a finding of diminishment or disestablishment. *Yankton Sioux Tribe,* 522 U.S. at 351, 118 S.Ct. 789; *Solem,* 465 U.S. at 471, 104 S.Ct. 1161. Therefore, the provisions of the Act of 1906 and the events leading up to its passage will be reviewed.

■ Under the Act of 1893, all eligible tribal members were entitled to an allotment of land. A new census of the Tribe in 1894 showed the tribal membership to be over 500. As a result, there was insufficient land for all members of the Tribe to receive their proper allotments. In an

1895 Act, Congress provided for the distribution per capita of one half of the trust fund held for the Tribe by the United States when the allotments to the lands had been completed.

The Tribes continued to be frustrated with the delay in the settlement of their affairs. In a November 22, 1899 petition, the Tribe expressed its frustration, stating that they would accept "most anything to secure us in the right in the management of our own property and to be relieved from the protection and care of the government of the United States." (Petition dated November 22, 1899, reprinted in Senate Report 173, January 7, 1904, at 15–16 [MD 372]). As a result, the Commissioner of Indian Affairs instructed Inspector Cyrus Beede to meet with the Tribe and formulate some acceptable plan for an equitable settlement of their affairs with the government. The Commissioner wanted to allot the remaining lands of the reservation, although he acknowledged that there was insufficient land to make the allotments under the 1856 treaty.

The plan submitted by Inspector Beede was approved by a majority of the adult members of the Tribe in December 1900. The Tribe accepted the proposed plan of settlement "as a full and complete settlement of all obligations of the government, of whatever kind or nature, either express or implied" after the government had complied with the conditions set out in the plan. (Proposed Plan of Settlement with the Stockbridge–Munsee Tribe of Indians [MD 374]). Under the plan, the government could purchase land elsewhere to make the allotments since there was insufficient land on the reservation. According to the plan, funds to provide land to all tribal members would be paid by the United States. The plan specifically provided that the land reserved to the Tribe by the 1856 treaty which had not been sold or patented "shall be patented ... to such Indians." *Id.*

Senate Bill 335 was drafted to implement the plan. Congressional reports and correspondence described the origins and purpose of the legislation. A report to Congress in January 1901 stated that the "time has fully arrived when the affairs of this unfortunate people should be settled and their relations with the Government cease." (Letter from Commissioner W.A. Jones dated January 24, 1901, included in a Report to the House of Representatives, House Document No. 405 [MD 369]). The Chairman of the Senate Indian Affairs Committee received a tribal petition supporting the pending bill as "a complete settlement" of the Tribe's affairs. (April 24, 1902, letter from Secretary of the Interior E.A. Hitchcock [MD 328]).

A House Committee report on the legislation stated that the bill was "intended to adjust and finally settle all of the affairs of the Stockbridge and Munsee tribe of Indians ...[and that it] furnishes the best means possible for settling for all time the affairs of the tribe in question." (House Report No. 1420, Report submitted by the Committee on Indian Affairs to accompany S. 335, March 7, 1904 [MD 441–442]). The report also acknowledged that the bill carried out the plan of settlement "formulated in an agreement on December 8, 1900, which was signed by more than a majority of the male adult Indians." *Id.* at 441. A letter in March 1902 from Senator Joseph V. Quarles to Secretary Hitchcock stated that the bill will "furnish a means of adjusting satisfactorily and finally all existing differences among the members of the tribe in question, and will also relieve the Government from future expense and care of these Indians." (Letter of March 25, 1902, to the Secretary of the Interior [MD 336–338]).

Reports from the Department of the Interior were clear about the effect of the legislation. In an April 29, 1902, letter to Secretary Hitchcock, Acting Commissioner A.C. Tonner stated that the bill is identical in language with a draft plan submitted to the Department of the Interior on January 24, 1901, "which was designed and intended to adjust and settle all matters pertaining to the affairs of the Stockbridge and Munsee Tribe of Indians with the United States." (Letter of Acting Commissioner A.C. Tonner dated April 29, 1902 [MD 337]).

In a July 29, 1902, report, the Green Bay Indian Agency stated: "A bill is now before Congress which provides for a distribution of the tribal property and for a complete winding up of their tribal affairs. The plan of settlement upon which this bill is based was signed by more than a majority of the male adult members of the tribe.... The Stockbridge Indians are an intelligent and industrious tribe, and the Department has long since been satisfied that they have reached the stage where they should pass out of existence as a tribe and become citizens." (Report of Indian Agent D.H. George of the Green Bay Agency dated July 29, 1902 [MD 340]). On August 17, 1903, the agency again reported that the Stockbridge Indians "are anxiously waiting a division of their lands and a final adjustment of their tribal affairs ...." (Report of Indian Agent Shepard Freeman of the Green Bay Agency dated August 17, 1903 [MD 352]).

Other than the lingering dispute over enrollment, the only obstacle to passage of the bill was the source of the funds to pay tribal members for whom no land was available for allotment and patenting. Congress ultimately provided that the funds be paid out of the Tribe's consolidated fund held by the United States. With this change, Congress passed the bill which was largely based on the plan of settlement negotiated with the Tribe in 1900 by Inspector Beede.

The 1906 Act provided for the issuance of patents in fee simple for the Tribe. (34 Stat. 382 [MD 463–464]). Those members of the Tribe who had not yet received patents for land in their own right were to "be given allotments of land and patents therefor in fee simple." *Id.* (MD 463). Those individuals who did not receive their quota of land could receive additional land from other lands or receive $2.00 per acre in lieu of receiving an allotment. Because there was insufficient land "within the limits of the Stockbridge and Munsee Reservation to make the allotments" in the amount specified, the Secretary of the Interior was authorized to seek additional land and to negotiate with the Menominee Tribe for this purpose. (MD 463–464). It was "obligatory" for allottees either "to accept such selection as an allotment," or to cash out by accepting payment for their interest. *Id.*

The Act made clear that all the land within the reservation was subject to fee patents, and that upon allotment and patenting no trust land would remain. No tribal lands were restored to the public domain, nor did the Act reserve any land for school, agency or religious purposes. The next annual report in 1906 made by the Commissioner of Indian Affairs stated that with the enactment of the legislation it "is hoped that the affairs of these Indians can be settled and the government's supervision of them cease." (1906 Report of the Commissioner of Indian Affairs to Congress [MD 475]).

Following passage of the Act, allotment selections for those tribal members receiving allotments in fee simple in the remaining acres of the 18 sections were sent to the Office of Indian Affairs. The Secretary of the Interior approved the allot-

ments and on April 4, 1910, patents were issued to tribal members. However, over 400 tribal members who did not receive land in 1910 had to wait three more years to receive a no-land payment of $2.00 per acre.

Based on a detailed analysis of the provisions of the Act of 1906, the tenor of the legislative reports presented to Congress and the events surrounding the Act's passage, the court concludes that Congress intended to disestablish the Stockbridge–Munsee Reservation when it passed the 1906 Act. The historical context and subsequent treatment of the Act by government officials and Congress also support this conclusion.

The court's conclusion is grounded upon consideration of the relevant factors set forth by the Supreme Court, not simply on the fact that the issuance of fee patents disestablished the reservation. Rather, the evidence derived from the circumstances surrounding the passage of the Act, including its origins and the tenor of legislative reports, revealed a widely-held contemporaneous understanding that the reservation would be disestablished as a result of the Act. *See Solem,* 465 U.S. at 471, 104 S.Ct. 1161.

The understanding that implementation of the Act would end federal supervision continued. Shortly after the issuance of the patents in April 1910, Chief Clerk C.F. Hauke of the Office of Indian Affairs responded to a letter from a tribal member inquiring about the effect of the patents on the legal status of tribal members and whether the lands were taxable. Chief Clerk Hauke responded:

> All restrictions and control of the United States having been relinquished by the issuance of patents in fee simple, the lands are taxable the same as are lands of all other residents of the State of Wisconsin. Indians receiving patents in fee simple are citizens of the State or Territory wherein they reside.

(Letter from Chief Clerk C.F. Hauke To Phillip Tousey, Esq., Gresham, Wisconsin dated June 9, 1910 [MD 499]).

The defendants dispute the significance of the Hauke letter noting that it says nothing about the disestablishment of the reservation. Rather, the defendants stress the significance of the letter from Assistant Commissioner of Indian Affairs F.H. Abbott in 1911. The letter was a response to a letter from the United States Attorney in Wisconsin inquiring whether the Stockbridge–Munsee Reservation was still a reservation and seeking guidance with regard to a criminal prosecution of Nelson Gardner. Assistant Commissioner Abbott, citing relevant Supreme Court decisions opined that "it would appear that the Stockbridge and Munsee Reservation although allotted ... remains intact, because it has not (a) been opened by act of Congress, and (b) the limits thereof have not been changed by administrative action." (Letter of January 24, 1911, from Assistant Commissioner of Indian Affairs F.H. Abbott to United States Attorney E.J. Henning at 7–8 [MD 533–534]). He concluded that "it would be of great importance to have the question of jurisdiction in criminal cases in the State of Wisconsin decided by the federal courts." *Id.* [MD 536].

The court addressed the issue in *United States v. Gardner,* 189 F. 690, 695 (E.D.Wis.1911). The court ruled that at the time the crime allegedly was committed, no fee patents had yet been issued to tribal members. Therefore, the court concluded that during the time between the passage of the 1906 Act and the issuance of patents in 1910, the site of the crime was still within federal jurisdiction. The court also opined that after the allotments had been approved or the patents actually

issued, the reservation would cease. The court noted that, according to the government, the Department of Interior, through its Indian Office, maintained that the lands occupied by the Tribe constituted a reservation "up to the time the last remnant of land was distributed and conveyed." *Id.* at 694.

The court again addressed the issue four years later in *United States v. Anderson*, 225 F. 825 (E.D.Wis.1915). In that case, the court found that the Stockbridge–Munsee Reservation, "created by treaty and congressional acts, has been dissolved through the patenting in fee simple of the lands comprising the same to the members of the tribe, pursuant to [the 1906] Act." *Id.* at 825.

The defendants point out that the federal government continued to provide services to the Tribe after 1910, including resolving financial claims against tribal funds held by the United States, running a government school for tribal children, promoting public health and enforcing liquor laws. During this time, however, the Bureau of Indian Affairs did not require the presence of a reservation in order to provide services to Indians or exert jurisdiction over them.

With respect to the liquor laws, during the 1920s and 1930s, federal prohibition laws applied to all persons in the United States. Liquor problems in the town of Red Springs, specifically at Morgan Siding which was situated within the 18 sections, received a good deal of attention from law enforcement in the 1920s. The BIA Superintendent sought help from the deputy prohibition administrator in the problem area identified as the "territory adjacent to the Menominee Reservation." (Letter of February 8, 1928, from Superintendent W.R. Beyer, Keshene Indian Agency to Deputy Prohibition Administrator Frank Cunningham [MD 644] ). Because the jurisdiction of the federal liquor agent assigned to the Menominee Reservation was "only within the limits of the reservation," it was necessary to obtain the assistance of the prohibition office. *Id.* Requests for assistance, including a request to the Wisconsin governor in 1929, were premised on the fact that the State had jurisdiction outside reservations, but not within them.

When apparently in frustration, the chief special officer at the Keshena Indian Agency suggested addressing the problem by having Congress declare all land in the town of Red Springs 'Indian country' with regard to liquor issues, Acting Commissioner of Indian Affairs John Collier promptly responded:

> There is no tribal unallotted land in Wisconsin belonging to this tribe. All lands allotted to them have been patented in fee, hence none of this reservation is now held in trust. These lands are not located within the exterior boundaries of any existing Indian reservation. In view of the above circumstances, this land has lost its character as "Indian country" and we would not be justified in attempting to secure legislation extending or restoring the Indian liquor laws to this territory.

(Letter from Acting Commissioner John Collier to Chief Special Officer Louis Mueller dated November 20, 1933 [MD 669] ). Collier, who became the Commissioner of Indian Affairs in 1933, was a strong advocate of Indian rights and the original architect of the Indian Reorganization Act. The purpose of IRA was to stop allotments and further loss of Indian lands and to provide tribes with a means to reorganize their governmental and economic structures.

In 1935, shortly after the passage of the IRA, the Stockbridge–Munsee Tribe filed an application to be reorganized and submitted a draft constitution. In the draft

constitution the Tribe asserted that its territory and jurisdiction extended to the two-township reservation created in 1856. However, the Tribe was promptly disabused of this contention.

A memorandum from the Department of the Interior referencing a review of a Tribe member's letter on its proposed constitution stated:

The first numbered paragraph assumes that there is a reservation for these Indians. Information received from your Land Division indicates that this is not the case, that there is no tribal land or individual restricted land left of the original reservation.

This paragraph should, therefore, be corrected, and further plans for organization should be correlated with some plan for acquiring land and setting up a reservation status for these Indians. It is noted that various provision of the proposed Constitution assume the existence of a reservation.

(Memorandum of February 1, 1936, from the Board of Appeals for the Solicitor, Department of the Interior, to the Assistant Commissioner of Indian Affairs [MD 707]).

The Office of Indian Affairs rejected the Tribe's application to be reorganized under the IRA because officials concluded that, under the IRA, the existence of tribal land or individual-restricted land was a prerequisite to reorganization. (Letter of June 9, 1936, from Assistant Commissioner William Zimmerman, Jr., to Carl Miller, Secretary of the Society of the Mohicans in Gresham, Wisconsin [MD 709]). In rejecting the Tribe's application, the Assistant Commissioner stated that "plans for organization should be correlated with the plan for acquiring land and setting up a reservation status for these Indians." *Id.*

On March 19, 1937, the Acting Secretary of the Interior, acting pursuant to the IRA, acquired approximately 1,049.88 acres of lands within the confines of the original reservation for the Stockbridge–Munsee Tribe. The lands were placed in trust and the Acting Secretary decreed that the lands "are hereby proclaimed to be an Indian reservation." (Proclamation Setting Aside Land for Reservation for Stockbridge and Munsee Band of Mohican Indians dated March 19, 1937 [MD 731]).

A revised constitution and by-laws prepared by the Stockbridge Business Committee was submitted to the Commissioner of Indian Affairs on July 1937. The territorial clause of the revised constitution stated: "The jurisdiction of the Stockbridge Munsee Community shall extend to all lands purchased, now or hereafter, by the United States for the use of members of the said community." (Constitution and By–Laws of the Stockbridge Munsee Community received by the Office of Indian Affairs on July 8, 1937, Art. II [MD 735]).

The defendants state that this reflects the Tribe's understanding of its reservation boundaries. Other documents from tribal members reflect a contrary view. Nonetheless, even assuming that this was the Tribe's understanding, the Tribe received notification that its understanding was in error. Kenneth Meiklejohn, Assistant Solicitor in the Interior Department, reviewed the proposed constitution and memorialized his comments in a memorandum. He stated: "Organization of the Stockbridge and Munsee Band of Mohican Indians was originally held up, despite the fact that it constitutes a recognized tribe, because the Band had no reservation land." (Memorandum of Assistant Solicitor Kenneth Mieklejohn to "Indian Organization" [MD 744]). However, he noted that the situation was rectified on March 19, 1937, when certain land was purchased for the Tribe under the IRA and the Secretary of the Interior proclaimed a reser-

vation for the Tribe. "The original obstacle to the Band's organization has thus been removed." *Id.*

The defendants maintain that Assistant Solicitor Meiklejohn's statement that the Stockbridge–Munsee "constitutes a recognized tribe" contradicts the plaintiff's thesis that the Tribe was dissolved when fee simple patents were issued to tribal members in 1910. The issue is whether the Stockbridge–Munsee Reservation, not the Tribe, was disestablished. The Act of 1906 is devoid of an indication that Congress intended to dissolve the Stockbridge and Munsee as a Tribe. Regardless, the Meiklejohn memorandum clearly states that the Tribe had no reservation land until land was purchased for them under the IRA and the Secretary of the Interior proclaimed a reservation for them.

The view that the Tribe had no reservation land until the purchase of land for them under the IRA is further supported by subsequent events. Some eleven years after land was initially obtained for the Tribe under the IRA, a second proclamation by the Secretary of the Interior in 1948 added approximately 1,200 acres to the 1937 proclamation lands. The proclamation stated that the 1200 acres "are hereby added to and made a part of the existing reservation established March 19, 1937." (Proclamation of December 7, 1948 [MD 799]). The proclamation clearly expressed that the reservation previously was limited to lands proclaimed a reservation in 1937.

By an Act passed in 1972, Congress declared that approximately 13,077 acres of land purchased for the Tribe in 1933 under the Farm Security Act "shall be a part of the reservation heretofore established for this community." (Act of October 9, 1972 [MD 885]). A letter to Congress from the Office of the Secretary of the Interior supporting the bill noted that the submarginal lands in question were located "within the former reservation." (Letter from the Office of the Secretary, Department of the Interior, to Spiro Agnew, President, United States Senate, dated March 1, 1971, and appended to Senate Report 92–822, at 5, 6 [MD 866]). The fact that this land was within the two townships supports the conclusion that the reservation was disestablished. There would have been no need to add the lands if Congress had believed that the two-township reservation was still intact.

Following the passage of the 1972 Act, Tribal Chairman Leonard Miller requested BIA assistance in clarifying reservation boundaries for purposes of posting against trespassers. In response, Kenneth Payton, Deputy Commissioner of Indian Affairs, opined that the reservation had survived the implementation of the 1906 Act. His conclusion was based upon his "cursory review" of the record, which "reveals that the United States continued in fact to provide certain trust services for the subject tribe and did acknowledge the existence of a reservation subsequent to the 1906 Act and prior to the 1934 Indian Reorganization Act." (Letter from Kenneth Payton, Deputy Commissioner of Indian Affairs dated April 5, 1974, to Mr. Miller [MD 891]).

This conclusion is contrary to the position of the Department of the Interior which acknowledged that the Tribe was without a reservation at the time of the IRA. Moreover, in 1981, the Secretary of the Interior approved a quit claim deed conveying property within Red Springs located within the boundaries of the original Stockbridge–Munsee Reservation to the United States in trust for the Menominee Indian Tribe. (Quit Claim Deed dated December 28, 1981[MD 920]). Such action further supports the conclusion that the remaining portion of the Stockbridge–

Munsee Reservation had been disestablished by the Act of 1906.

According to The Payton letter, this land was within the Stockbridge Munsee Reservation. A question was raised as to whether the conveyance could be approved. In response, the Office of the Field Solicitor, Department of the Interior, discounted the Payton letter. Field Solicitor Mark Anderson concluded that "Supreme Court decisions subsequent to 1974 cast serious doubts on the validity of [Payton's] conclusion that the two township boundaries continue to exist." (Letter of December 30, 1981, from Mark A. Anderson, Office of the Field Solicitor to Abe Zuni, Acting Area Director, Minneapolis Area Office [MD 940–941]).

With respect to cartographic evidence, the record is mixed. Generally, maps after 1878 and before 1910 depict an 18 section reservation and maps from 1910 to 1931 show no reservation. Throughout the period 1870–1948, it was the practice of the Office of Indian Affairs to report as reservation acreage the lands that continued to be held in trust for an Indian Tribe. As the lands were sold, the Office of Indian Affairs automatically reduced the acreage indicated in the reports without regard to any action by Congress. Therefore, the cartographic evidence has limited value.

The demographics of the reservation are also a matter for the court's consideration. Although it bears little relation to Congressional intent, demographics can support a finding of diminishment based on practical realities. *Solem*, 465 U.S. at 471, 104 S.Ct. 1161. A review of the demographic evidence shows that between 1856 and 1910, the population of the townships of Bartelme and Red Springs was almost entirely Indian. However, by 1920, according to Dr. Oberly, a large white settlement came into the new Town of Red Springs and this continued up until 1940.

In 1990, the population was 55 percent Indian and 45 percent white. By the year 2000, the Indian population was 63 percent. Although the demographic evidence shows that the Indian character of the 1856 reservation has remained strong, in light of the other substantial evidence in the record, the demographic evidence is insufficient to support a finding that the reservation was not disestablished.

In sum, the parties have presented well-crafted and researched briefs to the court, along with their detailed documentary support. The United States' amicus brief was of the same caliber and likewise aided the court in its analysis of the important issues in this case. After an exhaustive review of the briefs and evidentiary submissions of the parties and the United States, including the detailed reports and documentation provided by the expert witnesses, the court concludes that the Act of 1871 diminished the two-township Stockbridge–Munsee Reservation to 18 contiguous sections. The court further concludes, based on its review, that the Act of 1906 disestablished the Stockbridge–Munsee Reservation. Accordingly, the defendants' motion for summary will be denied. The court will enter summary judgment in favor of the plaintiff.

The defendants have also filed a counterclaim seeking a declaratory judgment that the 1856 boundaries of the reservation remain intact and an injunction barring the State from imposing income tax on tribal members residing within those borders with respect to income earned on the reservation. In light of the court's conclusion that the Act of 1871 diminished the Stockbridge–Munsee Reservation and that the Act of 1906 disestablished the reservation the defendants' counterclaim will be dismissed.

## CONCLUSION

**NOW, THEREFORE, IT IS OR-DERED** that the defendants' motion for summary judgement be and hereby is **denied.** (Docket # 100).

**IT IS FURTHER ORDERED** that summary judgment be and hereby is **granted** in favor of the plaintiff.

**IT IS ALSO ORDERED** that the defendants' counterclaim be and hereby is **dismissed.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.